**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| and | ) ) | |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) ) | |
| Plaintiff-Intervenor, | ) ) | PUBLIC DOCUMENT |
| v. | ) ) | Court No. 22-00190 |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS
FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:
CHRISTOPHER KIMURA
Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.
Telephone:  (202) 482-0131


January 9, 2023

KELLY M. GEDDES
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 307-2867
Facsimile: (202) 305-2062
Email: kelly.geddes2@usdoj.gov

*Attorneys for Defendant*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____
                                        )
JIANGSU SENMAO BAMBOO AND WOOD          )
INDUSTRY CO., LTD.,                     )
                                        )
              Plaintiff,                )
                                        )
        and                             )
                                        )
LUMBER LIQUIDATORS SERVICES, LLC,       )
                                        )
              Plaintiff-Intervenor,     )
                                        )
        v.                              )         Court No. 22-00190
                                        )
UNITED STATES,                          )
                                        )
              Defendant,                )
                                        )
        and                             )
                                        )
AMERICAN MANUFACTURERS OF               )
MULTILAYERED WOOD FLOORING,             )
                                        )
              Defendant-Intervenor.     )
_____ )

<u>ORDER</u>

Upon consideration of plaintiffs' Rule 56.2 motion for judgment on the agency record,

defendant's response, plaintiffs' reply, and all other pertinent papers, it is hereby

        ORDERED that plaintiffs' motion is denied, and it is further

        ORDERED that the final results of the United States Department of Commerce are

sustained in their entirety, and it is further

        ORDERED that final judgment shall enter in favor of the United States.


Dated: _____        _____
                                                Judge

## <u>TABLE OF CONTENTS</u>

STATEMENT PURSUANT TO RULE 56.2 ...................................................................2

    I.    Administrative Determination Under Review ................................................ 2

    II.   Statement Of The Issues ............................................................................... 2

STATEMENT OF FACTS ...........................................................................................3

    I.    Preliminary Results ...................................................................................... 3

    II.   Final Results ................................................................................................. 7

SUMMARY OF THE ARGUMENT ...........................................................................10

ARGUMENT ..............................................................................................................12

    I.    Standard Of Review ................................................................................... 12

    II.   Commerce's Valuing Of Senmao's Log Inputs Using Surrogate Value Data From Malaysia, Rather Than Data From The Primary Surrogate Country, Is Supported By Substantial Evidence And In Accordance With Law ................................................. 14

        A.    Commerce Reasonably Found The Malaysian Log Input Data To Be The Best Available Information ...................................................................... 15

        B.    Lumber Liquidators Waived Its Argument That The Malaysian Data Were Aberrational, And The Argument Is Meritless ............................................... 18

    III.  Commerce's Revising Of The Brazilian Surrogate Value Data For Plywood Is Supported By Substantial Evidence And In Accordance With Law ........................ 20

    IV.  Commerce's Selection Of Brazil As The Primary Surrogate Country While Also Rejecting The Brazilian Log Data and Adjusting The Brazilian Plywood Data, Is Supported By Substantial Evidence And In Accordance With Law ........................ 23

    V.   Commerce's Calculation Of The Surrogate Financial Ratios Is Supported By Substantial Evidence And In Accordance With Law ................................................. 25

        C.    Commerce Reasonably Included "Transport Expenses" In Manufacturing Overhead ...................................................................................................... 26

        D.    Commerce Reasonably Declined To Offset Financial Expenses With Investment Income ....................................................................................... 28

    VI.  Commerce's Denial Of A By-Product Offset for Wood Scrap for Senmao Is Supported By Substantial Evidence And In Accordance With Law ........................ 31

CONCLUSION ...........................................................................................................35

i

## **TABLE OF AUTHORITIES**

### **Cases**

*Am. Tubular Prods., LLC. v. United States*, 847 F.3d 1354 (Fed. Cir. 2017) ........................ 10, 34

*Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241 (Ct. Int'l Trade 2021).............. 24

*Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908 (Fed. Cir. 2017)........ 18, 19

*Calgon Carbon Corp. v. United States*, 145 F. Supp. 3d 1312 (Ct. Int'l Trade 2016) ........... 15, 16

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................................. 12

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ................................... 18

*CP Kelco US, Inc. v. United States*, Slip op. 15-27, 2015 Ct. Intl. Trade LEXIS 31 (2015) ....... 31

*Daewoo Electronics Co., Ltd. v. United States,* 6 F.3d 1511 (Fed. Cir. 1993)............................ 13

*Diamond Sawblades Mfrs.' Coal. v. United States*, 219 F. Supp 3d 1368 (Ct. Int'l Trade 2017) 24

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369 (Fed. Cir. 2015) ....................... 25

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996) ........................................ 12, 13

*Guangdong Chemicals Imp. & Exp. v. United States*, 30 C.I.T. 1412 (2006)............................. 13

*Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289 (Fed. Cir. 2014) ............................... 14

*Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018)... 31, 34

*JBF RAK LLC v. United States*, 790 F.3d 1358 (Fed. Cir. 2015) .................................................. 12

*Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014)............. 15

*Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016)................... 14, 15, 24

*Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442 (Fed. Cir. 1994)............................ 13, 22

*Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268 (Ct. Int'l Trade 2002)........... 19

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)............................ 12

*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530 (Fed. Cir. 2019) .................... 25

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ........................ 12

*Mittal Steel Point Lisas, Ltd. v. United States*, 548 F.3d 1375 (Fed. Cir. 2008) ........................ 19

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016).................................... 20

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ............................ 4, 14

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006).......................................... 12

*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010)........................ 28

*Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353 (Ct. Int'l Trade 2011)..... 15

*Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011).... 15, 31, 33

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)...................... 33

*Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ................................................................................................. 13, 22

*Shandong Huarong Mach. Co. v. United States*, No. 03-00676, 2005 Ct. Int'l Trade LEXIS 57 (Ct. Int'l Trade 2005)........................................................................................................ 31, 33

*Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341 (Ct. Int'l Trade 2018) ................ 21

*U.S. Steel Grp. v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) ................................................. 12

*United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33 (1952) ........................................... 19

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................. 12

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573 (Fed. Cir. 1993) ........................................ 33

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011).......... 13, 24

**Statutes**

19 U.S.C. § 1516a ......................................................................................................................... 12

19 U.S.C. § 1673 ............................................................................................................................. 3

19 U.S.C. § 1677b ................................................................................................................. passim

19 U.S.C. § 1677m................................................................................................................. 32, 34

28 U.S.C. § 2637 ........................................................................................................................... 18

**Regulations**

19 C.F.R. § 351.401 ...................................................................................................................... 33

19 C.F.R. § 351.408 ................................................................................................................... 5, 15

**Administrative Determinations**

*Alloy and Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8,821 (Dep't of Commerce Feb. 18, 2020), and accompanying IDM ........................................................................................ 22

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 70,163 (Dep't of Commerce Nov. 25, 2014), and accompanying IDM ........................................................................................ 28

*Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 7,532 (Dep't of Commerce Jan. 29, 2021), and accompanying IDM ........................................................................................ 21

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020), and accompanying IDM ........................................................................... 33

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 Fed. Reg. 14,495 (Dep't of Commerce March 12, 2012), and accompanying IDM ........... 28, 29

*Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of the First Administrative Review of the Antidumping Duty Order*, 76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011), and accompanying IDM ........................................................... 29, 30

*Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (Dep't of Commerce May, 5, 2014), and accompanying IDM ......................................................................................... 28

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results and Partial Rescission of Review*; 2019-2020, 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022), and accompanying IDM ....................................... 33

*Valuation in Single Country*, 61 Fed. Reg. 7,308, 7,345 (Dep't of Commerce 1996) ................. 15

*Wood Mouldings and Millwork Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (Dep't of Commerce Jan. 4, 2021), and accompanying IDM ................................................................ 30

**Other Authorities**

Import Admin. Policy Bulletin No. 04.1: Non-Market Economy Surrogate Country Selection Process (Dep't of Commerce Mar. 1, 2004) (Policy Bulletin 04.1), available at http://enforcement.trade.gov/policy/bull04-1.html.......................................................... 4, 16, 24

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | )   Court No. 22-00190 |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S AND PLAINTIFF-INTERVENOR'S MOTIONS
FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Defendant, the United States, respectfully responds in opposition to the motions for

judgment upon the administrative record filed by plaintiff Jiangsu Senmao Bamboo and Wood

Industry Co., Ltd. (Senmao) and plaintiff-intervenor Lumber Liquidators Services, LLC (Lumber

Liquidators), challenging the final results of the Department of Commerce's ninth administrative

review of the antidumping duty order covering multilayered wood flooring from the People's

Republic of China (China).  The Court should deny the motion because the final results are supported by substantial evidence and are otherwise in accordance with law.

