**PUBLIC VERSION**

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. )<br><br>Plaintiff, )<br><br>and )<br><br>LUMBER LIQUIDATORS SERVICES, LLC, )<br><br>Plaintiff-Intervenor, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, )<br><br>Defendant-Intervenors. ) | Consol. Court No. 22-00190 |

### REPLY BRIEF OF PLAINTIFF JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD.

Jeffrey S. Neeley
Stephen W. Brophy
Husch Blackwell, LLP

1801 Pennsylvania Ave., N.W.
Suite 1000
Washington, D.C. 20006
(202) 378-2357
Jeffrey.Neeley@huschblackwell.com

Dated:  February 6, 2023

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

   **I.  Commerce's Decision to Select Brazil as the Primary Surrogate Country, while Also Rejecting or Adjusting the Brazilian Data was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ............................................... 2

   **II.  Commerce's Decision to Adjust the Brazilian Surrogate Value Data for Plywood was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ........ 7

   **III.  Commerce's Decision to Value Senmao's Log Inputs Using Surrogate Value Data from Malaysia, Rather than from the Primary Surrogate Country was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ............. 10

   **A.  Commerce Applied the Wrong Legal Standard in Deciding to Depart from its Practice of Relying on Data from a Single Surrogate Country** ................................... 11

   **B.  Commerce's Decision to Use Malaysian Data to Value Oak Logs was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ................................. 12

   **C.  Commerce's Decision to Value Non-Oak Logs Using Malaysian Data was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ............. 13

   **IV.  Commerce's Calculation of the Brazilian Financial Ratios was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ..................................... 16

   **V.  Commerce's Decision to Deny Senmao a By-Product Offset was Not Supported by Substantial Evidence or Otherwise in Accordance with Law** ..................................... 17

CONCLUSION ....................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Am. Tubular Prods., LLC. v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017) .................... 21

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019)..... 7

*China Kingdom Imp. & Exp. Co. v. United States*, 31 C.I.T. 1329, 1344–45 (2007)................... 21

*Clearon Corporation and Occidental Chemical Corp. v. United States*, 37 CIT 220 (2013) ........ 3

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1169 (2001)......... 20

*Fuwei Films (Shandong) Co. v. United States*, 837 F.Supp.2d 1347, 1356 (2012)....................... 2

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014), aff'd, 619 F. App'x 992 (Fed. Cir. 2015) .............................................................. 6

*Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) . 3, 5

*Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016)............................... 5

*Jindal Poly Films Ltd. of India v. United States,* 365 F. Supp. 3d 1379, 1388 (Ct. Int'l Trade 2019) ...................................................................................... 21

*MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021)........................................ 3

*New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *13 (Ct. Int'l Trade Mar. 23, 2021) ...................................................................................... 3

*Peer Bearing Company Changshan v. United States,* 804 F.Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011) ...................................................................................... 3

*Shikoku Chems. Corp. v. United States*, 16 CIT 382, 386-87 (1992) .......................................... 20

*Solarworld Americas, Inc. v. United States*, 532 F. Supp. 3d 1266, 1270 (Ct. Int'l Trade 2021)... 9

*Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340, 1354 (Ct. Int'l Trade 2018)....................................................................................... 20

*Tri Union Frozen Prod., Inc. v. United States*, 227 F. Supp. 3d 1387, 1394–95 (Ct. Int'l Trade 2017), *determination sustained,* 254 F. Supp. 3d 1290 (Ct. Int'l Trade 2017), aff'd, 741 F. App'x 801 (Fed. Cir. 2018)............................................................................... 8, 9

PUBLIC VERSION

## Statutes and Regulations

19 C.F.R. §351.408(c)(2 ................................................................................................ 2

19 U.S.C. § 1677m(d) ................................................................................................ 21

## Administrative Determinations

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Feb. 27, 1996). .......... 12

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 70,163 (November 25, 2014), and accompanying Issues and Decision Memorandum at Comment 6 ................................................ 16

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying Issues and Decision Memorandum at Comment 2. .............................................. 15

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying Issues and Decision Memorandum at Comment 3. ................................................ 9

*Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 12441 (March 9, 2015) and accompanying Decision Memorandum For Preliminary Results of Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam; 2013-2014, dated March 15, 2015 .................................................................. 5

*Certain Steel Nails from the People's Republic of China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) and accompanying Issues and Decision Memorandum at Comment 5. ..................................... 19

*Certain Uncoated Paper from China*, 81 Fed. Reg. 3112 (Jan. 20,2016) and accompanying Issues and Decision Memorandum at Comment 2 ....................................................... 7

*Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 35183 (July 28, 2017) and accompanying Decision Memorandum for the Preliminary Results of the 2015-2016 Antidumping Duty Administrative Review: Chlorinated Isocyanurates From the People's Republic of China, dated June 30. 2017 (using Mexico as the primary surrogate country where the SV for chlorine in Romania was aberrational)........................................................... 5

*Crystalline Silicon Photovoltaic Cells from China*, 82 Fed. Reg. 29033 (June 27, 2017) and accompanying Issues and Decision Memorandum at Comment 12 ............................................. 7

