## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | |
|     Plaintiff, | |
| and | |
| LUMBER LIQUIDATORS SERVICES, LLC, | |
|     Plaintiff-Intervenor, | Before: Jennifer Choe-Groves, Judge |
| v. | Court No. 22-00190 |
| UNITED STATES, | |
|     Defendant, | |
| and | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | |
|     Defendant-Intervenor. | |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the 2019–2020 antidumping duty administrative review of multilayered wood flooring from the People's Republic of China.]

Dated: August 25, 2023

Jeffrey S. Neeley and Stephen W. Brophy, Husch Blackwell LLP, of Washington, D.C., for Plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

Mark Ludwikowski and Kelsey Christensen, Clark Hill PLC, of Washington, D.C., for Plaintiff-Intervenor Lumber Liquidators Services, LLC.

Tara K. Hogan, Assistant Director, and Kelly M. Geddes, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director. Of counsel on the brief was Christopher Kimura, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brighthill and Stephanie M. Bell, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring.

Choe-Groves, Judge: Plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Plaintiff" or "Senmao") filed this action pursuant to 19 U.S.C. § 1675 contesting the final results of the U.S. Department of Commerce ("Commerce") in Multilayered Wood Flooring from the People's Republic of China ("Final Results"), 87 Fed. Reg. 39,464 (Dep't of Commerce July 1, 2022) (final results of antidumping duty admin. review; 2019–2020) and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of China; 2019–

2020 (Dep't of Commerce June 24, 2022) ("Final IDM"), PR 245.[1]

Before the Court is Plaintiff's Motion for Judgment upon the Agency Record Pursuant to USCIT Rule 56.2.  Pl.'s R. 56 Mot. J. Agency R. Pursuant to USCIT R. 56.2 ("Plaintiff's Motion" or "Pl.'s Mot."), ECF No. 38; see also Mem. Supp. Pl.'s R. 56.2 Mot. J. Agency R. ("Pl.'s Br."), ECF No. 38-1.  Also before the Court is Plaintiff-Intervenor Lumber Liquidators Services, LLC's ("Plaintiff-Intervenor" or "Lumber Liquidators") Rule 56.2 Motion for Judgment on the Agency Record. Pl.-Interv.'s R. 56 Mot. J. Agency R. ("Plaintiff-Intervenor's Motion" or "Pl.-Interv.'s Mot."), ECF No. 39; see also Pl.-Interv.'s Mem. Law Supp. Pl.-Interv.'s R. 56.2 Mot. J. Agency R. ("Pl.-Interv.'s Br."), ECF No. 39.  Defendant United States ("Defendant") filed Defendant's Response in Opposition to Plaintiff's and Plaintiff-Intervenor's Motions for Judgment upon the Agency Record.  Def.'s Resp. Opp'n Pl.'s Pl.-Interv.'s Mots. J. Agency R. ("Def.'s Resp."), ECF No. 41. Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring ("Defendant-Intervenor" or "AMMWF") filed Defendant-Intervenor's Response to Motion for Judgment on the Agency Record.  Def.-Interv.'s Resp. Mot. J. Agency R. ("Def.-Interv.'s Resp."), ECF Nos. 42, 43.  Plaintiff filed Reply Brief of Plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.  Pl.'s Reply Br.

---

[1]  Citations to the administrative record reflect the public administrative record ("PR") document numbers.  ECF Nos. 47, 48.

("Pl.'s Reply"), ECF Nos. 44, 45.  Plaintiff-Intervenor filed Reply Brief in Support

of Rule 56.2 Motion for Judgment on the Agency Record by Plaintiff-Intervenor.

Pl.-Interv.'s Reply Br. Supp. R. 56.2 Mot. J. Agency. R. ("Pl.-Interv.'s Reply"),

ECF No. 46.  The Court held oral argument on May 31, 2023.  Oral Argument

(May 31, 2023), ECF No. 52.

For the following reasons, the Court sustains in part and remands in part the

<u>Final Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's determination to select Brazil as the primary
   surrogate country, while using Malaysian data for log inputs, is supported
   by substantial evidence and in accordance with law;

2. Whether Plaintiff-Intervenor's argument that Malaysian data are
   aberrational is waived;

3. Whether Commerce's determination to revise the Brazilian surrogate
   value data for plywood is supported by substantial evidence and in
   accordance with law;

4. Whether Commerce's calculation of the Brazilian financial ratios is
   supported by substantial evidence and in accordance with law; and

5. Whether Commerce's denial of Plaintiff's by-product offset is in

accordance with law.

## BACKGROUND

Commerce conducted an administrative review for the period from

December 1, 2019 through November 30, 2020.  Initiation of Antidumping and

Countervailing Duty Admin. Review, Multilayered Wood Flooring from the

People's Republic of China, 86 Fed. Reg. 8166, 8169–71 (Dep't of Commerce

Feb. 4, 2021).  Commerce selected Senmao as the mandatory respondent in the

investigation.  See Commerce's Antidumping Administrative Review of

Multilayered Wood Flooring from the People's Republic of China; 2019–2020:

Respondent Selection Mem. ("Resp. Selection Mem.") (Mar. 9, 2021), PR 112.

Prior to Commerce issuing the preliminary results, Senmao proposed that

Commerce should use Brazilian surrogate value data to value its factors of

production and Defendant-Intervenor proposed that Commerce should use

Malaysian surrogate values.  Senmao's Surrogate Value Cmts. (July 29, 2021),[2] PR

176–77; AMMWF's Surrogate Value Cmts. (July 29, 2021), PR 179–82.

On December 27, 2021, Commerce published its preliminary determination.

Multilayered Wood Flooring from the People's Republic of China ("Preliminary

---

[2]  Senmao's Surrogate Value Comments are incorrectly dated as July 29, 2020.
Senmao's Surrogate Value Cmts. at 1.

Results"), 86 Fed. Reg. 73,252 (Dep't of Commerce Dec. 27, 2021) (prelim. results

of the antidumping duty admin. review, prelim. determination of no shipments, and

rescission of review, in part; 2019–2020), and accompanying Decision

Memorandum for the Preliminary Results of Antidumping Administrative Review

(Dec. 17, 2022) ("Preliminary Determination Memo" or "PDM"), PR 213.  In the

Preliminary Determination Memo, Commerce selected Brazil as the primary

surrogate country, valued Senmao's logs with surrogate values from the secondary

surrogate country of Malaysia, determined that the financial data of Duratex were

appropriate to calculate Senmao's financing costs of the subject merchandise, and

denied an offset to the reported factors of production for Senmao's by-product.