**STATEMENT PURSUANT TO RULE 56.2**

**I.**     **Administrative Determination Under Review**

    The administrative determination under review is *Multilayered Wood Flooring From the People's Republic of China*, 87 Fed. Reg. 39,464 (Dep't of Commerce July 1, 2022) (*Final Results*) (P.R. 252), and accompanying Issues and Decision Memorandum (IDM) (P.R. 245), covering the period of review from December 1, 2019 through November 30, 2020.[1]

**II.**    **Statement Of The Issues**

    1.     Whether Commerce's valuing of Senmao's log inputs using surrogate value data from Malaysia, rather than data from the primary surrogate country of Brazil, is supported by substantial evidence and in accordance with law.

    2.     Whether Commerce's revising of the Brazilian surrogate value data for plywood is supported by substantial evidence and in accordance with law.

    3.     Whether Commerce's selection of Brazil as the primary surrogate country, while also rejecting the Brazilian log data and adjusting the Brazilian plywood data, is supported by substantial evidence and in accordance with law.

    4.     Whether Commerce's calculation of the surrogate financial ratios is supported by substantial evidence and in accordance with law.

    2.   Whether Commerce's denial of a by-product offset for wood scrap for Senmao is supported by substantial evidence and in accordance with law.

---

[1] "P.R. and "C.R." refer to documents in the public and confidential records, respectively.

## STATEMENT OF FACTS

On February 4, 2021, Commerce initiated the ninth administrative review of the antidumping duty order on multilayered wood flooring from China, covering the period of review from December 1, 2019, through November 30, 2020.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166, 8,169 (Dep't of Commerce February 4, 2021) (P.R. 12).  Commerce found that it was not practicable to fully examine each of the 95 companies for which Commerce initiated an administrative review and selected Senmao as one of two mandatory respondents accounting for the largest volume of exports during the period of review.  *See* Respondent Selection Memo (P.R. 112, C.R. 21).  On May 3, 2021, petitioners and the other mandatory respondent submitted timely withdrawals of their requests for review of the other mandatory respondent, leaving Senmao as the sole mandatory respondent subject to the review.  *See* Withdrawal of Review Requests (P.R. 146, P.R. 147).

## I.      **Preliminary Results**

On December 27, 2021, Commerce published its preliminary results of the review, in which it preliminarily determined that multilayered wood flooring from China had not been sold in the United States at less-than-fair value during the period of review.  *See Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 73,252 (Dep't of Commerce Dec. 27, 2021) (*Preliminary Results*) (P.R. 219), and the accompanying Preliminary Decision Memorandum (Dec. 20, 2021) (PDM) (P.R. 213).

To make this determination, Commerce calculated the applicable antidumping duty by determining the amount by which the "normal value" of the subject merchandise exceeded its "export price (or the constructed export price)."  19 U.S.C. § 1673.  If the merchandise is produced in a market economy country, Commerce calculates the normal value of the

merchandise using available data from the respondent company.  However, Commerce considers

China to be a nonmarket economy country.  Accordingly, Commerce was required to determine

the normal value of the subject merchandise by relying on the best available information from a

surrogate market economy country or countries.  19 U.S.C. § 1677b(c).  Commerce used data

from those surrogate countries to derive surrogate valuations for the respondent's factors of

production, including raw materials, labor, and utilities, as well as factory overhead, profit, and

selling, general, and administrative expenses.  This statutory scheme allows Commerce to

"construct a hypothetical market value" of the subject merchandise in the nonmarket economy.

*See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

The statute requires that Commerce use, "to the extent possible," surrogate factors from

"one or more market economy countries that are at a level of economic development comparable

to that of the nonmarket economy country, and significant producers of comparable

merchandise." *Id.*; 19 U.S.C. § 1677b(c)(4)(A)-(B).  If more than one market economy country

is economically comparable and a significant producer of comparable merchandise, then

Commerce evaluates and compares the reliability and completeness of the record data from those

countries.  Import Admin. Policy Bulletin No. 04.1: Non-Market Economy Surrogate Country

Selection Process (Dep't of Commerce Mar. 1, 2004) (Policy Bulletin 04.1), available at

http://enforcement.trade.gov/policy/bull04-1.html.  Commerce gives interested parties an

opportunity to submit comments and information on its selection of a surrogate market economy

country.  *See* Request for Surrogate Country and Value Comments (P.R. 153).

Consistent with this practice, Commerce compiled a list of six countries it determined to

be at the same level of economic development as China, determined which of those countries

produce comparable merchandise and are significant producers of that merchandise, and

evaluated the availability and reliability of record data of those countries.  *See* PDM at 14-15; *see also* Preliminary Surrogate Value Memo (P.R. 210).

In the preliminary results, Commerce determined that Romania, Russia, Malaysia, Turkey, Mexico, and Brazil were all at the same level of economic development as China.  PDM at 15.  Second, Commerce found that all countries except Mexico were significant producers of comparable merchandise.  *Id.*  Third, Commerce found Brazil and Malaysia both had generally available and public data that were contemporaneous with the period of review, representative of broad market averages, tax- and duty-inclusive, and specific to the inputs being valued.  *Id*. at 17.

Commerce selected Brazil as the primary surrogate country.  *Id.*  Commerce chose Brazil because Commerce found that the surrogate financial statements from Brazil were better than available financial statements from Malaysia.  *Id.*  Commerce uses surrogate financial statements to approximate the general expense and profit ratios for producers of the subject merchandise.  19 C.F.R. § 351.408(c)(4).  In this case, parties submitted financial statements for two Brazilian companies, Duratex and Eucatex, as well as a Malaysian company, Focus Lumber.  IDM at 17.

Commerce found Eucatex's financial statement to be unreliable because Eucatex received a qualified opinion from its auditors.  *Id*.  However, it found Duratex to be a better surrogate than Focus Lumber because Duratex produces laminate flooring, a product comparable to the merchandise under review, and because the financial statement provided for Duratex was contemporaneous with the period of review.  *Id.*  Focus Lumber, by contrast, is a producer of plywood, veneer, and laminated veneer lumber, and no party provided a financial statement for Focus Lumber that was contemporaneous with the period of review.  *Id.*  *See also* Petitioner Surrogate Value Comments – Part 2 at Exhibit 10B (P.R. 180).