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 36,886 (July 30, 2019) and Issues and Decision Memorandum at Comment 13 ........................................................................................... 2

*Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (May, 5, 2014)................................. 16

*Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56761 (October 23, 2019) and accompanying Issues and Decision Memorandum at Comment 11.H. ............................................................................................................................. 15

*Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (January 4, 2021). ................ 16

*Multilayered Wood Flooring from China*, 80 Fed. Reg. 41476 (July 15, 2015) and accompanying Issues and Decision Memorandum at Comment l1.D ........................................................... 7, 10

*Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Successor-in-Interest Determination, and Final Determination of No Shipments*; 2018–2019, 86 Fed. Reg. 59987 (October 29, 2021). ............... 19

*Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64318 (October 18, 2011) and accompanying Issues and Decision Memorandum at Comment 14. ..................................................................................... 15

*Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (January 4, 2021) ................ 16

*Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2013-2014*, 82 Fed. Reg. 11428 (February 23, 2017) and accompanying Issues and Decision Memorandum at Comment 11 .................................................................... 13

PUBLIC VERSION

## INTRODUCTION

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") submits this reply to the response briefs filed by Defendant, United States ("Def. Response Br.") and Defendant-Intervenor, the American Manufacturers of Multilayered Wood Flooring ("Def. Int. Response Br.").  The Court should grant Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record and remand the case to the U.S. Department of Commerce ("Commerce") with instructions to reconsider the final results in the antidumping duty administrative review of *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39464 (July 1, 2022) ("Final Results") (P.R. 252).

As explained in Senmao's initial brief, Senmao has been selected as a mandatory respondent in numerous administrative reviews prior to the review under appeal in this case, and it has consistently obtained low, de-minimis or zero margins. Senmao has done its best to ensure that it was not dumping in the U.S. market and has relied on the reasonable assumption that Commerce would continue to calculate margins in accordance with the methodologies it employed in prior reviews.  However, having failed to find a high margin in these past reviews, Commerce apparently decided to utterly change its prior practices, without warning, in order to achieve its desired result.  Any of the Commerce decisions discussed below were unreasonable and contrary to law.  But in the aggregate an even more disturbing and cynical picture of Commerce actions is revealed.   This Court has previously held that Commerce could not change its methodologies without warning, stating that "{a}t some point, Commerce must be bound by its prior actions so that parties have a chance to purge themselves of antidumping liabilities.  *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 386-87 (1992) ("Shikoku's

1

reliance interest is sufficient to preclude Commerce from adopting the new method of calculating

packing expenses.").   In this case, Commerce provided no warning to Senmao that it was going

to change its practices and methodologies.  Thus, Senmao had no opportunity to change its

business practices in order to ensure that it was not dumping.  Nor were Commerce's changes

supported by record evidence.  Thus, we respectfully request that the Court remand the Final

Results of this administrative review to Commerce to reconsider its decisions in accordance with

law and substantial evidence on the record.


## ARGUMENT

I.      **Commerce's Decision to Select Brazil as the Primary Surrogate Country, while Also Rejecting or Adjusting the Brazilian Data was Not Supported by Substantial Evidence or Otherwise in Accordance with Law**

The regulations at 19 C.F.R. §351.408(c)(2) provides that Commerce "normally will value all

factors in a single surrogate country."  Commerce has stated that "it is Commerce's well-

established practice to rely upon the primary surrogate country for all surrogate values, whenever

possible, and to only resort to a secondary surrogate country if data from the primary surrogate

country are unavailable or unreliable." *See e.g. Crystalline Silicon Photovoltaic Cells, Whether*

*or Not Assembled Into Modules, From the People's Republic of China: Final Results of*

*Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*,

84 Fed. Reg. 36,886 (July 30, 2019) and Issues and Decision Memorandum at Comment 13;

*Fuwei Films (Shandong) Co. v. United States,* 837 F.Supp.2d 1347, 1356 (Ct. Int'l Trade 2012)

("Commerce's preference for using data from a single country {is} unreasonable when the data

was demonstrably aberrational as compared to certain benchmark prices, and alternative data

sources could be better corroborated.").  The Court has held that "the preference for use of data

from a single surrogate country could support a choice of data as the best available information where the other available data 'upon a fair comparison, are otherwise seen to be fairly equal ....'" *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *13 (Ct. Int'l Trade Mar. 23, 2021); citing *Peer Bearing Company Changshan v. United States,* 804 F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011). Commerce also must consider any potential distortion caused by the use of data from a surrogate country other than the primary surrogate country. The Court has held that "…this preference for valuing FOPs with information from a single surrogate country reasonable because deriving surrogate data from one surrogate country limits the amount of distortion introduced into the calculations because a domestic producer would be more likely to purchase a product available in the domestic market." *Clearon Corporation and Occidental Chemical Corp. v. United States*, 37 CIT 220 (2013); *Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014); *MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021).