PDM at 17, 24–25.  Commerce calculated an antidumping margin of zero for

Senmao.  Id. at 14.

　　　Following the Preliminary Results, the parties to the investigation submitted

additional briefing.  Senmao's Admin. Case Br. (Feb. 7, 2022), PR 228; Lumber

Liquidators' Letter in Lieu of Admin. Case Br. (Feb. 7, 2022), PR 229; AMMWF's

Admin. Case Br. (Feb. 7, 2022), PR 230; Senmao's Admin. Rebuttal Br. (Feb. 17,

2022), PR 233; Lumber Liquidators' Admin. Rebuttal Br. (Feb. 17, 2022), PR 234;

AMMWF's Admin. Rebuttal Br. (Feb. 17, 2022), PR 235.

　　　Commerce published its Final Results on July 1, 2022.  Final Results, 87

Fed. Reg. 39,464; see also Final IDM.  In the Final IDM, Commerce continued to

select Brazil as the primary surrogate country, value Senmao's logs with

Malaysian surrogate values, and deny Senmao a by-product offset, but Commerce

revised the surrogate values for plywood and revised its calculation of surrogate

financial ratios.  See Final IDM at 5, 9–10, 22–23, 26–28.  Commerce calculated

Senmao's antidumping duty margin at 39.27%.  Final Results, 87 Fed. Reg. at

39,465.

Plaintiff filed this action timely pursuant to 19 U.S.C. § 1675 contesting

Commerce's Final Results.  See Compl., ECF No. 7.

## JURISDICTION

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with law.  19

U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Legal Framework

Antidumping duties are calculated as the difference between the normal

value of subject merchandise and the export price or the constructed export price of

the subject merchandise.  19 U.S.C. § 1673.  To determine the normal value of the

subject merchandise in a non-market economy, Commerce must calculate

surrogate values using "the best available information regarding the values of such factors in a [comparable] market economy." 19 U.S.C. § 1677b(c). In doing so, Commerce relies on one or more market economy countries that are (1) "at a level of economic development comparable to that of the non[-]market economy country," and (2) "significant producers of comparable merchandise." Id. § 1677b(c)(4). Commerce's task is to "attempt to construct a hypothetical market value" of the subject merchandise in the non-market economy. Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999). When Commerce determines that there is more than one country at the same level of economic development as the non-market economy country and is a significant producer of comparable merchandise, Commerce will consider the quality and availability of the surrogate value data. See Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1075, 638 F. Supp. 2d 1325, 1347 (2009).

Commerce's regulatory preference is to value all factors of production with surrogate values from a single surrogate country. 19 C.F.R. § 351.408(c)(2); see Jiaxing Brother Fastener Co., Ltd. v. United States, 822 F.3d 1289, 1302 (Fed. Cir. 2016). However, Commerce may use a second surrogate country if data from the primary surrogate country are unavailable or unreliable. See Import Admin. Policy Bull. No. 04.1: Non-Market Economy Surrogate Country Selection Process (Dep't of Commerce Mar. 1, 2004) ("Policy Bulletin No. 04.1"). When the data

from a single surrogate country are "demonstrably aberrational as compared to

certain benchmark prices, and alternative data sources could be better

corroborated," Commerce's preference for using data from a single country is

deemed unreasonable.  <u>Peer Bearing Co.-Changshan v. United States</u>, 35 CIT 103,

119, 752 F. Supp. 2d 1353, 1369–72 (2011).

## II.      Selection of Surrogate Country

Plaintiff and Plaintiff-Intervenor argue that Commerce's determination to

select Brazil as the primary surrogate country, while also rejecting or adjusting

Brazilian data for the primary inputs (valuing Plaintiff's log inputs using

Malaysian data, adjusting Brazilian plywood data, and revising the Brazilian

financial ratios) is not in accordance with law or supported by substantial evidence.

Pl.'s Br. at 16–19; Pl.-Interv.'s Br. at 17–20.  Plaintiff-Intervenor asserts that

Commerce's use of Malaysian log data is not in accordance with law because

Commerce deviated from its established methodology and caused an aberrational

result.  Pl.-Interv.'s Br. at 20–25.  Plaintiff and Plaintiff-Intervenor contend that

Commerce erred by not valuing all factors of production from a single surrogate

country because the record in this case does not support a determination that

Brazilian data are unavailable or unreliable.  <u>See</u> Pl.'s Br. at 16–20; Pl.-Interv.'s

Br. at 19–20.  Plaintiff-Intervenor challenges Commerce's determination to use

both Brazilian and Malaysian data as a departure from Commerce's established

practice of using a single surrogate country.  Pl.-Interv.'s Br. at 17–20.

If Commerce has a routine practice for addressing similar situations, it must

either apply that practice or provide a reasonable explanation regarding why

Commerce has deviated from that practice.  See SKF USA, Inc. v. United States,

263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the

agency offers insufficient reasons for treating similar situations differently."

(internal citation omitted)); see also M.M. & P. Mar. Advancement, Training,

Educ. & Safety Program v. Dep't of Commerce, 729 F.2d 748, 755 (Fed. Cir.

1984) ("An agency is obligated to follow precedent, and if it chooses to change, it

must explain why."); see also Cinsa, S.A. de C.V. v. United States, 21 CIT 341,

349, 966 F. Supp. 1230, 1238 (1997) ("Commerce can reach different

determinations in separate administrative reviews but it must employ the same

methodology or give reasons for changing its practice.").

19 C.F.R. § 351.408(c) provides that, "[f]or purposes of valuing the factors

of production, . . . [Commerce] normally will value all factors in a single surrogate

country."  19 C.F.R. § 351.408(c), (c)(2).  Commerce explained when

promulgating its regulations that the preference for a single country is meant to

prevent parties from "margin shopping," and Commerce may depart from its

regulatory preference for a single surrogate country when Commerce determines

that the "accuracy of available information regarding prices for particular factors in

the surrogate country is 'highly questionable,'" in which case Commerce may

reject the questionable values and use data from a second country.  Antidumping

Duties; Countervailing Duties, 61 Fed. Reg. 7308, 7345 (Feb. 27, 1996).

Commerce may use a secondary surrogate country if financial data are "inadequate

or unavailable."  See Policy Bulletin 04.1 ("After all, a country that perfectly meets

the requirements of economic comparability and significant producer is not of

much use as a primary surrogate if crucial factor price data from that country are

inadequate or unavailable.").