Because Commerce selected Brazil as the primary surrogate country, Commerce used data from Brazil, where available, to value Senmao's factors of production and construct a normal value for the subject merchandise.  However, based on record evidence, Commerce preliminarily determined that Brazilian data were not available or reliable for valuing Senmao's log inputs.  Senmao used both oak and non-oak logs as inputs.  *See* Preliminary Surrogate Value Memo at 2; IDM at 18.  The Harmonized Tariff Schedule (HTS) includes a heading specific to oak logs as well as a more general log heading.  *See* IDM at 18, 22 (discussing heading 4403.91.1000, which covers oak wood in the rough, and heading 4403.99.00, which covers other wood in the rough).  However, no data for the oak-specific heading were submitted for Brazil, and Commerce could not determine from the record whether Brazil's data for the more general log heading included oak or were specific to non-oak species.  IDM at 22.  By contrast, the record included Malaysian data for both the oak-specific heading and the more general heading, and the record made clear that the general heading was limited to non-oak data.  *Id.* Accordingly, Commerce preliminarily chose to value Senmao's log inputs using the more product-specific data from Malaysia.  Preliminary Surrogate Value Memo at 2.

Commerce declined to provide Senmao a by-product offset for wood scrap generated through wood flooring production because Senmao reported in its questionnaire response that it did not track the quantity of the wood scrap generated during the period of review and only recorded the quantity of wood scrap sold.  PDM at 25.

Interested parties, including Senmao, Lumber Liquidators, and American Manufacturers of Multilayered Wood Flooring (petitioner and defendant-intervenor), submitted case briefs following issuance of the preliminary results.

II.     **Final Results**

Commerce published the final results on July 1, 2022, which addressed the petitioner's

and Senmao's concerns raised in their timely submitted administrative case and rebuttal briefs.

*See* Petitioner's Case Br. (P.R. 231), Petitioner's Rebuttal Br. (P.R. 235), Senmao's Case Br.

(P.R. 228), and Senmao's Rebuttal Br. (P.R. 233).

Commerce continued using Malaysian surrogate values for Senmao's oak log and non-

oak log inputs, rejecting Senmao's argument that it should use Brazil's data.  IDM at 22.

Acknowledging its regulatory preference to use data from the primary surrogate country to the

extent possible, Commerce nonetheless continued to find that Brazilian data were unavailable or

unreliable for Senmao's oak logs or non-oak logs.  IDM at 23.  Specifically, Commerce found

that the record did not include any data for the oak-specific HTS heading and that it was not clear

whether the data under the more general heading included oak logs or not.  *Id.*  To the extent that

the Brazilian data may have excluded oak logs, Commerce found that it was inappropriate to

value Senmao's oak log inputs using non-specific import data.  Conversely, to the extent that the

Brazilian data included oak logs, valuing Senmao's non-oak inputs using Brazilian data would

run the risk of double-counting oak logs that were already valued under the Malaysian oak log

data.  *Id.*  Because the Brazilian data was unavailable or unreliable for valuing either oak or non-

oak logs, Commerce continued to determine that it was appropriate to rely on the oak and non-

oak specific data from Malaysia, which it found to be the best available information.

In the final results, Commerce revised its selected plywood surrogate value to remove

certain incorrect Spanish import data.  IDM at 9.  The data showed identical values for $m^3$

(volume) and kg (weight), which Commerce found to be facially impossible.  *Id.*  Commerce

rejected Senmao's argument that Commerce should not revise the Brazilian surrogate value data

for plywood unless they are aberrational in the aggregate.  Senmao's Rebuttal Br. (P.R. 233) at

1-4, IDM at 7-9.  Commerce does consider whether data are "aberrational in the aggregate"

when it is determining whether data should be excluded because they are aberrational and

therefore likely to be inaccurate, but Commerce explained that that test is unnecessary for data

that are plainly incorrect on their face.  IDM at 7-10.  Senmao argued that if Commerce could not

use the unadjusted Brazilian data, then Commerce must select Malaysia as the primary surrogate

country.  Senmao's Rebuttal Brief at 3, IDM at 9.  Commerce disagreed and continued to use the

Brazilian data, finding that there was no basis to conclude the remaining data were aberrational

in the aggregate or otherwise unreliable.  IDM at 10.

Commerce also addressed two issues raised by petitioner with respect to how Commerce

preliminarily calculated surrogate financial ratios.  Commerce relied on data from the 2020

annual report from the wood division of Duratex, the Brazilian producer of laminate flooring it

selected for surrogate financial reports, as discussed above.  Of relevance here, in its preliminary

calculations Commerce had not included a line item for "transport expenses" in Duratex's total

selling, general, and administrative expenses, because Commerce determined that including that

expense might double-count outbound freight expenses which were accounted for elsewhere in

the margin calculation.  IDM at 14.  Commerce had also included the full amount of Duratex's

reported interest income as an offset to its financial expenses when calculating Duratex's net

financial expenses for the wood division.  PDM at 25, Preliminary Surrogate Value Memo at 6.

In response to comments from petitioner, and after reviewing Senmao's responses to

those comments, Commerce modified its preliminary treatment of Duratex's transport expenses

and net financial expenses.  In particular, Commerce revised the surrogate financial ratio

calculation to include Duratex's transport expenses line item as part of its manufacturing

overhead.  Commerce found, on further evaluation, that the transport expenses line item likely represented a cost element distinct from the freight-in expenses normally included in raw materials costs and the outbound freight expenses included elsewhere in Commerce's margin calculation.  IDM at 14.  Commerce also determined that it was not appropriate to include five line items of Duratex's investment income to offset its financial expenses because an offset is only appropriate for short-term investments, and Commerce was unable to discern from the record whether those line items consisted of long-term or short-term investment interest income. *Id*. at 15.

Finally, Commerce continued to disallow Senmao's claim to a by-product offset for wood scrap.  Senmao argued that Commerce's decision was contrary to decisions made in prior administrative reviews since the 2014-2015 review, and that neither Commerce nor petitioner cited to any difference from previous reviews that would warrant this change.  IDM at 24. Senmao also asserted that if Commerce had questions about Senmao's by-product offset claim, it should have asked.  *Id*.  Commerce explained that for nonmarket economy proceedings that use a factor of production methodology, reporting the by-product production quantity is necessary so Commerce may examine whether the by-product was produced from the reported factor of production quantities and whether the production process generated the amount of by-product claimed for the offset during the period of review.  *Id*. at 26.  Commerce also explained that each segment of a proceeding is independent and stands on its own record, and that even if past reviews had allowed Senmao to claim the offset even without reporting the production quantity, Commerce is not required to do the same in this review.  Further, because Senmao had expressly stated that it did not have the required data, Commerce found that it had no reason to follow up

with further questions.  *Id*. at 27-28 (*citing Am. Tubular Prods., LLC. v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017)).

## SUMMARY OF THE ARGUMENT

The final results should be sustained because they are supported by substantial evidence and in accordance with law.  First, Commerce's valuing of Senmao's log inputs using surrogate value data from Malaysia, rather than data from the primary surrogate country, Brazil, is supported by substantial evidence and in accordance with law.  Although there is a distinct HTS heading for oak logs, the record only included Brazilian surrogate value data for log inputs under a general HTS for a basket category of logs, and Commerce was unable to discern whether that data included oak logs.  Accordingly, Commerce reasonably determined that Malaysian data on the record, which included both oak-specific and non-oak-specific data under distinct HTS headings, was the best available information, despite its general preference to use data from the primary surrogate country if available.

Second, Commerce's decision to exclude a clearly incorrect line item from the Brazilian surrogate value data for plywood is supported by substantial evidence and in accordance with law.  The line item in question, reflecting one month of imports of plywood from Spain into Brazil, reported identical values for volume and weight, which is mathematically impossible.  Senmao argues that Commerce should only exclude data that are "aberrational in the aggregate," but this test applies only when Commerce is trying to determine whether unusually high or low line items are distorting the average values; it does not preclude Commerce from removing data that are incorrect on their face from an aggregate average unit value.