Commerce's position that it needed to manipulate Brazilian data undermines its choice of Brazil as the surrogate country for this review. The Commerce selection of Brazil as the primary surrogate country because it supposedly provided the best information available for valuing Senmao's factors of production is inconsistent with the fact that it simultaneously found significant flaws in the Brazilian data, including with respect to the major inputs and the financial statements:

1. Commerce found that the Brazilian data for plywood had to be revised to eliminate incorrect line items.
2. Commerce found that the Brazilian data for logs could not be used because it was not as specific.
3. Commerce found that the Brazilian financial ratios had to be recalculated from how it had been calculated in a previous case and how it was calculated in the preliminary results because it could not be sure of the nature of certain expenses

Commerce cannot have it both ways.  This inconsistency is indicative of the margin shopping that Commerce was engaged in.  Defendant's only support for the decision to use Brazil as the surrogate country was that the Brazilian data contained a preferable financial statement. Defendant claims that the Brazilian financial statement was contemporaneous with the POR (it covered calendar year 2020) and was for a producer of laminate flooring, which Commerce claims is a comparable product.  Meanwhile, the Malaysian financial statements covered 2018 and were for a producer of wood products, including plywood, veneer, and laminated veneer lumber.

Defendant does not explain why laminate flooring (which uses paper in the place of wood veneer) is more comparable to the wood flooring produced by Senmao than the wood products produced by the Malaysian company.  Senmao notes that laminate flooring is excluded from the scope of this order.  IDM at 4.   In addition, the financial ratios calculated by Commerce for the Brazilian producer was based on its entire wood division, not just the production and sale of laminate flooring. Surrogate Values for the Preliminary Results, dated December 20, 2021 at 6 (P.R. 210).   The financial statements at issue indicate that the "wood division" operates four industrial plants in Brazil and three in Colombia, responsible for the production of hardboard, medium density, particle panels, medium and high-density fiberboard panels, laminate flooring, and semi-finished components for furniture.   Additional Surrogate Value Information submitted by AMMWF, dated November 8, 2021 at Exhibit 3 (P.R. 200).  Therefore, the difference in the products produced by the Brazilian and Malaysian producers is not as different as Commerce implies.  Commerce is putting the financial statements, and especially the contemporaneous nature of the financial statements, above everything else in its surrogate country selection, with no explanation as why it is relying on this one factor.

4

In prior cases, where the SV was aberrational for a major input in one of the potential surrogate countries, Commerce has not mixed and matched the data.  Instead, it simply used a different surrogate country.  *Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 35183 (July 28, 2017) and accompanying Decision Memorandum for the Preliminary Results of the 2015-2016 Antidumping Duty Administrative Review: Chlorinated Isocyanurates From the People's Republic of China, dated June 30. 2017 (using Mexico as the primary surrogate country where the SV for chlorine in Romania was aberrational); *Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam: Preliminary Results of Antidumping Duty Administrative Review; 2013-2014*, 80 Fed. Reg. 12441 (March 9, 2015) and accompanying Decision Memorandum For Preliminary Results of Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam; 2013-2014, dated March 15, 2015 ("…the largest component of the normal value in this proceeding is shrimp, not labor. It is reasonable to conclude that, in this case, the Department selects the most appropriate surrogate country by reviewing and analyzing the availability of reliable shrimp SVs").    As note in Senmao's initial brief, the Court has previously found it reasonable for Commerce to give greater weight to the major inputs as opposed to the financial statements. *Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014), *aff'd sub nom. Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016).

Defendant-Intervenor claims that it was reasonable for Commerce to select Brazil as the primary surrogate country despite relying on Malaysian data for one the major inputs, logs, and adjusting the Brazilian data for the other major input, plywood, because [

].  Def. Int. Response Br. at 19.

5

This argument, however, is circular.  The only reason that financial ratios had an [



].  The fact that [                                                   ] is indicated

by the fact that Senmao had a zero margin in the preliminary results before Commerce

manipulated the Brazilian surrogate value for plywood.   It is also noteworthy that the financial

ratios increased from the preliminary results (16.01% overhead, 14.19 percent SG&A, and 12.72

percent profit) to the Final Results (25.71 percent overhead, 21.85 percent SG&A, and 10.16

percent profit).  *Compare* Surrogate Values for the Preliminary Results, dated December 17,

2021 at 6 (P.R. 210) to Final Surrogate Value and Calculation Memorandum, dated June 27,

2022 at 2 (C.R. 100, P.R. 246).

The decision to mix and match data from multiple surrogate countries should not be taken

lightly, as Commerce had done here.  ("{T}he court must treat seriously the Department's

preference for the use of a single surrogate country." *Jacobi Carbons AB v. United States*, 992 F.

Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014), aff'd, 619 F. App'x 992 (Fed. Cir. 2015):

> This preference stems from the sensible conclusion that "deriving the surrogate
> data from one surrogate country limits the amount of distortion introduced into
> {the Department's} calculations because a domestic producer would be more
> likely to purchase a product available" domestically. *Clearon,* 37 CIT at ——,
> Slip Op. 13–22, at 12, 13 ("{T}he use of a 'single surrogate country' is justified
> when ... all other factors are 'fairly equal' because minimizing distortion supports
> a finding that Commerce relied upon the best available information on the
> record."). Moreover, the process of determining normal value by using data from
> a market economy country to value factors of production used in manufacturing a
> product in a nonmarket economy country is inexact enough without adding
> greater ambiguity, such as the inclusion of a third market and yet another
> currency.