In evaluating surrogate value data, Commerce considers several factors,

including whether the surrogate values are publicly available, contemporaneous

with the period of review, representative of a broad market average, tax and duty-

exclusive, and specific to the inputs being valued.  See Policy Bulletin No. 04.1;

see also Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386

(Fed. Cir. 2014) (citing the same factors).  Commerce explained that comparable

merchandise is determined on a case-by-case basis, the meaning of a significant

producer can differ from case to case, and fixed standards have not been adopted in

Commerce's surrogate country selection process.  See Policy Bulletin No. 04.1.  In

assessing whether a country is a significant producer of comparable merchandise,

Commerce considers whether all of the potential surrogate countries have

significant exports of comparable merchandise, but does not consider levels of significance in comparison with other countries.  See id.

Commerce determined that Romania, Russia, Malaysia, Turkey, Mexico, and Brazil were economically comparable to China.  PDM at 15.  Commerce selected Brazil as the primary surrogate country for valuing all of Senmao's factors of production, except for the log inputs.  Final IDM at 9.  In reaching this determination, Commerce considered three financial statements that were placed on the record to calculate the financial surrogate values: (1) Brazilian company Eucatex S.A. Industria e Comercio ("Eucatex"); (2) Brazilian company Duratex S.A. ("Duratex"); and (3) Malaysian company Focus Lumber Berhad ("Focus Lumber").  See PDM at 15, 17; Senmao's Surrogate Value Cmts. at Ex. 13 (financial statement of Eucatex); AMMWF Surrogate Value Cmts. at Ex. 10 (financial statement of Focus Lumber); AMMWF's Additional Surrogate Value Cmts. (Nov. 8, 2021) at Ex. 3B, PR 200 (financial statement of Duratex).  Commerce considered whether the financial statements were publicly available, contemporaneous with the period of review, representative of broad market averages, tax- and duty-exclusive, and specific to the inputs being valued.  Id. at 17.  Commerce considered the financial data from the Brazilian and Malaysian companies, and determined that the Brazilian company Duratex's data were preferable because Duratex was a producer of identical or comparable merchandise

(laminate flooring), the data were contemporaneous with the period of review, and

the data were not questioned by its auditors.  Id.  In comparison, Commerce

determined that the Brazilian company Eucatex's data were less reliable because

although the data were contemporaneous with the period of review and related to

laminate flooring, Eucatex's auditors provided a qualified opinion, thereby calling

into question the reliability of the financial data.  Id.  Upon reviewing the various

financial data from Brazil, Commerce selected Brazil as the primary surrogate

country because Commerce determined that the Brazilian data contained useable

data for valuing all of Senmao's factors of production "except for the log inputs."

Id.  Commerce failed, however, to cite any record evidence demonstrating that the

Brazilian data on log inputs was highly questionable, inadequate, or unavailable,

and would therefore warrant a departure from a single surrogate country.

    With respect to the log inputs using Malaysian data, Commerce failed to

provide a reasonable explanation to depart from its established practice of using

one surrogate country and failed to support its determination with substantial

evidence.  For example, Commerce reviewed the Malaysian company Focus

Lumber's financial data and determined that the Malaysian financial statements

were publicly available, contemporaneous with the period of review, representative

of broad market averages, tax- and duty-exclusive, and specific to the inputs being

valued.  Id.  In explaining why Commerce selected Malaysian import data specific

to oak log inputs, Commerce stated:

> [W]e find it appropriate to select Brazil as the primary surrogate
> country because the record contains usable Brazilian data for valuing
> all of Senmao's [factors of production] except for the log inputs. . . .
> While it is Commerce's preference to value all inputs from a single
> surrogate country, we determine that record evidence demonstrates that
> the log inputs reported by Senmao are more accurately valued using
> Malaysian [surrogate values].

Id.  Notably, Commerce failed to cite any record evidence to support its

determination that Brazil's data on log inputs were either "highly questionable" or

"inadequate or unavailable," or that Malaysian data were more accurate to value

log inputs.  Although Commerce made a conclusory statement in the Preliminary

Determination Memo that "*record evidence demonstrates* that the log inputs

reported by Senmao are more accurately valued using Malaysian [surrogate

values]," Commerce only cited generally to "[AMMWF's Additional Surrogate

Value Comments]" in support of its determination and did not cite to any specific

documents on the record.  Id. (emphasis added) (citing AMMWF's Additional

Surrogate Value Comments).

In the Final IDM, Commerce also did not cite to any evidence to support its

determination, stating only that:

> Commerce continues to value Senmao's oak logs using Malaysian
> [surrogate values] 4403.91.1000 and non-oak logs using Malaysian
> basket category 4403.99.00, as these [surrogate values] constitute the

best available information on the record. . . . For Malaysia, the
petitioner provided [Global Trade Atlas ("GTA")] import data for logs
classified under Malaysian HS 4403.91.1000 and HS 4403.99. Thus,
the record includes import data from Malaysia that explicitly
differentiates oak and other species of logs, as well as import data from
Brazil that does not explicitly differentiate by log species. . . . Thus,
considering the record evidence in its entirety, we have continued to
value all of Senmao's logs using Malaysian [surrogate values] in the
final margin calculation.

Final IDM at 22–23. Although Commerce referred generally to GTA import data,

Commerce failed to cite any specific documents on the record to support its

determination, despite its general declarations that the record includes evidence. In

the Final IDM, Commerce stated, "*See* [Preliminary Surrogate Value

Memorandum (Dec. 17, 2021), PR 210–11]" generally, but did not cite to any

record evidence. Id. at 18 n.94.

In the Preliminary Surrogate Value Memorandum, Commerce stated that:

Commerce has determined that the Brazilian [surrogate values] on the
record for the material inputs appear complete and viable in terms of
the criteria set out above and we selected Brazil as the primary
surrogate country. However, as also noted in the Preliminary
Determination Memorandum, Commerce has determined that
Malaysian [surrogate values] on the record are more specific to
Senmao's log inputs than are the Brazilian [surrogate values].

Prelim. Surrogate Value Mem. at 2 (citing AMMWF's Additional Surrogate Value

Cmts.; PDM). Notably, in the Preliminary Surrogate Value Memorandum,

Commerce attached various documents as exhibits, but failed to identify any

particular record documents on which Commerce relied.  See Prelim. Surrogate Value Mem.

    In summary, Commerce in its Final IDM attempted to support its determinations with citations to record evidence, but Commerce referred only to GTA import data generally without citations to any particular documents; referred to the Preliminary Surrogate Value Memorandum without citations to any particular documents; referred to AMMWF's Additional Surrogate Value Comments without citations to any particular documents; and referred to various court decisions and Policy Bulletin No. 04.1.  See Final IDM at 18, 22–23. Because Commerce failed to identify any record evidence on which it relied, the Court holds that Commerce's determinations are not supported by substantial evidence.