Third, Commerce's selection of Brazil as the primary surrogate country is supported by substantial evidence and in accordance with law.  Although the Malaysian log data on the record

were superior to the available Brazilian data, and although the Brazilian data included the erroneous line item that Commerce excluded from its calculations, Brazil continued to have the best overall data.  Specifically, Commerce found that the Brazilian financial statements were the best available information to calculate surrogate financial ratios.  The Brazilian financial statements were product-specific and contemporaneous with the period of review.  By contrast, the Malaysian financial statement was not contemporaneous with the period of review nor did the company produce comparable merchandise.  These differences support the reasonableness of Commerce's conclusion that Brazil was significantly superior to Malaysia as a primary surrogate country.  Senmao has not demonstrated that this choice was unreasonable, and it is not the Court's role to reweigh evidence.

Fourth, Commerce's calculation of the Brazilian financial ratios is supported by substantial evidence and in accordance with law.  Commerce appropriately reasoned that where a financial statement included a line item for "transport expenses" separate from a line item for "raw materials," those transport expenses did not include the freight-in expenses that would typically be considered part of the raw material costs and therefore likely referred to a different transport expense within the scope of manufacturing overhead.  Commerce also followed its usual practice in denying an offset for interest income when it could not determine from the record evidence whether specific interest income categories derived from short-term or long-term investments.

Finally, Commerce's denial of Senmao's claimed by-product offset for wood scrap is supported by substantial evidence and in accordance with law.  In its questionnaire response, Senmao stated it did not maintain the quantitative data required for Commerce to consider granting an offset.  Although Senmao received an offset in prior administrative reviews, those

determinations were based on their own factual records, and those previous determinations do not require Commerce to grant an offset here where, on this record, Senmao failed to present factual information relevant to this period of review sufficient for Commerce to grant the offset.

## ARGUMENT

### I.     Standard Of Review

In reviewing Commerce's antidumping or countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Even if it is possible to draw two inconsistent conclusions from the record evidence, this does not mean that Commerce's findings are unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A party challenging {Commerce's} determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).

The Court affords Commerce a great deal of deference when "a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, Commerce may perform its duties in the way it believes most suitable. *Id.* The Court of Appeals for the Federal

Circuit has further acknowledged that Commerce is "the 'master' of antidumping law . . . {and that its determinations are} worthy of considerable deference." *Daewoo Electronics Co., Ltd. v. United States,* 6 F.3d 1511, 1516 (Fed. Cir. 1993) (citations omitted); *see also Fujitsu,* 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

Specifically, when valuing the factors of production for the purpose of calculating a respondent's antidumping margin using data from surrogate countries, Commerce's statutory mandate is to use "the best available information regarding the values of such factors." 19 U.S.C. § 1677b(c)(1). "Commerce is granted broad discretion to determine whether information is the best available because the statute does not define the term." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011). The ultimate goal is "to determine the antidumping margins 'as accurately as possible.'" *Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (quoting *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994)). Therefore, "{i}n determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components*, 268 F.3d at 1382.

Accordingly, Commerce is not required to apply any specific methodology or select any specific data source. "The {Tariff Act of 1930} simply does not say—anywhere—that the factors of production must be ascertained in a single fashion." *Id.* (quoting *Lasko*, 43 F.3d at 1446); *see also Guangdong Chemicals Imp. & Exp. v. United States*, 30 C.I.T. 1412, 1416 (2006)

("19 U.S.C. § 1677b (2000) provides that valuation of factors of production 'shall be based on the best available information,' but does not mandate that Commerce use any particular data source."). Further, the data relied on need not be perfect. *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1301 (Fed. Cir. 2016) (*Jiaxing II*) (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of the manufacturer in the nonmarket economy. *Nation Ford Chem. Co.*, 166 F.3d at 1377. Ultimately, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, the Court's review should question "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II* (citing *Zhejiang*, 652 F.3d at 1341).

## II. Commerce's Valuing Of Senmao's Log Inputs Using Surrogate Value Data From Malaysia, Rather Than Data From The Primary Surrogate Country, Is Supported By Substantial Evidence And In Accordance With Law

Senmao and Lumber Liquidators challenge Commerce's choice to value log inputs using surrogate value data from Malaysia, rather than Brazil, the primary surrogate country. Senmao Br. at 10-13; Lumber Liquidators Br. at 17-25. However, Commerce reasonably determined that the Brazilian data for the log inputs was unavailable or unreliable, and that Malaysian data for those inputs constituted the best available information because they were more product-specific. Further, the Court should decline to entertain Lumber Liquidators' newly presented argument that the Malaysian data was aberrational, because it failed to exhaust its administrative remedies, and in any case the argument is meritless.

### A.    Commerce Reasonably Found The Malaysian Log Input Data To Be The Best Available Information

Commerce "normally will value all factors in a single surrogate country." 19 C.F.R.

§ 351.408(c)(2). This practice prevents parties from "margin shopping" by arguing that

Commerce should "combine input prices from different surrogates to achieve the highest or

lowest valuations of those inputs." *Valuation in Single Country*, 61 Fed. Reg. 7,308, 7,345

(Dep't of Commerce 1996). However, this single-country preference "carries the day only when

it is used to 'support a choice of data as the best available information where the other available

data 'upon fair comparison, are otherwise seen to be fairly equal.'" *Calgon Carbon Corp. v.*

*United States*, 145 F. Supp. 3d 1312, 1326-27 (Ct. Int'l Trade 2016) (*citing Peer Bearing Co.-*

*Changshan v. United States*, 804 F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011) (*quoting Peer*

*Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1373 (Ct. Int'l Trade 2011)).

Commerce will "resort to a secondary surrogate country if data from the primary surrogate

country are unavailable or unreliable." *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp.

3d 1326, 1332-3 (Ct. Int'l Trade 2014) (*Jiaxing I*) (citations omitted), *affirmed by Jiaxing II*. In

that circumstance, Commerce exercises the flexibility permitted by 19 U.S.C. § 1677b(c)(1) and

(4) and 19 C.F.R. § 351.408(c)(1) to use data from multiple surrogate countries to ensure use of

the best available information.

When comparing the available surrogate import data for logs from both Brazil and

Malaysia, Commerce determined that Malaysia possessed the best available information, despite

Commerce's preference to use data from a single country where possible. Senmao reported that

it used seven species of logs as inputs during the period of review, including oak and non-oak

species. IDM at 18. Senmao submitted data from Brazil for only one HTS heading (4403.99),

and the submitted information did not clearly indicate whether that heading included data for oak

logs.  *Id.* at 22; *see also* Senmao Surrogate Value Comments at PDF pages 9, 11 (P.R. 176).

Petitioner, however, submitted Malaysian data for two HTS headings, one specific to oak wood

(4403.91.1000) and one category that specifically excluded oak (4403.99.00).  IDM at 18; *see*

*also* Petitioner's Surrogate Value Data (P.R. 182).

Accordingly, Commerce found that the Malaysian categories provided more specifically

tailored data for valuing Senmao's oak and non-oak logs.  Further, because Commerce found that

it could not determine from the record whether the Brazilian import data included oak logs, it

could not determine whether the import data were appropriate for valuing Senmao's oak log

inputs.  Therefore, Commerce concluded that Brazilian oak log data were effectively unavailable

or unreliable.  IDM at 23.  On the other hand, because Commerce could not determine whether

the Brazilian data excluded oak logs, it similarly could not determine whether those data were

appropriate for valuing Senmao's non-oak logs, and therefore reasonably concluded that

Brazilian non-oak log data were effectively unavailable or unreliable.  Accordingly, the Brazilian

and Malaysian datasets were not "fairly equal," and Commerce had the option of selecting the

better, more product-specific Malaysian dataset even though it came from a secondary surrogate

country.  *Calgon Carbon Corp.*, 145 F. Supp. 3d at 1326-7.