*Id.*  Once Commerce determined that there were significant flaws in the Brazilian data, it should have simply switched to using Malaysia as the surrogate country in order to avoid such distortions.

## II.   Commerce's Decision to Adjust the Brazilian Surrogate Value Data for Plywood was Not Supported by Substantial Evidence or Otherwise in Accordance with Law

Commerce deviated from its practice when it adjusted the Brazilian plywood values to remove a line item reflecting Brazilian imports of plywood from Spain.  Commerce's practice is to determine whether an average unit value ("AUV") is aberrational in the aggregate and not to remove specific line items from the data. *Crystalline Silicon Photovoltaic Cells from China*, 82 Fed. Reg. 29033 (June 27, 2017) and accompanying Issues and Decision Memorandum at Comment 12; *Certain Uncoated Paper from China*, 81 Fed. Reg. 3112 (Jan. 20,2016) and accompanying Issues and Decision Memorandum at Comment 2; *Multilayered Wood Flooring from China,* 80 Fed. Reg. 41476 (July 15, 2015) and accompanying Issues and Decision Memorandum at Comment l1.D.  Under this practice, Commerce does not compare individual values of imports in the selected surrogate country entered under the HTS category and evaluate and remove specific line items.  Commerce has explained: "{o}therwise, parties would advocate the manipulation of data by removing one or more line items they find objectionable, with the result that we would not be using the average prices for that category, but some subset thereof."  Id.  The Court has held that Commerce's policy of not disaggregating data in order to preserve representativeness is reasonable.  *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019).

Defendant has created a distinction without a difference for the purpose of this review. It argues that its longstanding practice was not applicable in this case and only applies where Commerce is deciding to exclude data that appear unusually high or low, not when Commerce can readily determine that data sets are inaccurate on their face.  Def. Response Br. at 21.   That distinction is found nowhere in the regulations, is utterly subjective, and appears designed to be non-reviewable by the courts.  Defendant claims that the Spanish import data was not aberrational but rather was incorrect (as if aberrational and incorrect are not synonymous in the context of this case) since it contained a patent error, i.e. the data reported the same quantity figure for cubic meters and kilograms.  Def. Response Br. at 20.  Defendant-Intervenor makes the same distinction.   Def. Int. Response Br. at 16.

To Senmao's knowledge, this is the first time that the government has made a distinction between "aberrational data" and "incorrect data" and the first time that is has tried to limit its practice to cases where the data is aberrational, as now "defined" by Commerce.   But the definition of aberrational is completely absent.   Neither Defendant nor Defendant-Intervenor cites to any cases where this distinction has been claimed before.   In fact, Commerce has previously explicitly treated "incorrect" as included in the definition of "aberrational":

> Commerce endeavors to use data that is non-aberrational and reliable. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997); Remand Results 18–19. Commerce considers data to be aberrational when it is an "extreme outlier," Remand Results 11; <u>id.</u> at 23–24, 31–32 (citing prior agency practice), is distorted or misrepresentative, or is **"somehow incorrect".**

*Tri Union Frozen Prod., Inc. v. United States*, 227 F. Supp. 3d 1387, 1394–95 (Ct. Int'l Trade), *determination sustained*, 254 F. Supp. 3d 1290 (Ct. Int'l Trade 2017), <u>aff'd,</u> 741 F. App'x 801 (Fed. Cir. 2018) (emphasis added).

Commerce further defines "aberrational" to mean an extreme outlier, distorted or misrepresentative, or **somehow incorrect**.

*Solarworld Americas, Inc. v. United States*, 532 F. Supp. 3d 1266, 1270 (Ct. Int'l Trade 2021)

citing *Tri Union Frozen Prods. v. United States*, 41 CIT ——, ——, 227 F. Supp. 3d 1387,

1394-95 (2017) (emphasis added).

Commerce considers data to be aberrational when it is an "extreme outlier," is distorted or misrepresentative, or is **"somehow incorrect."**

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying Issues and Decision Memorandum at Comment 3.  (emphasis added).

Defendant also claims that the data were not "aberrational" because Commerce had no need to compare the data to any other data in order to determine that the former is incorrect. Def. Response Br. at 21 and IDM at Comment 2.  However, the decision not to compare the data with data from other countries or historical data from Brazil was Commerce's own and does not go to the nature of the data.   Obviously, in this case, either the data is properly reported in cubic meters or it is properly reported in kilograms.  Commerce could have compared the data to other import data in order to make that determination but chose not to because then it would have to consider if the data was "aberrational", not "incorrect."   So Commerce had to come up with a new word in its decision to say the same thing.  In fact, Petitioner argued in its case brief that the data was "aberrational".   Case Brief of AMMWF, dated February 8, 2022, at 6 (C.R. 98, P.R. 230).   Commerce ultimately rejected this argument and employed its new definition in order to avoid applying its practice of not removing specific line items from the import data.   IDM at Comment 2.