    Commerce noted in its Final IDM that "[i]t is not Commerce's responsibility to build an adequate record for parties."  Id. at 22.  Similarly, the Court notes that it is not the Court's responsibility to sift through the record to attempt to identify which documents, if any, support Commerce's determinations.  Because Commerce failed to cite any record evidence demonstrating that the Brazilian data on log inputs were highly questionable, inadequate, or unavailable, and any evidence demonstrating that Malaysian data on log inputs were "the best available information" under 19 U.S.C. § 1677b(c)(1), the Court concludes that Commerce

did not provide a reasonable explanation for departing from its established practice

of using a single surrogate country.  The Court holds that Commerce's

determinations to select Brazil as the primary surrogate country and to value

Plaintiff's log inputs using Malaysian data are not in accordance with law and not

supported by substantial evidence.  The Court remands this issue for further

explanation or reconsideration by Commerce.

### III.    Waiver of Plaintiff-Intervenor's Argument That Malaysian Data Are Aberrational

Plaintiff-Intervenor argues that Commerce's determination to select

Malaysia as a secondary surrogate country is unlawful because Commerce's use of

Malaysian log data caused an aberrational result and the margin of 39.27% in the

Final Results "defies commercial and economic reality," focusing on Plaintiff's

low margins in prior reviews and the margin of 0% in the Preliminary Results.  See

Pl.-Interv.'s Br. at 20–25.  Defendant contends that Plaintiff-Intervenor waived this

argument because of its failure to exhaust administrative remedies.  Def.'s Resp. at

18–20.

Before commencing suit in the U.S. Court of International Trade, an

aggrieved party must exhaust all administrative remedies available to it.  "In any

civil action . . . the Court of International Trade shall, where appropriate, require

the exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The court

"generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies." Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (citations omitted). 19 C.F.R. § 351.309(c)(2) requires that, "[t]he case brief must present all arguments that continue in the submitter's view to be relevant to the . . . final determination or final results." 19 C.F.R. § 351.309(c)(2). There are limited exceptions to the exhaustion requirement. See Pakfood Pub. Co. v. United States, 34 CIT 1122, 1145–48, 724 F. Supp. 2d 1327, 1351–53 (2010) (listing futility for the party to raise its argument at the administrative level and issues fully considered by Commerce as two generally recognized exceptions to the exhaustion doctrine); see also Holmes Prod. Corp. v. United States, 16 CIT 1101, 1104 (1992) ("[E]xhaustion may be excused if the issue was raised by another party, or if it is clear that the agency had an opportunity to consider it."). Incorporation by reference to another party's administrative argument is also among the exceptions this court has recognized to the exhaustion requirement. See Meihua Grp. Int'l Trading (Hong Kong) Ltd. v. United States, 47 CIT __, __, 633 F. Supp. 3d 1203, 1213 (2023).

Plaintiff-Intervenor Lumber Liquidators filed a letter in lieu of an administrative case brief and raised objections by incorporating by reference the arguments made in Plaintiff's administrative briefs. See Pl.-Interv.'s Reply at 8–9;

Lumber Liquidators' Letter in Lieu of Admin. Case Br. at 2; Lumber Liquidators' Admin. Rebuttal Br. at 2.  Plaintiff did not raise the argument, however, of Malaysian data being aberrational.  See Senmao's Admin. Case Br.; Senmao's Admin. Rebuttal Br.  The Court concludes that the exception of incorporation by reference does not exist because Plaintiff did not argue during the administrative proceeding that the Malaysian data were aberrational and thus Plaintiff-Intervenor waived this argument.

In addition, Plaintiff-Intervenor argued for the first time during oral argument that the futility exception applies in this case because the high margins did not yet exist in the Preliminary Results.  Recording of Oral Argument at 13:58–15:03, ECF No. 53.  While this argument may have been persuasive if properly raised, the Court concludes that Plaintiff-Intervenor waived this argument because it did not include this argument in its moving or reply briefs.  Issues raised for the first time at oral argument are waived.  See Shell Oil Co. v. United States, 35 CIT 673, 702, 781 F. Supp. 2d 1313, 1338 (2011), aff'd, 688 F.3d 1376 (Fed. Cir. 2012) (holding that party's argument was waived because it was raised for the first time at oral argument).

The Court concludes, therefore, that Plaintiff-Intervenor waived the issue of Malaysian data being aberrational and cannot raise it before this Court.

### IV.    Adjustment of Surrogate Value Data for Plywood

Plaintiff argues that Commerce's determination to revise the Brazilian surrogate value data for plywood is not supported by substantial evidence and not in accordance with law because Commerce deviated from its practice when it adjusted Brazilian plywood values to remove a line item reflecting Brazilian imports of plywood from Spain and did not provide any evidence that the Brazilian surrogate value for plywood is "aberrational in the aggregate." Pl.'s Br. at 14–15.

Defendant and Defendant-Intervenor contend that Commerce only applies the "aberrational in the aggregate" test when Commerce is deciding to exclude a large amount of data that appear unusually high or low, not when Commerce can readily determine that data are inaccurate, such as in this administrative review. Def.'s Resp. at 20–23; Def.-Interv.'s Resp. at 16–17. Plaintiff replies that this is the first time to its knowledge that the Government has made a distinction between "aberrational data" and "incorrect data." Pl.'s Reply at 8.

As noted previously, if Commerce has a routine practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation regarding why Commerce has deviated from that practice. See SKF USA, Inc., 263 F.3d at 1382.

Commerce stated that it did not apply the "aberrational in the aggregate" test when it revised the Brazilian surrogate data for plywood, reasoning that:

> [T]here is prima facie evidence that the January 2020 Spanish import component of the Brazilian [surrogate value] is incorrect. Therefore, the concerns underlying Commerce's practice of evaluating [surrogate values] in the aggregate are not present here. In this regard, Commerce evaluates [surrogate values] on an aggregate basis out of administrative convenience—to avoid the "impossible task" of identifying and defining "what is and what is not aberrational among . . . thousands of data points spread along a vast spectrum of relatively high and low values"—and to discourage the cherry-picking and manipulation of data.

Final IDM at 10. Commerce determined that the data were inaccurate because "the Spanish import data in the Brazilian [surrogate value] for the month of January 2020 reported the same quantity figures for $M^3$ [or cubic meters] as it does for kg, we conclude that this particular component of the Brazilian [surrogate value] is clearly incorrect." Id. at 9.