Senmao argues that Commerce should have accepted the Brazilian data because

Commerce did not identify any record evidence that oak logs would have a significantly different

value.  Senmao Br. at 13.  However, Commerce seeks to select the most product-specific data

available.  Policy Bulletin 04.1.  It does not discard this product-specific preference simply

because it has not affirmatively established that the different products in a less product-specific

dataset may have similar prices to the subject merchandise.  Senmao reported it used oak and

non-oak logs.  Senmao C-D Questionnaire Response (P.R. 145, C.R. 29) at 10-11 of Section D.

Commerce therefore selected the most product-specific data for valuing both those inputs.  In any event, Senmao is incorrect that there is no evidence that the values are different.  To the contrary, the record evidence showed that the average unit value, calculated as the total sum of import values divided by the total sum of import quantities, for the Malaysian oak logs is almost twice as large as the average unit value for the Malaysian non-oak import data.  *See* Preliminary Surrogate Value Memo at 3-4; *see also* Petitioner's Surrogate Value Comments at Exhibit 1 (P.R. 180).  This suggests that if the Brazilian import data did not include oak logs, it would not accurately represent oak log input costs.  And if it did include oak logs, it would not accurately represent non-oak log input costs.

Finally, Senmao contends that Commerce failed to establish that the Malaysian non-oak data were more specific to Senmao's non-oak logs than the Brazilian data, because both datasets used the same HTS heading and different countries usually include the same products under a given HTS heading.  Senmao Br. at 12-13.  However, while the record evidence made clear that the Malaysian data did not include oak logs, it was not clear whether the same was true for the Brazilian data.  IDM at 22.  Further, the record contained no specific data for oak log imports to Brazil during the period of review, suggesting that oak log imports may have been categorized differently, such as under the more general heading Senmao seeks to use to value the non-oak logs.  IDM at 20-21.  Indeed, Senmao initially suggested that Commerce should value the oak logs under this general heading, suggesting Senmao believed this heading *did* include oak logs.  Ultimately, where Senmao does not point to any record evidence to support its claim that the Brazilian data did not include oak logs, and where Senmao failed to provide any such evidence when it had the opportunity do so, it was reasonable for Commerce to refrain from making

unsupported inferences about the extent to which Brazil's system is or is not harmonized with Malaysia's.

B.      **Lumber Liquidators Waived Its Argument That The Malaysian Data Were Aberrational, And The Argument Is Meritless**

Lumber Liquidators argues for the first time before this Court that the Malaysian data were aberrational because the resulting margin defies Senmao's commercial reality. Lumber Liquidators Br. at 20-25. The Court should decline to entertain this argument because Lumber Liquidators did not exhaust this issue before Commerce. Moreover, Commerce is not required to take into account a firm's "commercial reality" when making its determinations, and Lumber Liquidators has not cited any authority suggesting otherwise.

Congress has directed that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This statute "indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (*citing Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). Further, "general policies underlying the exhaustion requirement—protecting administrative agency authority and promoting judicial efficiency"—would be negated if the Court were to consider arguments raised for the first time in judicial proceedings. *Corus Staal*, 502 F.3d at 1379 (internal quotation and citation omitted).

For these reasons, the Court should "generally take{} a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id*. An exception to the exhaustion requirement is possible only if exhaustion would have been "futile;" the relevant matter is a "pure question of law;" an intervening court decision would affect the agency's action; or a party had no reason to believe the agency would not follow established

18

precedent. *Luoyang Bearing Factory v. United States*, 240 F. Supp. 2d 1268, 1297 n.26 (Ct. Int'l Trade 2002) (citing authorities). None of these exceptions apply here.

Indeed, when an interested party to the administrative proceeding has notice that Commerce could use data in a certain way, it is incumbent on the party to raise any objections in their case briefs. *Boomerang Tube*, 856 F.3d at 913; *accord Mittal Steel Point Lisas, Ltd. v. United States*, 548 F.3d 1375, 1383-1384 (Fed. Cir. 2008) (explaining that "courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*") (quoting *United States v. L.A. Trucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)) (emphasis added in *Mittal Steel*).

In the preliminary results, Commerce notified all parties that Commerce intended to use Brazil as the primary surrogate country but would use Malaysian data for the oak log inputs. PDM at 17. Lumber Liquidators did not offer any disagreement with that approach; in fact, it urged Commerce to "decline to make any changes to its preliminary results." Lumber Liquidators Rebuttal Br. at 2 (P.R. 234). It now raises its objection for the first time on appeal. But both of its arguments—that Commerce should have valued all factors of production from a single surrogate country, and that the surrogate values from Malaysian log data are aberrational—could have been raised in an administrative case brief following the preliminary results. Lumber Liquidators' brief before this Court does not address its failure to exhaust administrative remedies, nor does it seek to invoke any exhaustion exception. *See* Lumber Liquidators Br. at 20-25. The Court should therefore reject its arguments for failure to exhaust.

Moreover, Lumber Liquidators' arguments fail on the merits. As already explained, Commerce reasonably concluded that despite its preference for using data from a single country, Malaysian log data constitute the best available information to value Senmao's inputs. As to the

argument that the Malaysian log data are aberrational, Lumber Liquidators identifies no record

evidence that detracts from Commerce's surrogate value selection.  It instead relies on circular

logic that the margin is too high because it is based on surrogate values that must be distorted

because, again, the margin is too high.  First, such "results-orientated" outcomes are "not

intended by Congress."  *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1345 (Fed. Cir.

2016).  Such an argument "misconceives not only the scope of the agency's statutory

responsibility, but also the nature of the administrative process."  *Id*.  Second, Commerce is not

required to consider respondents' commercial reality in selecting surrogate values, or otherwise.

"Congress has provided specific methods for Commerce to employ when it executes its duties,

such as in calculating normal value or export price…" and that "{w}hen Congress directs the

agency to…execute its duties in a particular manner, Commerce need not examine the economic

or commercial reality of the parties."  *Id.* at 1343-44.  Further, the term "commercial reality"

does not apply "in some broader sense, such as to require Commerce to apply the statutory

methods to determine the industry-wide commercial realities prevailing during a particular time

period."  *Id.* at 1344 (internal quotation and citation omitted).  Thus, consistent with the

observations in *Nan Ya*, the Court should reject Lumber Liquidators' arguments.

### III.    Commerce's Revising Of The Brazilian Surrogate Value Data For Plywood Is Supported By Substantial Evidence And In Accordance With Law

As explained above, after electing to use Brazil as the primary surrogate country,

Commerce decided to exclude a subset of the available data for Brazilian plywood because the

data in that subset were clearly erroneous.  IDM at 9.  Specifically, it was evident on the face of

the dataset that the January 2020 Spanish import data for Brazilian plywood reported the same

quantity figure, 2,455, for cubic meters ($m^3$) as well as for kilograms (kg).  *See* Preliminary

Surrogate Value Memo at Attachment 1 (Sheet "Brazil – Calculated_SV_Data" at row 1886)

(P.R. 211); *see also* IDM at 9-10.  It is mathematically impossible for both measurements to be the same, as m$^3$ measures volume while kg measures weight.  IDM at 9.  Nonetheless, Senmao urges the Court to find that Commerce's decision to exclude those data was unlawful because, according to Senmao, it goes against Commerce's usual practice.