PUBLIC VERSION

Finally, Defendant also argues that it was required to exclude the data in order to fulfill its statutory mandate to select the best information available.  Def. Response Br. at 23.  Commerce is acting as if removing the Spanish line items from the Brazilian import data somehow made the data accurate.  This is incorrect.  Removing the Spanish line items simply distorted the Brazilian data as they found it in a way grossly adverse to Senmao.   As Commerce has explained in justifying its policy of not removing individual line items, the result is simply that Commerce is "not using the average prices for that category, but some subset thereof."  *Multilayered Wood Flooring from China,* 80 Fed. Reg. 41476 (July 15, 2015) and accompanying Issues and Decision Memorandum at Comment 11.D.  This does not result in Commerce using an accurate surrogate value for plywood, let alone the best information available. As a result of Commerce's adjustment, plywood was not accurately valued in the Final Results since the data no longer includes import data from Spain.

### III.   Commerce's Decision to Value Senmao's Log Inputs Using Surrogate Value Data from Malaysia, Rather than from the Primary Surrogate Country was Not Supported by Substantial Evidence or Otherwise in Accordance with Law

In the Final Results, Commerce selected Brazil as the primary surrogate country but relied on Malaysian surrogates to value Senmao's log inputs.  IDM at Comment 5.  Commerce valued Senmao's oak logs using Malaysian import data under HTS 4403.91, a subheading that covers oak logs, and valued other logs using Malaysian import data under HTS 4403.99.   Commerce refused to use the Brazilian data on the record for HTS 4403.99 to value any of Senmao's log inputs.  This decision was not supported by substantial evidence or otherwise in accordance with law.

### A. Commerce Applied the Wrong Legal Standard in Deciding to Depart from its Practice of Relying on Data from a Single Surrogate Country

Defendant claims that the Malaysia provided "more specifically tailored data for valuing Senmao's oak and nonoak logs" and that Commerce could not determine from the record whether the Brazilian import data covered oak logs or whether the Brazilian data excluded oak logs. Def. Response Br. at 16. However, Commerce's practice is clear. As cited above, Commerce does not depart from its regulations and its practice of valuing all inputs in a single surrogate country just because another country provides a more "specific" surrogate value.

In this case, there plainly were data on the record to value Brazilian logs. Defendant and Defendant-Intervenor's argument that Commerce must always use the most-specific data to value an input is contrary to Commerce practice. If Commerce is going to take the most specific data from every potential surrogate country to value each factor or production, then Commerce's regulations and its practice of relying on a single surrogate country would be meaningless. The standard would be which surrogate country provides the most specific data for each factor or production and parties will be submitting mixed data sets using data from multiple surrogate country in order to build the margin that they want. Senmao's efforts to price fairly within the confines of the law and regulations have been ignored, and the data manipulated simply to punish a foreign company operating in good faith, in a manner that is shocking. The Commerce practice, before this case, was to take the data as it found it.

The radical new Commerce approach will result in the very margin shopping that Commerce has previously sought to avoid. In Commerce's explanation in promulgating the regulations, it was very specific that "{t}he preference for using a single country... is meant to prevent parties from 'margin shopping': i.e., to prevent parties from arguing that the Department combine input prices from different surrogates to achieve the highest or lowest valuations of those inputs."

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,345 (Feb. 27, 1996). Commerce's actions in the current review thus is in violation of its own regulations. Commerce blatantly mixed the highest surrogate value on the record for logs, the Malaysian data, with the highest surrogate financial ratios on the record, the Brazilian data, in order to generate a margin. There is no reason for Commerce to choose a surrogate country at all if it simply then picks and chooses among surrogate values based on which country has the most specific data. This is not the regulatory scheme that Commerce adopted but rather a radical change to its regulations and practice, without notice or comment. In fact, the Court has previously upheld Commerce's selection of a surrogate value despite the fact that an alternative surrogate value in another country was more specific. *United Steel & Fasteners, Inc. v. United States*, 469 F. Supp. 3d 1390, 1402 (Ct. Int'l Trade 2020) (where Plaintiff argued that Commerce should have chosen Indonesian HTS 7228.20.1100 to value a factor of production as it was more specific than Thai HTS 7228.20 and included data contemporaneous with the POR ). The Court rejected Plaintff's argument finding it insufficient to overcome the single surrogate country preference and finding that the evidence did not establish that the Thai data was distorted or inaccurate. The Court held that "…Commerce's single surrogate country preference is strong and must be given significant weight," *Id.*

**B. Commerce's Decision to Use Malaysian Data to Value Oak Logs was Not Supported by Substantial Evidence or Otherwise in Accordance with Law**

In this case, the fact that the Malaysian data contained data specific to oak logs, does not mean that the Brazilian data was unavailable or unreliable or that it was not fairly equal to the Malaysian data even if it did not contain data specific to oak logs. While oak and non-oak logs are not equal, they are "fairly equal," which is the standard that Commerce applies.