The Court concludes that Commerce has a standard practice of considering whether the average unit value ("AUV") is aberrational in the aggregate for the economically comparable surrogate countries or as compared to historical AUVs of the surrogate country at issue. See SolarWorld Americas, Inc. v. United States, 42 CIT __, __, 320 F. Supp. 3d 1341, 1351–52 (2018) ("Commerce explains that its practice is to assess aberrationality by examining HTS data both across potential surrogate countries and within the surrogate country over multiple years. . . . [and] considers import data to be aberrationally high if that data is 'many times higher

than import values from other countries.'"). Interested parties need to demonstrate

that the import data are aberrational in the aggregate. Id.

Defendant asserts, however, that Commerce did not apply the "aberrational

in the aggregate" test in this case, but rather disregarded clearly incorrect data as

required by 19 U.S.C. § 1677b(c)(1) to value the factors of production based on the

best available information regarding the values of such factors in order to

determine the antidumping margins as accurately as possible. Def.'s Resp. at 22;

see 19 U.S.C. § 1677b(c)(1).

Commerce determined that the data were clearly inaccurate because "the

Spanish import data in the Brazilian [surrogate value] for the month of January

2020 reported the same quantity figures for M³ as it does for kg," explaining that:

> M³ and kg are discrete units of measurement where M³ is a
> measurement of volume and kg is a measurement of mass.
> Accordingly, it is illogical for the Spanish import data to report the
> same quantity in these two different units of measure. Because this
> component of the Brazilian [surrogate value] is incorrect, we conclude
> that the January 2020 Spanish import component in the Brazilian
> plywood [surrogate value] should be disregarded.

Final IDM at 9 (citing AMMWF's Surrogate Value Cmts at Ex. 9). Commerce

states that Exhibit 9 "contains information on the density of certain wood species

and wood products," AMMWF's Surrogate Value Cmts. at 3, but the Court

observes that this document was apparently never placed on the record filed with

the Court. The Court notes that AMMWF's Surrogate Value Comments on the

record contain only Exhibits 1, 10A, and 10B, but do not include Exhibit 9. Because Commerce only cited to evidence that is not on the record to support its determination and the Court cannot review the exhibit, the Court concludes that Commerce's explanation for its adjustment of the plywood measurement figures as clearly incorrect is neither in accordance with law nor supported by substantial evidence. The Court remands the issue of the plywood surrogate value data adjustment for further explanation or reconsideration by Commerce.

## V.  Calculation of Financial Ratios

Plaintiff argues that Commerce's calculation of the Brazilian financial ratios is not supported by substantial evidence because (1) Commerce's treatment of "transport expenses" as manufacturing overhead constituted double-counting; and (2) Commerce incorrectly excluded certain interest income reported by Duratex to offset financial expenses. Pl.'s Br. at 19–21.

In calculating the financial ratios, Commerce relied on data from Duratex's 2020 annual report and preliminarily did not include a line item for "transport expenses" in Duratex's total selling, general, and administrative ("SG&A") expenses to avoid double-counting outbound freight expenses that were accounted for elsewhere in the margin calculation, but revised the surrogate financial ratio to include Duratex's "transport expenses" line item as part of its manufacturing overhead in the Final Results. Final IDM at 14. Commerce also preliminarily

included the full amount of Duratex's reported interest income as an offset to its financial expenses when calculating Duratex's net financial expenses for the wood division, but revised the surrogate financial ratio calculation to exclude this value from the offset to financial expenses in the <u>Final Results</u>.  <u>Id.</u> at 15.

### A. "Transport Expenses"

Plaintiff contends that Commerce's treatment of "transport expenses" as overhead expenses constituted double-counting and unreasonably increased the financial ratios because "the estimated transport expenses are based on wood division selling expenses, which Commerce treats as SG&A and selling expenses" and are already included in the financial ratio calculations.  Pl.'s Br. at 19. Plaintiff asserts that inventory value of raw materials includes freight expenses incurred on raw material purchases unless otherwise specified, and estimated freight expenses do not need to be included because those costs are included in the cost of products sold in Duratex's financial statement.  <u>Id.</u> at 20.

Defendant and Defendant-Intervenor argue that it was reasonable for Commerce to assume that freight-in expenses were already included in the raw material expenses in Duratex's financial statement and that "transport expenses" referred to transportation costs distinct from outbound freight and freight-in because this assumption is based on standard accounting practice.  Def.'s Resp. at 27; Def.-Interv.'s Resp. at 24.

Commerce explained that:

> [A]ccounting practice prescribes generally that raw materials inventory . . . is to be valued at a cost that includes all necessary expenditures to acquire and bring them to the desired condition and location for use . . . that includes not only the purchase price of the raw material, but also freight charges (most commonly referred to as "freight-in expenses") on incoming materials and other miscellaneous expenses.

Final IDM at 14. Commerce excluded the "transport expenses" line item in its

calculation because:

> [W]e relied on the Duratex 2020 annual report submitted by the petitioner to calculate the surrogate financial ratios, using data for Duratex's "wood division." Regarding the "transport expenses" line item, we excluded this amount in our calculation of total SG&A expenses in the surrogate financial ratio calculation to avoid potentially double counting outbound freight expenses that were accounted for elsewhere in the margin calculation. However, we have reconsidered this approach for the final results because there is no indication, either on the face of the income statement itself or in the accompanying notes, as to what specifically this item includes or to what activities it relates.

Id. (citing Prelim. Surrogate Value Mem. at 6, Att. 1).

Commerce relied on the surrogate financial ratios calculated from Duratex's

financial statement based on Duratex's reported wood division, with overhead

expenses at 16.01%, SG&A expenses at 14.19%, and profit at 12.72%. Prelim.

Surrogate Value Mem. at 6 (citing AMMWF's Additional Surrogate Value Cmts.

at Exs. 3A (Duratex's 2020 annual report) & 3B (Duratex's financial statement)).

In the Final IDM, Commerce considered Senmao's argument in its

administrative rebuttal brief that raw material inventory values do not include

freight-in expenses and determined that "transport expenses" in Duratex's financial

statement did not include outbound freight expenses, stating that:

> It is reasonable for our purposes to presume that the "raw materials and
> consumption materials" line item in Duratex's financial statement
> includes freight-in expenses, and that the "transport expenses" line item
> represents a distinct cost element. In this case, we find that it is both
> reasonable and solidly grounded in accounting practice and procedure
> to classify the "transport expenses" line item as overhead, as it likely
> relates to other factory activities (*e.g.,* within-factory transportation,
> vehicles used by factory management, etc.), and because the raw
> material value likely includes incoming freight. Moreover, treating
> "transport expenses" as an overhead is consistent with our practice in
> other cases involving similar line items, such as Activated Carbon from
> China 2012–13 ("travel and transportation" expenses) and Steel Tie
> Wire from China ("transportation" expenses).