This argument fails because the practice described by Senmao applies only where Commerce is deciding whether to exclude data that *appear* unusually high or low, not when Commerce can readily determine that data are inaccurate from their face.  When determining whether to use a particular dataset, Commerce excludes average unit values that are aberrational and unreliable.  If a party alleges that average unit values are aberrational, Commerce does not look at each individual line item, but rather considers whether the data are "aberrational in the aggregate."  *See*, *e.g.*, *Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 7,532 (Dep't of Commerce Jan. 29, 2021), and accompanying IDM, at Comment 2 (*Certain Corrosion Inhibitors*); *see also Solarworld Ams., Inc. v. United States*, 320 F. Supp. 3d 1341, 1351-2 (Ct. Int'l Trade 2018) (explaining Commerce's practice).

Commerce uses this "aberrational-in-the-aggregate" test for the purposes of administrative convenience to "avoid the 'impossible task' of identifying and defining 'what is and what is not aberrational among…thousands of data points'…and to discourage the cherry-picking and manipulation of data."  *Certain Corrosion Inhibitors* at Comment 2.  As part of this test, Commerce compares the average unit value in question with other import data on the record and historical average unit values from previous proceedings.  In most cases, the aberrational-in-the-aggregate test is used to determine whether non-representative, small quantity imports with high values distort the allegedly aberrant average value to the extent that Commerce cannot

reasonably use it to accurately calculate a margin and must choose a more market representative average value as a replacement. *See Alloy and Carbon Steel Threaded Rod from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 8,821 (Dep't of Commerce Feb. 18, 2020), and accompanying IDM at Comment 3.

However, in this case Commerce was not considering whether the data at issue were "aberrational" due to distortion by non-representative data points. Rather, it observed that a subset of the Brazilian plywood data contained a patent error, because the exact same values were reported for weight and for volume, which is mathematically not possible. Senmao has not cited any case where Commerce limited its practice of excluding plainly incorrect data to only data that is aberrational in the aggregate. Nor could it, because in that circumstance, there would be no point in applying such a test. It serves no purpose to ask whether data are aberrational when Commerce has already determined the data are clearly incorrect.

Further, Commerce is not required to apply the "aberrational in the aggregate" test when determining whether to use particular data as part of the calculation of the normal value of subject merchandise. Rather, as explained above, the applicable statutes require only that Commerce value the factors of production "based on the best available information regarding the values of such factors," 19 U.S.C. § 1677b(c)(1), in order "to determine the antidumping margins 'as accurately as possible.'" *Shakeproof Assembly Components*, 268 F.3d at 1382 (quoting *Lasko*, 43 F.3d at 1446). Accordingly, "{i}n determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." *Shakeproof Assembly Components*, 268 F.3d at 1382. There is no prescribed methodology, and

Commerce is not required to use any particular dataset or follow any particular procedure when testing the reliability of data.

In this case, Senmao has not argued that the facially incorrect January 2020 Spanish import data constituted the best available information, or that including them would lead to more accurate antidumping margins, but instead relies entirely on the idea that Commerce should not depart from its usual practice. But it was well within Commerce's discretion to conclude that plainly incorrect information could not constitute the best available information and could not lead to more accurate results, and that it was therefore reasonable to exclude that data in order to fulfill its statutory mandate. IDM at 9-10.

## IV. Commerce's Selection Of Brazil As The Primary Surrogate Country While Also Rejecting The Brazilian Log Data and Adjusting The Brazilian Plywood Data, Is Supported By Substantial Evidence And In Accordance With Law

Senmao and Lumber Liquidators argue that if Commerce cannot value logs and plywood using the unadjusted Brazilian data, then Commerce's selection of Brazil as the primary surrogate country is not reasonable and Commerce should have relied on Malaysia as the primary surrogate country. Senmao Br. at 17-19; Lumber Liquidators Br. at 17-20. However, Commerce reasonably determined that because the record included surrogate financial statements of a Brazilian producer of laminate flooring, a comparable product to the product at issue, that were contemporaneous with the period of review, Brazil's data were preferable to that of Malaysia, which only included surrogate financial statements that were not contemporaneous with the period of review for a producer of other similar wood products including plywood, veneer, and laminated veneer lumber. Accordingly, Commerce's decision was supported by substantial evidence and in accordance with law.

Commerce's ultimate obligation is to select the best available information on the record to value factors of production, and it has broad discretion in determining what information is the

best available.  *Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1341.  In practice, Commerce seeks to identify and rely on the record data that "most accurately represent{} the fair market value" of the relevant factor of production.  Policy Bulletin 04.1; *Jiaxing II*, 822 F.3d at 1293.  To accomplish that, it strives to select, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax and duty exclusive.  *Id.* (discussing requirements).  And while "Commerce occasionally relies on financial statements that lack certain details…it prefers financial statements that 'contain the full level of details.'"  *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1256 (Ct. Int'l Trade 2021), quoting *Diamond Sawblades Mfrs.' Coal. v. United States*, 219 F. Supp 3d 1368, 1381 (Ct. Int'l Trade 2017).

Commerce reasonably selected Brazil as the primary surrogate country in this review.  In accordance with its established practice, Commerce identified both Brazil and Malaysia as countries that are economically comparable to China and significant producers of the subject merchandise.  PDM at 15-16.  Brazil also had complete and viable data to value Senmao's factors of production, except for the oak and non-oak logs, and the record included financial statements for a Brazilian producer of laminate flooring, a product comparable to the product at issue in this review, that were contemporaneous with the period of review.  PDM at 17; Surrogate Value Memo at 2.  Malaysia had the advantage of reliable data to value the oak and non-oak logs, but the record did not include any Malaysian surrogate financial statements for the producers of merchandise identical or comparable to the subject merchandise.  Rather, it included a financial statement of a company that produced plywood, veneer, and laminated veneer lumber—products similar to, but distinct from, the product at issue in this review.  PDM at 17; Petitioner Surrogate Value Comments – Part 2 at Exhibit 10B (P.R. 180).  Further, the

Malaysian statement was not contemporaneous with the period of review.  *Id*.  Product

specificity and contemporaneity are both important factors in Commerce's selection of a

financial statement for surrogate values to accurately calculate a dumping margin.  *See Mid*

*Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 542-543 (Fed. Cir. 2019) (upholding

Commerce's four-criteria framework that considers "the similarity of the surrogate company's

business and products to the respondent's business and products…and the contemporaneity of

the data.").

Senmao does not dispute Commerce's determination that Brazilian financial statements

are superior to Malaysian financial statements.  Rather, Senmao asserts that such superiority

cannot outweigh flaws with respect to Brazilian surrogate values for Senmao's log and plywood

inputs.  Senmao Br. at 18.  However, Commerce did not find that the Brazilian surrogate value

for plywood was unusable or flawed.  Rather, Commerce found that, "after removing the

incorrect Spanish import data," there was "no basis to conclude the overall {average unit value}

for Brazil is aberrational or otherwise unusable."  IDM at 10.  And while Commerce found that it

could not rely on the Brazilian value for logs, Commerce reasonably found that the superiority of

the Brazilian financial statements outweighed that concern.  Senmao has not explained why this

choice was unreasonable; accordingly, this Court should reject Senmao's invitation to reweigh

the evidence.  *See*, *e.g.*, *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377

(Fed. Cir. 2015).

## V.    Commerce's Calculation Of The Surrogate Financial Ratios Is Supported By Substantial Evidence And In Accordance With Law

As part of its calculation of the antidumping margin, Commerce relied on the financial

statements from Duratex, the Brazilian surrogate producer, to calculate financial ratios.  Senmao

contends that Commerce's calculation was unreasonable because it treated Duratex's "transport

expenses" as part of its manufacturing overhead, and because it did not use certain interest income reported by Duratex to offset its expenses.  However, both these decisions were supported by substantial evidence and in accordance with law.