While Defendant-Intervenor cites to Commerce's decision in *Xanthan Gum* for the
proposition that "Commerce prefers to rely on the data that are most specific to the input", that
quotation was expressed in the context of selecting the most specific surrogate value within the
same primary surrogate country, not mixing and matching data from different surrogate countries
based on which contains the most specific classification for a particular factor of product.  Def.
Int. Response Br. at 11 *citing Xanthan Gum from the People's Republic of China: Final Results
of Antidumping Duty Administrative Review; 2013-2014*, 82 Fed. Reg. 11428 (February 23,
2017) and accompanying Issues and Decision Memorandum at Comment 11.

In this case, the Brazilian data was simply the best information available in the primary
surrogate country.   Defendant and Defendant-Intervenor claim that the Brazilian data could not
be used to accurately value oak logs because the Malaysian and historical Brazilian data for oak
logs is higher than the data for POR non-oak logs.   Def. Response Br. at 17 and Def. Int.
Response Br. at 14-15.   However, this is a post hoc rationalization for a flawed decision that has
not been supported.  These alleged facts were not discussed or analyzed by Commerce in its
decision.  Commerce's decision was based solely on the fact that the Malaysian data was more
specific, which is not the correct standard.   But Commerce did not consider whether the
Brazilian data were somehow aberrational for valuing oak logs.  Nor did Commerce provide any
analysis of whether using the Malaysian data instead of the Brazilian data outweighed the
potential distortion of valuing a primary input using data from a secondary surrogate country,

### C.  Commerce's Decision to Value Non-Oak Logs Using Malaysian Data was Not Supported by Substantial Evidence or Otherwise in Accordance with Law.

Even if Commerce had been justified in relying on the Malaysian data for oak logs, there was
no reasonable basis to reject the Brazilian data with respect to non-oak logs. Defendant claims

that while the data made clear that the Malaysian data under HTS 4403.99 did not include oak logs, there was no basis to conclude that the Brazilian data under HTS 4403.99 also did not include oak logs.  Def. Response Br. at 17.   In this case, there was Brazilian data on the record covering imports under HTS 4403.99 and there was Malaysian data on the record covering imports under HTS 4403.99.  Commerce's decision reflects a willful blindness to the nature of the Harmonized Tariff Schedule, which it knows well is harmonized on the six-digit level.  Therefore, the Malaysian description for HTS 4403.99 will be the same as the Brazilian description for HTS 4403.99 and if HTS 4403.99 does not include oak logs in the Malaysian tariff schedule, it will not include oak logs in the Brazilian tariff schedule.   As a result, there was no reasonable basis for Commerce to reject the Brazilian data under 4403.99 to value Senmao's non-oak logs.   Defendant suggests that there is no record evidence to support the claim that the Brazilian data did not include non-oak logs and that it was reasonable for Commerce to refrain from making "unsupported inferences about the extent to which Brazil's system is or is not harmonized with Malaysia's."  To suggest that the parties must not only submit factual information for the record but also instruct Commerce in every basic principle of the harmonized tariff schedule just in case it becomes relevant is not reasonable.

   In addition, by the time Commerce revealed its alleged ignorance of the HTS, the time to submit new factual information had passed and Senmao had no opportunity to put information on the record demonstrating that the HTS is harmonized at the six-digit level.  But the submission of such information is not necessary.  Commerce has previously recognized that the HTS is harmonized at the six-digit level making such record evidence unnecessary:

> By virtue of the HS code being the same across countries at the six-digit level,
> any HS code for which dimension is specified at the six-digit level for Brazil or
> Mexico will also be specified at the six-digit level for Russia.

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying Issues and Decision Memorandum at Comment 2.

> Commerce notes that HTS classifications between countries are identical only to the six-digit level.

*Mattresses from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances, in Part*, 84 Fed. Reg. 56761 (October 23, 2019) and accompanying Issues and Decision Memorandum at Comment 11.H.

> As stated above, HTS categories are harmonized among countries only up to the six-digit level

*Multilayered Wood Flooring from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64318 (October 18, 2011) and accompanying Issues and Decision Memorandum at Comment 14.   Therefore, Commerce seems to understand the HTS when convenient, and the argument that there is a requirement of a submission of additional record information is incorrect.   In addition, Defendant-Intervenor confirms that there is a HTS subheading 4903.91 in Brazil covering oak logs.  Def. Int. Response Brief at 15. Just because there was no data available under that subheading in the current review period does not mean that Brazil suddenly started classifying oak logs under HTS 4903.99 instead.  Such speculation by Commerce is without support.

15

**IV.     Commerce's Calculation of the Brazilian Financial Ratios was Not Supported by Substantial Evidence or Otherwise in Accordance with Law**

In the Final Results, Commerce calculated estimated "transport expenses" for the wood division of a surrogate company in Brazil and treated these expenses as manufacturing overhead in the financial ratio calculations.  As argued in our initial brief, this decision constitutes double counting and thus unreasonably increased the financial ratios.   Not only was this  contrary to how Commerce calculated the financial ratios in the preliminary results, it was also was contrary to how Commerce calculated the financial ratios based on the same financial statement in *Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (January 4, 2021).