Final IDM at 14.

In Certain Activated Carbon From the People's Republic of China,

Commerce noted that its:

> Accounting practice prescribes generally that raw materials inventory
> on a company's balance sheet is to be valued at a cost that includes all
> necessary expenditures to acquire such materials and bring them to the
> desired condition and location for use in the manufacturing process[,
> where this] valuation includes not only the purchase price of the raw
> material, but also freight charges (most commonly referred to as
> "freight-in") on incoming materials and other miscellaneous expenses
> such as handling or insurance incurred by the buyer related to the
> purchase. . . . Accordingly, for the final results, we continue to treat
> "travel and transportation" expenses . . . under cost of goods sold as an
> overhead item in our surrogate financial ratio calculations.

Certain Activated Carbon From the People's Republic of China, 79 Fed. Reg.

70,163 (Dep't of Commerce Nov. 25, 2014) (final results of antidumping duty

admin. review; 2012–2013), and accompanying Issues and Decision

Memorandum.  In Prestressed Concrete Steel Rail Tie Wire from the People's

Republic of China, Commerce confirmed its established practice of including

transportation expenses as manufacturing overhead, especially when the financial

statement contains a separate transport expenses line item.  Prestressed Concrete

Steel Rail Tie Wire from the People's Republic of China, 79 Fed. Reg. 25,572

(Dep't of Commerce May 5, 2014) (final determination of sales at less than fair

value), and accompanying Issues and Decision Memorandum.

The Court concludes that there is an established accounting practice to

include transportation expenses as part of manufacturing overhead in the SG&A

expenses.  Commerce provided a reasonable explanation based on evidence of

Duratex's financial statement and made a determination consistent with established

accounting practices.  The Court concludes that Commerce's treatment of the

"transport expenses" line item as an overhead expense and its determination that

that the raw material value likely included incoming freight in the financial ratio

calculations are in accordance with law and supported by substantial evidence.

## B.  Interest Income

Plaintiff contends that only the income for remuneration on financial

investments is potentially not related to short-term, while the other line items are

all short-term in nature—foreign exchange variances (related to net gains and

losses on transactions denominated in foreign currencies during fiscal year),

indexation arguments (effectively adjust asset values for impact of inflation or

other factors during fiscal year), and interest and discounts obtained (related to

revenue received from lenders on bank deposits)—and should have been included

as an offset to financial expenses in Commerce's calculations.  Pl.'s Br. at 21.

Defendant asserts that Plaintiff does not deny that the line item for

remuneration on financial investments is potentially a long-term financial activity,

that it was reasonable for Commerce to exclude the line item due to uncertainty,

and that there is insufficient information in Duratex's financial statement and

record evidence for Commerce to determine whether these categories of interest

income were long-term or short-term in nature.  Def.'s Resp. at 29–30.  Defendant-

Intervenor argues that Plaintiff fails to cite record evidence to support its assertions

about the short-term nature of the line items.  Def.-Interv.'s Br. at 26.  Plaintiff

replies that Commerce cites only one case in support of its alleged practice and

cites no record evidence in support of its conclusions.  Pl.'s Reply at 16–17.

The first question in calculating an offset is whether the interest income is

short-term or derived from current assets or working capital accounts.  Pakfood

Pub. Co., 34 CIT at 1152, 724 F. Supp. 2d at 1357.  The burden of proof is on the

respondent to substantiate and document the nature of accounts when making a

claim for an offset, and Commerce will not allow an offset when a respondent

cannot demonstrate that the interest income in question is short-term in nature.  Id.;

see also Certain New Pneumatic Off-the-Road Tires from the People's Republic of

China, 77 Fed. Reg. 14,495 (Dep't of Commerce Mar. 12, 2012) (final results of

the 2009–2010 antidumping duty admin. review and final recission, in part), and

accompanying Issues and Decision Memorandum at Cmt. 7 ("The Department's

well-established practice is to allow an offset to interest expenses with short-term

interest income . . . [and it] is the Department's practice to exclude interest income

generated from long-term financial assets.").

Commerce preliminarily included the full amount of Duratex's reported

interest income as an offset to its financial expenses when calculating Duratex's

net financial expenses for the wood division, but revised the surrogate financial

ratio calculation to exclude this value from the offset to financial expenses in the

final determination.  Final IDM at 14–15 (citing PDM; Prelim. Surrogate Value

Mem. at Att. 1).  Duratex's annual report included five line items: "renumeration

on financial investments," "foreign exchange variances," "indexation adjustment,"

"interest and discounts obtained," and "other."  See Final Surrogate Value and

Calculation Mem. (June 24, 2022), PR 246–47; AMWWF's Additional Surrogate

Value Cmts. at Ex. 3A.

In the Final IDM, Commerce explained that:

We also excluded additional line items for which we cannot determine

> whether interest income is long-term or short-term in nature. Commerce cannot assume that this interest income is short-term because there is no additional description in the surrogate financial statement on interest income, and it is Commerce's practice not to look behind surrogate financial statements.

Final IDM at 15 (citing Final Surrogate Value and Calculation Mem.). Commerce provided the same explanation in the Final Surrogate Value and Calculation Memorandum. Final Surrogate Value and Calculation Mem. at 2 (citing AMWWF's Additional Surrogate Value Cmts. at Ex. 3B, "Note 27 – Financial Income").

Commerce excluded interest income generated from long-term financial assets because it determined based on a review of record evidence of Duratex's financial statement that such income was related to long-term investing activities. Final IDM at 15. Commerce also excluded line items for which it could not determine whether the interest income was long-term or short-term in nature. Id. The Court concludes that Commerce's determinations in this case were consistent with its established practice as described in Pakfood Pub. Co. because Commerce did not allow offsets when it could not determine whether the interest income in question was short-term in nature.

The Court concludes that Commerce's calculation of financial ratios is in accordance with law and supported by substantial evidence. Accordingly, the Court sustains Commerce's calculation of financial ratios.

### VI.   Denial of By-Product Offset

Plaintiff argues that Commerce's denial of its by-product offset is not in accordance with law because (1) Commerce's determination is inconsistent with Commerce's past treatment of Plaintiff and (2) Commerce should have provided Plaintiff with an additional opportunity to submit information regarding its claimed by-product offset.  Pl.'s Br. at 22–26.