### C.    Commerce Reasonably Included "Transport Expenses" In Manufacturing Overhead

Commerce calculated surrogate financial ratios using the financial statements presented in Duratex's 2020 annual report.  The expenses listed in that report included a line item for "raw materials and consumption materials" as well as a line item for "transport expenses."  *See* Exhibit 3B to Petitioner's Additional SV Comments (P.R. 200) at 64 (PDF page 93).  Commerce initially excluded "transport expenses" from its calculation of total selling, general, and administrative expenses to avoid double-counting outbound freight, which is accounted for elsewhere in Commerce's margin calculations.  IDM at 14.

On closer consideration, however, Commerce determined that "transport expenses" most likely referred to a distinct cost element from freight expenses.  Duratex would presumably have included the freight-in expenses in the "raw materials" expense it reported.  IDM at 14.  As Commerce explained, "accounting practice prescribes generally that raw materials inventory…is to be valued at a cost that includes all necessary expenditures to acquire and bring them to the desired condition and location for use," which would include freight-in expenses.  *Id.*  Senmao acknowledges this practice, emphasizing that "{c}onsistent with standard accounting practices, the inventory value of raw materials includes freight expenses incurred on raw material purchases unless otherwise specified."  Senmao Br. at 20.  Senmao even supports this view with language from the financial statement itself.  Specifically, Senmao cites Note 2.9 of the Duratex financial statements, which states that "(t)he cost of finished goods and work in progress

compromises the cost of raw materials, direct labor, other direct costs and related direct production costs (based on normal capacity)." *Id*. at 19-20.

In accordance with this standard practice, Commerce found it "reasonable…to presume that the 'raw materials and consumption materials' line item…includes freight-in expenses, and that the 'transport expenses' line item represents a distinct cost element" that relates to other factory activities, such as within-factory transportation and vehicles used by factory management. IDM at 14. Based on this presumption, Commerce determined that "transport expenses" probably did not include outbound freight expenses either, such that its initial concerns regarding double-counting no longer applied.

In challenging this reasoning, Senmao asks the Court to presume that the financial statements deviated from the standard practice—even while Senmao cites language from the financial statement in support of this standard practice—by listing an expense that includes freight-in expenses separately from raw material expenses. It is far more reasonable, however, to read the financial statements the way Commerce did: in light of the standard practice and assuming that freight-in expenses were already included in the raw material expenses and that "transport expenses" therefore referred to transportation costs distinct from outbound freight and freight-in, and was therefore properly included in manufacturing overhead. These might include expenses such as within-factory transportation or vehicles used by factory management. IDM at 14. Senmao calls this "pure speculation," Senmao. Br. at 20, but absent further evidence as to what "transport expenses" entail, Commerce is simply making the most reasonable assumption based on standard accounting practice, which is that the transport expenses likely capture factory activities and are exclusive of freight-in or outbound freight.

Further, Commerce's categorization is consistent with its past practice where, like here, the financial statement contains a separate transport expenses line item.  *See*, *e.g.*, *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 70,163 (Dep't of Commerce Nov. 25, 2014), and accompanying IDM at Comment 6 (discussing "travel and transportation" expenses);  *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (Dep't of Commerce May, 5, 2014), and accompanying IDM at Comment 11 (discussing "transportation expenses").

Accordingly, Commerce decision to include the line item for transport expenses as part of Duratex's selling, general, and administrative expenses was supported by substantial evidence and in accordance with law.

### D.  Commerce Reasonably Declined To Offset Financial Expenses With Investment Income

Senmao's second argument challenges Commerce's exclusion of certain financial income as an offset to financial expenses.  Senmao Br. at 20.  Commerce's practice is to allow an offset to financial expenses with short-term interest income that is generated from a surrogate company's current assets and working capital accounts, and which reflects the general operations of the company.  IDM at 14-15; *see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Results of the 2009-2010 Antidumping Duty Administrative Review and Final Rescission, in Part*, 77 Fed. Reg. 14,495 (Dep't of Commerce March 12, 2012), and accompanying IDM at Comment 7; *see also Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1357 (Ct. Int'l Trade 2010) (explaining Commerce's interest offset practice).

Interest income generated from long-term financial assets through investment activities, such as long-term interest income, capital gains, and dividend income, are not associated with

the surrogate company's current working capital and are therefore excluded from the offset. IDM at 14-15; *Certain New Pneumatic Off-the-Road Tires* IDM at 13.  If Commerce cannot determine whether interest income is long-term or short-term in nature, it will exclude the interest income from the offset to financial expenses.  *See*, *e.g.*, *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of the First Administrative Review of the Antidumping Duty Order*, 76 Fed. Reg. 77,772 (Dep't of Commerce Dec. 14, 2011), and accompanying IDM at Comment 9.

In the preliminary results, Commerce included the full amount of the surrogate company Duratex's reported interest income as an offset to financial expenses.  IDM at 14.  Specifically, Duratex's financial statement included a financial income section with five categories: remuneration on financial investments, foreign exchange variances, indexation adjustment, interest and discounts obtained, and other.  *See* Exhibit 3B to Petitioner's Additional SV Comments (P.R. 200) at 65 (PDF page 94).  With respect to the remuneration on financial investments, Commerce determined that this description likely referred to long-term investments. IDM at 14-15.  Senmao has not denied this, but rather acknowledges that Duratex's remuneration on financial investments is "potentially" a long-term financial activity.  Senmao Br. at 21; Senmao Rebuttal Brief (P.R. 233) at 4.  As explained above, Commerce will exclude as an offset to financial expenses any income derived from long-term financial assets such as investment activities, as well as any income that is "potentially" derived from long-term financial assets but where the record evidence fails to establish whether it is long-term or short-term.  Accordingly, for the final results, Commerce removed the income generated under this category from the offset.  IDM at 14-15.

Senmao also contests Commerce's exclusion of the four additional financial income categories of foreign exchange variances, indexation adjustment, interest and discounts obtained, and other.  IDM at 15.  But the information available in the financial statement and on the record was insufficient for Commerce to determine whether these categories of interest income were long-term or short-term in nature, nor could it assume the income was short-term because no additional descriptions or supporting notes accompanied Duratex's financial statement.  *Id*. Senmao argues that these categories are short-term in nature by stating what they supposedly represent, but Senmao cites no probative record evidence in support of its claims.  Moreover, it is Commerce's practice to not look behind the surrogate financial statements to determine the appropriateness of including items in the financial ratio calculations, particularly where, as here, the financial statements offer no additional description on interest income.  *See*, *e.g.*, *Citric Acid from China* IDM at Comment 9, and *Certain Polyester Staple Fiber from the People's Republic of China: Final Results of the Antidumping Duty Administrative Review*, 80 Fed. Reg. 4,542 (Dep't of Commerce Jan. 28, 2015), and accompanying IDM at Comment 1.  Thus, it was reasonable and consistent with Commerce's practice to conclude that there was insufficient evidence to establish that these were short-term investments and to therefore exclude these categories from the offset.

Senmao argues that Commerce's calculations were contrary to the calculations in another proceeding, *Wood Mouldings and Millwork Products from China*, where the same financial statement was used, and the full amount of interest income was not removed from the financial expenses offset.  Senmao Br. at 19 (referencing *Wood Mouldings and Millwork Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (Dep't of Commerce Jan. 4, 2021), and accompanying IDM (*Wood*

*Mouldings from China* IDM)).  However, *Wood Mouldings* is a distinct proceeding that stands on

its own record, and Senmao is unable to rely on the factual conclusions of that proceeding and

compare them to Commerce's conclusions here.  *See Peer Bearing Co.*, 587 F. Supp 2d at 1325

(citing *Shandong Huarong Mach. Co. v. United States*, No. 03-00676, 2005 Ct. Int'l Trade

LEXIS 57 at 19 (Ct. Int'l Trade 2005)), and *Hyundai Heavy Indus., Co. v. United States*, 332 F.

Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018).  Moreover, no interested party in the *Wood*

*Mouldings* proceeding commented on the financial ratio calculations for the final determination,

so the decision memorandum does not have the benefit of a reasoned explanation of Commerce's

treatment and analysis.  *See Wood Mouldings from China* IDM.  As already explained, in this

case, Commerce initially included all five interest categories in the offset for Senmao's expenses,

but after petitioner challenged this decision, Commerce considered the issue more closely and

concluded that these income categories should be excluded from the offset.  In *Wood Mouldings*,

Commerce never had reason to reexamine the issue, and there is no basis for speculating as to

what Commerce might have concluded if it did.  Accordingly, there is no basis for Senmao to

contend that Commerce has acted in a manner that is arbitrary or inconsistent with established

practice.  *See, e.g., CP Kelco US, Inc. v. United States*, Slip op. 15-27, 2015 Ct. Intl. Trade

LEXIS 31, *31 (2015) ("{C}iting isolated investigations does not prove the existence of past

practices; it just proves that Commerce thought differently on different facts at different times.")

Rather, the only question is whether Commerce's decision in this case was supported by

substantial evidence; it is.

## VI.   Commerce's Denial Of A By-Product Offset for Wood Scrap for Senmao Is Supported By Substantial Evidence And In Accordance With Law

In this review, Commerce declined to provide Senmao a by-product offset for wood scrap

generated through wood flooring production because Senmao reported that it did not track the

quantity of the wood scrap generated during the period of review and only recorded the quantity

of wood scrap sold.  IDM at 25.   Senmao objects to this decision because Commerce allowed

the offset in prior reviews.  Senmao contends that nothing justified the change in treatment, and

suggests that if Commerce needed additional information to determine whether to grant an offset,

it should have asked Senmao additional questions in accordance with 19 U.S.C. § 1677m(d).

Senmao Br. at 25.  However, these arguments are without merit.

In its Section D questionnaire, Commerce requested that Senmao identify "by month, the

quantity produced, sold, reintroduced into production, or otherwise disposed of (e.g., sold,

returned to production of the merchandise under consideration, discarded)" and "{p}rovide

production records demonstrating the production of each by-product/co-product during one

month of the {period of review}" and, if the scrap was sold, "evidence of the sales … as well as

evidence of receipt of payment for the sale of the item for the largest month of sales for each by-

product/co-product."  Senmao Initial Questionnaire (P.R. 114) at D-9.  Senmao reported wood

scrap as a by-product generated during the production of subject merchandise but stated that it

"does not track the quantity of the wood scrap generated during the period of review and only

records the quantity of wood scrap sold."  Senmao C-D Questionnaire Response at 17 of Section

D (PDF page 104).

Commerce's practice is to grant respondents an offset to the reported factors of

production for by-products generated during the production of the subject merchandise if

evidence is provided that such by-product has commercial value.  *See* PDM at 25; IDM at 26-27.

To be eligible for an offset, a respondent must provide and substantiate the quantity of by-

product it generated from the production of subject merchandise during the period of review.  *Id.*

*See also Certain Fabricated Structural Steel from the People's Republic of China: Final*

*Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020), and accompanying IDM at Comment 17.  These records are important for Commerce's by-product offset decisions, as Commerce examines whether the by-product was produced from the quantity of the factors of production reported and whether the production process generated the amount claimed during the period of review.  IDM at 26.  Interested parties that are in possession of relevant information have the burden of establishing the amount and nature of a particular adjustment.  *See* 19 C.F.R. § 351.401(b)(1); *see also Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production {belongs} to the party in possession of the necessary information); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results and Partial Rescission of Review*; 2019-2020, 87 Fed. Reg. 1,120 (Dep't of Commerce Jan. 10, 2022), and accompanying IDM, at Comment 9.  Because Senmao did not provide the necessary production records demonstrating its reported recovered quantities of the by-product and that it later sold these recovered quantities, Commerce reasonably declined to grant the offset.

Senmao argues that Commerce's decision to deny the by-product offset in this proceeding is inconsistent with Commerce's grant of by-product offsets in prior segments of the proceeding.  Senmao Br. at 22-25.  The Court has held, however, that each segment of a proceeding is independent and stands on its own record.  *See Peer Bearing Co. v. United States*, 587 F. Supp 2d 1319, 1325 (Ct. Int'l Trade 2008) (citing *Shandong Huarong Mach. Co.*, No. 03-00676, 2005 Ct. Int'l Trade LEXIS 57 at 19; *see also Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014).  Because each segment stands on its own record, Senmao "may not . . . rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in

the review." *Hyundai Heavy Indus.*, 332 F. Supp. 3d at 1342.  As Senmao has not identified any

evidence on the record of this proceeding to show that it met its burden of production, there is no

basis for the Court to set aside Commerce's determination.  In sum, Commerce acted within its

authority and consistent with its prevailing practice in denying Senmao's request for a by-

product offset in this review even if Commerce had granted the offset in previous segments of

the proceeding.

Senmao also argues that if Commerce needed additional information concerning the by-

product offset, it had an obligation to ask additional questions pursuant to 19 U.S.C. § 1677m(d).

Senmao Br. at 25.  However, Commerce's request in the antidumping questionnaire for scrap

production information to calculate a by-product offset made clear what Commerce needed from

Senmao to make the calculation, and Commerce is not obligated to ask additional questions

where the respondent has stated that it does not possess the requested information.  *American

Tubular Products* forecloses Senmao's argument.  In that case, the respondent unambiguously

stated that it did not measure or record scrap production at the time it was produced.  *Am.

Tubular Prods., LLC*, 847 F.3d at 1361.  Like Senmao, the respondent argued that Commerce

was obligated to follow with a deficiency notice and an opportunity for correction.  The Federal

Circuit rejected that argument, holding that Commerce "was not obligated to accommodate

Chengde's failure to document scrap production; nor was Commerce obligated to continue

asking for information that Chengde clearly stated it did not record."  *Id*.  Like the respondent in

*American Tubular Products,* Senmao unequivocally stated that it did not track the necessary by-

product information requested in Commerce's questionnaire.  Senmao C-D Questionnaire

Response at 17 of Section D (PDF page 104).  Commerce therefore had no reason to provide

follow up questions confirming whether Senmao had information that Senmao already admitted to not possessing in the first place.

Accordingly, Commerce's decision to deny Senmao a by-product offset for wood scrap when Senmao affirmatively reported it did not track nor could it provide the required information is supported by substantial evidence and in accordance with law.

## CONCLUSION

For these reasons, the Court should deny plaintiff's and plaintiff-intervenor's motions for judgment on the agency record and sustain Commerce's final results in their entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL:                             /s/ Kelly M. Geddes
CHRISTOPHER KIMURA                      KELLY M. GEDDES
Attorney                                Trial Attorney
Office of the Chief Counsel             Commercial Litigation Branch
  for Trade Enforcement and Compliance   Civil Division
U.S. Department of Commerce             Department of Justice
Washington, D.C.                        P.O. Box 480
Telephone:  (202) 482-0131              Ben Franklin Station
                                        Washington, D.C.  20044
                                        Telephone: (202) 307-2867
                                        Email: kelly.geddes2@usdoj.gov

Dated January 9, 2023                   *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 10,117 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

/s/ Kelly M. Geddes