For the first time, in the Final Results, Commerce decided that "transport expenses" likely referred to a distinct cost element from freight expenses.  Defendant claims that this decision was supported by substantial evidence but cites to no record evidence at all.  Def. Response Br. at 28. Defendant claims that this is supported by accounting practices but cites to no authority or record evidence for the statement that this is standard accounting practice. It simply cites to itself and its own prior determinations, none of which cite to any accounting authority either.  *See, e.g., Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013*, 79 Fed. Reg. 70,163 (November 25, 2014), and accompanying Issues and Decision Memorandum at Comment 6; *Final Determination of Sales at Less Than Fair Value: Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China*, 79 Fed. Reg. 25,572 (May, 5, 2014).  Absent such record evidence, Commerce's decision is pure speculation and unsupported by substantial evidence.

Likewise, Commerce's decision to revise the surrogate financial ratio calculation from the preliminary results to allow an offset for only certain financial income that it decided should

be treated as short-term in nature was unsupported by the record.  Defendant claims that the

information on the record was insufficient for Commerce to determine whether these categories

of interest income were long-term or short-term in nature and its practice is, therefore, to treat

them as long-term investments and exclude them from the offset to financial expenses.

Commerce, however, cites to only one case in support of its alleged "practice" and cites to no

record evidence supporting its conclusions.   Defendant claims that Senmao's assertions are

speculative but the best it can do to support its argument is to make assertions as to what these

expenses "might" include.  Def. Response Br. at 27.  Commerce simply makes the assumption

that is most adverse to Senmao, which is unreasonable.  As argued in our initial brief, Senmao's

explanation of the line items at issue was reasonable and should have been accepted.

## V.      Commerce's Decision to Deny Senmao a By-Product Offset was Not Supported by Substantial Evidence or Otherwise in Accordance with Law

In the Final Results, Commerce denied Senmao's claim for a byproduct offset because

Senmao was only able to provide data on its byproduct sales and was not able to provide data for

its by-product production during the POR.   IDM at Comment 6.  Defendant and Defendant-

Intervenor defend this decision by citing to Commerce's alleged practice to grant respondents an

offset to the factors of production for by-products only if respondents can provide and

substantiate the quantity of by-product it generated from the production of subject merchandise

during the period of Review. Def. Response Br. at 32; Def. Int. Response Br. at 27.  While

Commerce claims that this is its "practice", it fails to explain why, if this was a "practice." this

"practice" was not followed in any of the prior administrative reviews with respect to Senmao.

Neither Defendant nor Defendant-Intervenors adequately explain Commerce's sudden decision

to change course, without warning, and apply this "practice" in this administrative review.

Rather, both Defendant and Defendant-Intervenor cite to the mantra that "each segment of a proceeding is independent and stands on its own record".  Def. Response Br. at 33; see also Def. Int. Response Br. at 27.  However, Commerce itself did not follow its own mantra in these proceedings, apparently because the mantra did not lead to its desired high dumping margin.  As explained in Senmao's opening brief, Petitioner's argued against granting Senmao a by-product offset in the 2014-2015 administrative review because Senmao could not provide data on its by-product production during the POR.   Nevertheless, the Department held that Senmao was entitled to a by-product offset finding that "{a}t verification, the Department not only observed how wood scrap was generated and collected, but also how the reported by-product (*i.e.*, wood scrap) sales could be tied to the sales general ledger for other income with sales invoices, sales VAT invoices, receipts, accounting vouchers, and warehouse-in/out slips." *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25766 (June 5, 2017) and accompanying Issues and Decision Memorandum at Comment 13.  Thus, Senmao's offset claim was deemed credible.

Then in the 2015-2016 administrative review, Petitioners again argued against granting Senmao a by-product offset for the same reasons.   Despite the fact that there were no new facts on the record with respect to Senmao's by-product production, Commerce relied on its findings in the prior administrative review.  It did not treat that prior proceeding as irrelevant or make a decision solely on the basis of the record of the 2015-2015 administrative review.   It relied on its factual findings from the prior review stating that there was "no contradictory information on the record of this review to warrant departure from our prior determination." *Multilayered Wood*

*Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35461 (July 26, 2018) and accompanying Issues and Decision Memorandum at Comment 4.  Since that time, the Department consistently continued to grant Senmao a by-product offset without requiring that Senmao provide information on the volume of scrap produced during the POR.  The fact that Petitioner did not raise the issue a third time between the 2015-2016 administrative review and the 2019-2020 administrative review at issue here does not change the fact that Commerce did not require Senmao to submit production records for scrap produced during the PORs of those reviews or apply its alleged "practice" in deciding whether to grant a by-product offset.