Commerce denied Plaintiff's claim for a by-product offset, explaining that "[i]n [non-market economy] proceedings specifically, because we rely upon [a factors of production] methodology, we do not grant claims for a by-product offset where the companies are not able to provide data for their by-product production during the [period of review]."  Final IDM at 26.  It is generally Commerce's practice to grant an offset to normal value, for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and re-enters the respondent's production process.  Arch Chems, Inc. v. United States, 35 CIT 424, 426 (2011) (citing Ass'n of Am. School Paper Suppliers v. United States, 32 CIT 1196, 1205 (2008)).  The burden rests on the respondents to substantiate by-product offsets by providing Commerce with sufficient information to support their claims.  Id. (citation omitted).

The Section C and D Questionnaire included the following language

regarding by-product offsets:

> By-product/co-product offsets are only granted for merchandise that is either sold or reintroduced into production during the [period of review], up to the amount of that by-product/co-product actually produced during the [period of review].  If you are claiming a by-product or co-product offset in your [factors of production] database, please report each by-product or co-product in a separate field.

See Jiangsu Senmao's Sec. C and D Questionnaire Resp. (April 29, 2021) at 17,

PR 145.  In its questionnaire response, Plaintiff stated that it "does not track the

quantity of the wood scrap generated during the [period of review] and only

records the quantity of wood scrap sold [and it] did not record the actual

consumption of wood scrap as fuel to generate steam."  Id.  Plaintiff also stated

that it could not provide production records because it does not track actual wood

scrap quantity generated.  Id. at 18.

Commerce explained that it denied the by-product offset due to Commerce's

practice:

> [I]n considering a by-product offset, Commerce examines whether the by-product was produced from the quantity of the [factors of production] reported and whether the respondent's production process for the merchandise under consideration actually generated the amount of the by-product claimed as an offset.  Commerce has stated that "{s}crap sold but not produced during the [period of investigation] should not be included within the scrap offset because it would be unreasonable to offset the cost during the [period of investigation] for scrap produced prior to the [period of investigation]."  Furthermore, Commerce's practice ensures that a respondent does not receive a by-

product offset for products generated in the production of non-subject merchandise.  Commerce's methodology ensures the accuracy of its dumping calculations in [non-market economy] proceedings. Therefore, we are following this methodology for these final results, consistent with our general practice in [a non-market economy] proceeding.

Final IDM at 26–27.

## A. Previous Administrative Reviews

Plaintiff asserts that Commerce's denial of its by-product offset is inconsistent with Commerce's treatment of Plaintiff in previous administrative reviews and that Commerce failed to explain why its practice of requiring production records to grant a by-product offset was not followed in prior administrative reviews because there are not new facts to justify different treatment in this administrative review.  Pl.'s Br. at 22–25; Pl.'s Reply at 18–19.

Defendant and Defendant-Intervenor assert that Commerce reasonably denied a by-product offset because Plaintiff lacked production records indicating the quantity of scrap during the period of review and each administrative review is independent in nature.  Def.'s Resp. at 31–34; Def.-Interv.'s Resp. at 27–30.

Commerce denied Plaintiff a by-product offset for wood scrap generated through wood flooring production because Plaintiff reported that it did not track the quantity of the wood scrap generated, only the quantity sold, during the period of review.  See Final IDM at 26; PDM at 25; see Jiangsu Senmao's Sec. C and D

Questionnaire Resp. at 17–18.  Plaintiff contends that Commerce has an

established practice because it did not deny a by-product offset in prior reviews

despite a lack of production records.  Pl.'s Br. at 22–23 (citing <u>Multilayered Wood</u>

<u>Flooring from the People's Republic of China</u> ("<u>Final Results 2014–2015 Admin.</u>

<u>Review</u>"), 82 Fed. Reg. 25,766 (Dep't of Commerce June 5, 2017) (final results of

antidumping duty admin. review, final determination of no shipments, and final

partial rescission of antidumping duty admin. review; 2014–2015), and

accompanying Issues and Decision Memorandum ("Senmao's 2014–2015 Admin.

Review IDM"); <u>Multilayered Wood Flooring from the People's Republic of China</u>

("<u>Final Results 2015–2016 Admin. Review</u>"), 83 Fed. Reg. 35,461 (Dep't of

Commerce July 26, 2018) (final results of antidumping duty admin. review, final

determination of no shipments, and partial rescission; 2015–2016), and

accompanying Issues and Decision Memorandum ("Senmao's 2015–2016 Admin.

Review IDM"); <u>Multilayered Wood Flooring from the People's Republic of China</u>

("<u>Preliminary Results 2018–2019 Admin. Review</u>"), 86 Fed. Reg. 22,016 (Dep't of

Commerce Apr. 26, 2021) (prelim. results of the antidumping duty admin. review,

prelim. determination of no shipments, prelim. successor-in-interest determination,

and rescission of review, in part; 2018–2019), and accompanying Decision

Memorandum ("Senmao's 2018–2019 Admin. Review PDM"); <u>Multilayered</u>

<u>Wood Flooring From the People's Republic of China</u> ("<u>Final Results 2018–2019</u>

Admin. Review"), 86 Fed. Reg. 59,987 (Dep't of Commerce Oct. 29, 2021) (final

results of antidumping duty admin. review, final successor-in-interest

determination, and final determination of no shipments; 2018–2019), and

accompanying Issues and Decision Memorandum ("Senmao's 2018–2019 Admin.

Review IDM").

Commerce's practice is to grant an offset to normal value for sales of by-

products generated during the production of subject merchandise if the respondent

can demonstrate that the by-product is either resold or has commercial value and

re-enters the respondent's production process.  Arch Chems., 35 CIT at 426.

Commerce determined in this administrative review that Senmao lacked

production records, and denied a by-product offset because Plaintiff was unable to

demonstrate that the by-product was either resold or had commercial value and re-

entered Plaintiff's production process.  Final IDM at 26.

In the 2014–2015 administrative review, Commerce determined that Senmao

was entitled to a by-product offset despite a lack of production records because

"[a]t verification, the Department not only observed how wood scrap was

generated and collected, but also how the reported by-product (*i.e.*, wood scrap)

sales could be tied to the sales general ledger for other income with sales invoices,

sales [value added tax] invoices, receipts, accounting vouchers, and warehouse-

in/out slips" and "Senmao produced no products during the [period of review]

which were not subject merchandise; and thus, all wood scrap sold would be a by-product from subject merchandise." Final Results 2014–2015 Admin. Review, 82 Fed. Reg. 25,766; Senmao's 2014–2015 Admin. Review IDM at Cmt. 13. Commerce determined that Senmao was eligible for a scrap offset based on Commerce's observations during verification. Id.