In prior cases where Commerce has decided to apply a reporting requirement that it had foregone previously, it has provided respondents with a warning that they would have to provide additional information in subsequent administrative reviews and change their record-keeping practices if necessary.   In *Certain Steel Nails from China*, Commerce initially did not require product-specific reporting in early segments of the proceeding.  In the third administrative review, Commerce notified respondents that it intended "require ... {that} respondents for this case report all FOPs data on a CONNUM-specific basis using all product characteristics in subsequent reviews, as documentation and data collection requirements should now be fully understood."  *Certain Steel Nails from the People's Republic of China*, 78 Fed. Reg. 16,651 (Mar. 18, 2013) and accompanying Issues and Decision Memorandum at Comment 5. Likewise, in *Thuan An Prod. Trading & Serv. Co. v. United States*, this Court rejected respondent's argument that Commerce had created a reliance interest, where Commerce provided them with a warning that Commerce would require CONNUM-specific reporting in

future reviews.  *Thuan An Prod. Trading & Serv. Co. v. United States*, 348 F. Supp. 3d 1340,

1354 (Ct. Int'l Trade 2018). ‼

  In this case, Senmao was provided with no warning that Commerce would suddenly

apply an alleged "practice" or apply a standard that it had never applied to Senmao before.

Senmao reasonably relied on Commerce's prior decisions that it did not need to maintain records

of by-product production and that it's recordkeeping practices had satisfied the Department that

Senmao was entitled to a by-product offset.  Senmao had a substantial "reliance interest" in the

established reporting practices in these proceedings and Commerce did not provide adequate

reasons for the sudden application of its alleged "practice".  *Shikoku Chems. Corp. v. United*

*States*, 16 CIT 382, 386-87 (1992) ("Shikoku's reliance interest is sufficient to preclude

Commerce from adopting the new method of calculating packing expenses."):

> At some point, Commerce must be bound by its prior actions so that parties have
> a chance to purge themselves of antidumping liabilities. Principles of fairness
> prevent Commerce from changing its methodology at this late stage.

Id.  *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1169 (2001)

("Commerce may not make minor but disruptive changes in methodology where a respondent

demonstrates its specific reliance on the old methodology used in multiple preceding reviews.")

Despite these reliance interests, Senmao was provided with no warning in this review that

Commerce was no longer going to rely on its prior findings and would now enforce its

requirement that Senmao document its by-product production during the POR in order to receive

a by-product offset.

  Nor did Commerce give Senmao an opportunity to demonstrate its eligibility to a by-

product offset by issuing supplemental questionnaires once Senmao indicated that it did track by-

product production.   Defendant and Defendant Intervenor cite to the U.S. Court of Appeals

holding in *American Tubular* Products to the effect that Commerce is not required to issue a supplemental questionnaire in cases where respondent indicated that it did not maintain the requested information.  *Am. Tubular Prods., LLC. v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017). The Federal Circuit held that Commerce "was not obligated to accommodate Chengde's failure to document scrap production; nor was Commerce obligated to continue asking for information that Chengde clearly stated it did not record." *Id*.  This case, however, is distinguishable.   As argued above and in Senmao's initial brief, Commerce had granted Senmao a by-product offset in prior reviews despite the fact that Senmao did not maintain production records for by-products.   In fact, Senmao did not keep such records during the initial administrative review in which Commerce granted Senmao a by-product offset.   Nevertheless, Senmao was able to satisfy Commerce that other information supported its right to such an offset and Commerce was willing to accept such alternative information despite its alleged "practice" of requiring production records.   These issues were not before this Court or the Federal Circuit in *American Tubular*.   If Commerce was no longer going to rely on the facts collected in a prior segment of the proceeding, it was required to give Senmao an opportunity to again put alternative information on the record again pursuant to 19 U.S.C. § 1677m(d).    The courts have previously held that this statutory requirement is not ambiguous. *China Kingdom Imp. & Exp. Co. v. United States*, 31 C.I.T. 1329, 1344–45 (2007).  Moreover, the Court has held that this requirement applies in cases where respondent is claiming an adjustment. *Jindal Poly Films Ltd. of India v. United States,* 365 F. Supp. 3d 1379, 1388 (Ct. Int'l Trade 2019).

In this case, Commerce has consistently found that Senmao is entitled to a by-product offset despite the fact that it did not keep records of by-product production.  Given that Commerce points to no information missing from this review that was present in prior reviews

and given that the Department failed to request any additional information or warn Senmao that is needed to change its record-keeping practices, it should have granted Senmao a by-product offset in the Final Results of this review.

## CONCLUSION

For the reasons discussed above, Senmao respectfully requests that this Court remand this proceeding to Commerce with instructions to grant the relief requested herein.

Respectfully submitted,

/s/Jeffrey S. Neeley
Jeffrey S. Neeley
Stephen W. Brophy
**Husch Blackwell LLP**
1801 Pennsylvania Ave., N.W.
Suite 1000
Washington, DC 20006
(202) 378-2409
Email: Jeffrey.Neeley@huschblackwell.com

*Counsel for Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.*

Dated:  February 6, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(2), the undersigned certifies that this submission complies with the word limitation requirement.  The word count for this submission, as computed by Husch Blackwell's word processing system Microsoft Word, is 6,672 words, which is less than the 7,000 word limit.

/s/ Jeffrey S. Neeley
_____
Jeffrey S. Neeley
Husch Blackwell LLP
*Counsel for Plaintiffs Jiangsu Senmao*
*Bamboo and Wood Industry Co., Ltd.*