Commerce denied a by-product offset for Senmao in the 2012–2013 administrative review because Senmao was unable to substantiate that it produced any of the scrap that it sold during the period of review, but Commerce determined that the facts in the 2014–2015 administrative review were different from the facts in the 2012–2013 administrative review. Senmao's 2014–2015 Admin. Review IDM; see Multilayered Wood Flooring from the People's Republic of China, 80 Fed. Reg. 41,476 (final results of antidumping duty admin. review and final results of new shipper review; 2012–2013) (Dep't of Commerce July 15, 2015), and accompanying Issues and Decision Memorandum.

In the 2015–2016 administrative review, Commerce again determined that Senmao was entitled to a by-product offset despite a lack of production records because "[a]lthough we did not conduct verification of Jiangsu Senmao's questionnaire responses during this segment of the proceeding, we did so during the immediately preceding (i.e., the 2014–2015) review." Final Results 2015–

2016 Admin. Review, 83 Fed. Reg. 35,461; Senmao's 2015–2016 Admin. Review

IDM at Cmt. 4.

In the administrative reviews during the years 2016–2017, 2017–2018, and

2018–2019, no party argued that Senmao's by-product offset should be denied.

See Multilayered Wood Flooring from the People's Republic of China, 84 Fed.

Reg. 38,002-01 (Dep't of Commerce Aug. 5, 2019) (final results of antidumping

duty admin. review and final results of new shipper review; 2016–2017), and

accompanying Issues and Decision Memorandum ("Senmao's 2016–2017 Admin.

Review IDM") (determination did not discuss the issue of Senmao's by-product

offset); Multilayered Wood Flooring from the People's Republic of China, 85 Fed.

Reg. 78,118 (Dep't of Commerce Dec. 3, 2020) (final results of antidumping duty

admin. review and final results of new shipper review; 2017–2018), and

accompanying Issues and Decision Memorandum ("Senmao's 2017–2018 Admin.

Review IDM") (determination in which Senmao was not selected as a voluntary

respondent); Preliminary Results 2018–2019 Admin. Review, 86 Fed. Reg. 22,016;

Senmao's 2018–2019 Admin. Review PDM (determination in which Commerce

made an offset to Senmao's reported factors of production for by-product because

"Senmao provided production records demonstrating it reported recovered

quantities of the by-product and that it later sold these recovered quantities.");

Final Results 2018–2019 Admin. Review, 86 Fed. Reg. 59,987; Senmao's 2018–

2019 Admin. Review Final IDM (no changes made to by-product offset

determination).

In the 2018–2019 administrative review, Senmao provided Commerce with

production records demonstrating that it reported recovered quantities of the by-

product and that it later sold these recovered quantities during the 2018–2019

period of review, and Commerce granted an offset as a result.  See Senmao's

2018–2019 Admin. Review PDM; Senmao's 2018–2019 Admin. Review Final

IDM.

The Court does not agree with Plaintiff's assertion that an established

practice exists that Commerce will grant a by-product offset to Senmao despite a

lack of evidence, based only on two administrative reviews granting the offset after

verification, followed by three years of no by-product offsets being granted on

such basis.  See Senmao's 2016–2017 Admin. Review IDM; Senmao's 2017–2018

Admin. Review IDM; Senmao's 2018–2019 Admin. Review PDM; Senmao's

2018–2019 Admin. Review Final IDM.

The Court concludes that an existing practice does not exist and it was

reasonable for Commerce to deny a by-product offset because Plaintiff failed to

provide information to substantiate a by-product offset.  The Court sustains

Commerce's denial of an offset due to a lack of evidence as reasonable and in

accordance with law.

## B. Opportunity to Submit Additional Information

Plaintiff contends that Commerce should have provided Plaintiff with an

opportunity to submit additional information regarding its claimed by-product

offset because Plaintiff has a substantial "reliance interest" in the required reported

practices pursuant to 19 U.S.C. § 1677m(d).  Pl.'s Br. at 25–26.  19 U.S.C.

§ 1677m(d) states:

> If the administering authority or the Commission determines that a
> response to a request for information under this subtitle does not
> comply with the request, the administering authority or the Commission
> (as the case may be) shall promptly inform the person submitting the
> response of the nature of the deficiency and shall, *to the extent
> practicable*, provide that person with an opportunity to remedy or
> explain the deficiency in light of the time limits established for the
> completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d) (emphasis added).  Defendant and Defendant-Intervenor

assert that Commerce is not obligated to ask additional questions when the

respondent states that it does not possess the requested information.  Def.'s Resp.

at 34–35; Def.-Interv.'s Resp. at 29–30.

The Court concludes that Commerce was reasonable in not providing

another opportunity for Plaintiff to submit the missing production records.  The

operable language in 19 U.S.C. § 1677m(d) is "to the extent practicable," and

Plaintiff already stated that it did not track the quantity of wood scrap generated

during the period of review.  Thus, even if Commerce allowed another opportunity

for Plaintiff to produce the requested information, Plaintiff already stated that it did

not keep records of the quantity of wood scrap necessary to demonstrate that it was

entitled to a by-product offset.  Accordingly, Commerce's denial of an offset by-

product is reasonable and in accordance with law.

## CONCLUSION

For the foregoing reasons, the Court remands for further consideration

consistent with this Opinion: (1) Commerce's determination to select Brazil as the

primary surrogate country while using data for log inputs from the secondary

surrogate country of Malaysia, and (2) Commerce's determination to revise the

Brazilian surrogate value data for plywood.  The Court sustains Commerce's

calculation of the Brazilian financial ratios and Commerce's denial of Plaintiff's

by-product offset.  Plaintiff-Intervenor waived its argument that the Malaysian data

were aberrational.

Accordingly, it is hereby

**ORDERED** that Plaintiff's Motion for Judgment upon the Agency Record

Pursuant to USCIT Rule 56.2, ECF No. 38, is granted in part and denied in part;

and it is further

**ORDERED** that Plaintiff-Intervenor's Rule 56.2 Motion for Judgment on

the Agency Record, ECF No. 39, is granted in part and denied in part; and it is

further

**ORDERED** that that this case shall proceed according to the following

schedule:

(1) Commerce shall file its remand determination on or before October 25,

2023;

(2) Commerce shall file the administrative record on or before November 8,

2023;

(3) Comments in opposition to the remand determination shall be filed on or

before December 8, 2023;

(4) Comments in support of the remand determination shall be filed on or

before January 8, 2024; and

(5) The joint appendix shall be filed on or before January 22, 2024.


   /s/ Jennifer Choe-Groves   
Jennifer Choe-Groves, Judge

Dated:   August 25, 2023  
New York, New York