## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD. | ) ) ) |
| Plaintiff, | ) ) |
| and | ) ) |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) Consol. Court No. 22-00190 ) |
| Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) ) ) |
| Defendant-Intervenors. | ) ) |

## PLAINTIFF'S COMMENTS IN OPPOSITION TO REMAND REDETERMINATION

Jeffrey S. Neeley
Stephen W. Brophy
Husch Blackwell, LLP

1801 Pennsylvania Ave., N.W.
Suite 1000
Washington, D.C. 20006
(202) 378-2357
Jeffrey.Neeley@huschblackwell.com

Dated:  December 8, 2023

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STANDARD OF REVIEW ............................................................................................. 1

BACKGROUND ............................................................................................................ 2

ARGUMENT ................................................................................................................. 4

    **A.**    **Commerce's Final Remand Results with Respect to the Surrogate Value for Logs is Not in Accordance with the Court's Remand Order and is Not in Accordance with Law** 7

    **B.**    **Commerce's Final Remand Results with Respect to the Surrogate Value for Plywood is Not in Accordance with the Court's Remand Order and is Not in Accordance with Law** ................................................................................................ 10

      **1.**    **Commerce Again Fails to Follow it Standard Practice of Considering Whether the Average Unit Value is Aberrational in the Aggregate** ............................................. 10

      **2.**    **Commerce Fails to Demonstrate that the Adjusted Plywood Value is the Best Information Available** ....................................................................................... 15

CONCLUSION ............................................................................................................. 17

# TABLE OF AUTHORITIES

## Cases

*Ausimont USA, Inc. v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995) ............. 1

*Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019)... 13

*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ........................................................................................................................................ 2

*Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984) ......................... 2

*Clearon Corporation and Occidental Chemical Corp. v. United States*, 37 CIT 220 (2013) ........ 8

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ................................................................ 1

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ...................................... 2

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1169 (2001) ........... 6

*Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 651 F. Supp. 3d 1348, 1359, 1361 (Ct. Int'l Trade 2023) ...................................................................................................................... 3

*Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333 (Ct. Int'l Trade 2014) 8

*MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021) ........................................ 8

*Nakornthai Mill Public Co. v. United States*, 587 F. Supp. 2d 1303, 1306 (Ct. Int'l Trade 2008)  2

*New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *13 (Ct. Int'l Trade Mar. 23, 2021) ............................................................................................................................................... 9

*Peer Bearing Company Changshan v. United States,* 804 F.Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011) ............................................................................................................................................... 9

*Shikoku Chems. Corp. v. United States*, 16 CIT 382, 386-87 (1992) ............................................ 6

*SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011) ....................................... 13

*SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ...................................... 11

*Tri Union Frozen Prod., Inc. v. United States*, 227 F. Supp. 3d 1387, 1394–95 (Ct. Int'l Trade), *determination sustained*, 254 F. Supp. 3d 1290 (Ct. Int'l Trade 2017), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) ...................................................................................................................... 14

*U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984)..........................................2

*United Steel & Fasteners, Inc. v. United States*, 469 F. Supp. 3d 1390, 1402 (Ct. Int'l Trade 2020) ................................................................................................................................8

*Xinjiamei Furniture Zhangzhou) Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014)........................................................................................................................1, 2

## Statutes

19 U.S.C. § 1516a(b)(1)(B)(i)...............................................................................................1

19 C.F.R. §351.408(c)(2 .......................................................................................................8

## Other Authorities

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) ...........14

*Crystalline Silicon Photovoltaic Cells from China*, 82 Fed. Reg. 29033 (June 27, 2017) and accompanying Issues and Decision Memorandum at Comment 12 ...........................................12

*Multilayered Wood Flooring from China,* 80 Fed. Reg. 41476 (July 15, 2015) and accompanying Issues and Decision Memorandum at Comment l1.D ..........................................................12, 13

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39464 (July 1, 2022) ...................................................................................................2. 6

*Multilayered Wood Flooring from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2019–2020*, 86 Fed. Reg. 73252 (December 27, 2021)................5

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 38002 (August 5, 2019) ....................................................................................................4

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25766 (June 5, 2017). 4, 5

*Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35461 (July 26, 2018) ..........................................................4

*Multilayered Wood Flooring from the People's Republic of China: Notice of Court Decision Not in Harmony with the Final Results of the Second Antidumping Duty Administrative Review*, 85 Fed. Reg. 83888 (December 23, 2020) ........................................................................... 5

*Multilayered Wood Flooring from the People's Republic of China: Notice of Court Decision Not in Harmony with the Final Results of the Second Antidumping Duty Administrative Review*, 85 Fed. Reg. 83888 (December 23, 2020) (3.92 percent margin for 2012-2013 review). ................. 5

## INTRODUCTION

On behalf of Plaintiffs Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

("Senmao"), and pursuant to the Court's Order of August 25, 2023 (ECF No. 54), we hereby

submit Plaintiff's comments in opposition to the Final Results of Redetermination Pursuant to

Remand Order ("Final Remand Results") filed by the U.S. Department of Commerce

("Commerce") on October 25, 2023, ECF No. 55 (RPR 10).[1]  Commerce filed the administrative

record for the Final Remand Results on November 8, 2023, ECF No. 56.  Commerce Final

Remand Results are not in compliance with the Court's remand order, are not supported by

substantial evidence, and are otherwise not in accordance with law.  Plaintiffs respectfully

request that the Court again remand this case to Commerce with instructions to reconsider its

Final Remand Results consistent with the findings of this Court.

## STANDARD OF REVIEW

The Court will hold unlawful agency determinations that are "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i);

*Ausimont USA, Inc. v. United States*, 19 CIT 151, 157, 882 F. Supp. 1087, 1092 (1995).

Substantial evidence means that there is "more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The Court also reviews Commerce's remand

redeterminations for compliance with the Court's remand order. *Xinjiamei Furniture Zhangzhou)*

---

[1]  References to the administrative record for the *Final Remand* are shown as "RCR" (remand confidential record) and "RPR" (remand public record). References to the initial administrative record submitted to the Court on August 30, 2022, ECF No. 33, are shown as "CR" (confidential record) and "PR" (public record).

*Co. v. United States*, 968 F. Supp. 2d 1255, 1259 (Ct. Int'l Trade 2014) (quoting *Nakornthai Mill Public Co. v. United States*, 587 F. Supp. 2d 1303, 1306 (Ct. Int'l Trade 2008).

In judging the Department's interpretation of a statute, the Court does so under the framework established by *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). Under Chevron, the Court first asks whether Congress has directly spoken to the precise question at issue. If Congress has done so, the inquiry ends; the Court "must give effect to the unambiguously expressed intent of Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (*quoting Chevron*, 467 U.S. at 842-43). Commerce must act reasonably and may not be arbitrary and capricious. *See e.g., Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012) ("Commerce's decision will be set aside if it is arbitrary and capricious.").

## BACKGROUND

The Court remanded this case to Commerce with respect to two decisions by Commerce in the final results of the underlying administrative review: 1) Commerce's decision to select Brazil as the primary surrogate country but rely on Malaysian surrogates to value Senmao's log inputs, and 2) Commerce's decision to adjust the Brazilian surrogate value for plywood to remove Spanish import date for January 2020 from the average unit value because a single line of data was "clearly incorrect". *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39464 (July 1, 2022) ("Final Results") (P.R. 252) and accompanying Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of China; 2019-2020, dated June 24, 2022 at Comments 2 and 5 ("IDM") (P.R. 245).  The Court remanded

these issues to Commerce for further explanation and reconsideration. *Jiangsu Senmao Bamboo & Wood Indus. Co. v. United States*, 651 F. Supp. 3d 1348, 1359, 1361 (Ct. Int'l Trade 2023).

With respect to the log inputs, the Court held that Commerce's decision was not supported by substantial evidence and was not in accordance with law because Commerce failed to cite any evidence that the Brazilian data for log inputs were highly questionable, inadequate, or unavailable, and any evidence demonstrating that Malaysian data were "the best information available". *Id.* at 1358, The Court concluded that Commerce had not provided a reasonable explanation for departing from its established practice of using a single surrogate country. *Id.*

With respect to the plywood surrogate value, The Court concluded that "that Commerce has a standard practice of considering whether the average unit value ("AUV") is aberrational in the aggregate for the economically comparable surrogate countries or as compared to historical AUVs of the surrogate country at issue." *Id.* at 1360.  The Court also held that it could not conclude that the Department's final results were supported by substantial evidence and otherwise in accordance with law given that the Department cited to an exhibit that was not on the record of the appeal.  *Id.* at 1361.

On October 3, 2023, Commerce issued its Draft Results of Redetermination Pursuant to Remand Order ("Draft Remand Results") (R.P.R. 1).   In the Draft Remand Results, Commerce valued all of Senmao's log inputs using Brazilian data concluding that "substantial evidence does not lead us to conclude that the Brazilian log SV is either highly questionable, inadequate, or unavailable to use to value Senmao's log inputs. *Id.* at 4-5.  Commerce continued to adjust the Brazilian plywood surrogate value and simply attached Exhibit 9 to American Manufacturers of Multilayered Wood Flooring's Surrogate Value Comments, which is the document the Court

cited as being missing from the record of this appeal.  *Id.* at 5.   On October 12, 2023, the parties submitted their comments on the Draft Remand Results. (R.P.R. 6, 7, and 8).

On October 25, 2023, Commerce issued its Final Remand Results (R.P.R. 11).  In the Final Remand Results, Commerce again changed its methodology.  This time, Commerce decided to make only one minor change to the methodology it used in the Final Results of the underlying administrative review.  Specifically, Commerce agreed to use the Brazilian surrogate value to value Senmao's non-oak logs.  Final Remand Results at 6-7.   However, Commerce continued to use the Malaysian surrogate value to value Senmao's oak logs despite the fact that it continued to treat Brazil as the primary surrogate country.  *Id.*  Commerce also continued to adjust the Brazilian surrogate value for plywood to remove Spanish import date for January 2020 from the aggregate average unit value.  *Id.* at 8.

## ARGUMENT

As noted in Senmao's previous submissions, this is not the first review in which Senmao was selected as a mandatory respondent.   Senmao was reviewed as a mandatory respondent and received zero, de minimis, or small margins in numerous administrative reviews.  *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 38002 (August 5, 2019) (zero margin); *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Rescission; 2015-2016*, 83 Fed. Reg. 35461 (July 26, 2018) (zero margin); *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25766

4

(June 5, 2017) (de minimis margin).   Even in reviews where Senmao received a margin as a mandatory respondent it was small.   *Multilayered Wood Flooring from the People's Republic of China: Notice of Court Decision Not in Harmony with the Final Results of the Second Antidumping Duty Administrative Review*, 85 Fed. Reg. 83888 (December 23, 2020) (3.92 percent margin for 2012-2013 review).

In the review at issue in this appeal, however, Commerce departed from its long-standing methodologies and went margin shopping.   This is apparent from Commerce's ever changing margin calculations during the review and this appeal.   With each decision by Commerce, Senmao's margin fluctuates dramatically:

- In the preliminary results of the underlying administrative review, Commerce calculated margin for Senmao of <u>0.00 percent,</u> as it had in several prior reviews. *Preliminary Results of the Antidumping Duty Administrative Review, Preliminary Determination of No Shipments, and Rescission of Review, in Part; 2019–2020*, 86 Fed. Reg. 73252 (December 27, 2021) ("Preliminary Results") (P.R. 219) and Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review: Multilayered Wood Flooring from the People's Republic of China; 2019-2020, dated December 17, 2022 ("Preliminary Decision Memorandum") (P.R. 213).

- In the final results of the underlying administrative review, Commerce changed its methodology and adjusted the surrogate value of plywood resulting in a margin of <u>39.27 percent</u>. *Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final*

*Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39464 (July 1, 2022)

("Final Results") (P.R. 252) and IDM (P.R. 245).

- In its Draft Remand Results, Commerce agreed to value all of Senmao's logs using Brazilian surrogate values, resulting in a margin of <u>16.07 percent</u>.  Draft Remand Results at 6 (R.P.R. 1).

- In its Final Remand Results, Commerce decided to only value Senmao's non-oak log inputs using Brazilian surrogate values, resulting in a margin of <u>34.68 percent</u>. Final Remand Results at 17. (RPR 10).

Senmao submits that Commerce would not find such varying margins based on the same record if they were simply following their long-standing policies and practices.   Rather, Commerce's changing positions on these issues demonstrates that its decisions are arbitrary and capricious and intended solely to assign Senmao the highest margin Commerce can get away with.  This Court has previously held that Commerce could not change its methodologies without warning, stating that "{a}t some point, Commerce must be bound by its prior actions so that parties have a chance to purge themselves of antidumping liabilities.  *Shikoku Chems. Corp. v. United States*, 16 CIT 382, 386-87 (1992) ("Shikoku's reliance interest is sufficient to preclude Commerce from adopting the new method of calculating packing expenses."); *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 C.I.T. 1150, 1169 (2001) ("Commerce may not make minor but disruptive changes in methodology where a respondent demonstrates its specific reliance on the old methodology used in multiple preceding reviews.").

    In this case, Senmao had a substantial reliance interest in Commerce following its longstanding practices.  Senmao has worked diligently over the years to ensure that it was not dumping in the U.S. market based on Commerce's longstanding practices for calculating whether

dumping exists.   Senmao had a good faith reliance on the fairness of the U.S. administrative process.  In this case, Commerce unreasonably changed its practices and methodologies without warning such that Senmao had no opportunity to change its prices or business practices in order to ensure that it was not dumping.  Commerce's Final Remand Results remain unreasonable and contrary to law and are not in compliance with the Court's remand order.

      **A.**      **Commerce's Final Remand Results with Respect to the Surrogate Value for Logs is Not in Accordance with the Court's Remand Order and is Not in Accordance with Law**

In the final results of the underlying administrative review, Commerce selected Brazil as the primary surrogate country but relied on Malaysian surrogates to value Senmao's log inputs. IDM at Comment 5 (P.R. 245).   The Court held that this decision was not supported by substantial evidence and was not in accordance with law because Commerce failed to cite any evidence that the Brazilian data for log inputs were highly questionable, inadequate, or unavailable, and any evidence demonstrating that Malaysian data were "the best information available". *Jiangsu Senmao*, 651 F. Supp. 3d at 1361. The Court concluded that Commerce had not provided a reasonable explanation for departing from its established practice of using a single surrogate country. *Id.*

In the Draft Remand Results, Commerce conceded that that there was not substantial evidence to support a finding that the Brazilian log surrogate value was either highly questionable, inadequate, or unavailable, and valued all of Senmao's log inputs using Brazilian HS category 4403.99. Draft Remand Results at 5 (R.P.R 1).   However, in the Final Remand Results, Commerce allegedly discovered record evidence supporting the use of a Malaysian surrogate value to value Senmao's oak logs.  Final Remand Results at 6 (RPR 10). Commerce

agreed to use the Brazilian surrogate value to value Senmao's non-oak logs using the Brazilian

six digit heading 4403.99.  *Id.* at 7.

With respect to oak logs, Commerce determined that a Brazilian SV for oak logs was not

available because the Brazilian six digit heading 4403.99 covered "Nonconiferous Wood in the

Rough (Not Elsewhere Specified)" and that oak logs would have been classified under HTS

4403.91. *Id.* at 14.  Since there was no data on the record for HTS 4403.91 in Brazil, Commerce

claimed it was justified in resorting to the use of Malaysian data for HTS 4403.91.  *Id.* at 15.

This, however, is not a sufficient basis for Commerce to depart from its normal and well-

established practice of valuing all factors of production in a single surrogate country. 19 C.F.R.

§351.408(c)(2).  The courts have emphasized the preference for using a single surrogate country

is strong and must be given significant weight. The Court has held that "…this preference for

valuing FOPs with information from a single surrogate country reasonable because deriving

surrogate data from one surrogate country limits the amount of distortion introduced into the

calculations because a domestic producer would be more likely to purchase a product available

in the domestic market." *Clearon Corporation and Occidental Chemical Corp. v. United States*,

37 CIT 220 (2013); *Jiaxing Brother Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1333

(Ct. Int'l Trade 2014); *MS Int'l, Inc. v. United States*, 2021 Ct. Intl. Trade LEXIS 129 (2021).

In fact, the Court has previously upheld Commerce's selection of a surrogate value despite

the fact that an alternative surrogate value in another country was more specific.  *United Steel &*

*Fasteners, Inc. v. United States*, 469 F. Supp. 3d 1390, 1402 (Ct. Int'l Trade 2020) (where

Plaintiff argued that Commerce should have chosen Indonesian HTS 7228.20.1100 to value a

factor of production as it was more specific than Thai HTS 7228.20 and included data

contemporaneous with the POR).  In that case, the Court rejected Plaintiff's argument finding it

insufficient to overcome the single surrogate country preference and finding that the evidence did not establish that the Thai data was distorted or inaccurate. The Court held that "…Commerce's single surrogate country preference is strong and must be given significant weight," *Id.* The Court has also held that "the preference for use of data from a single surrogate country could support a choice of data as the best available information where the other available data 'upon a fair comparison, are otherwise seen to be fairly equal ....'" *New Am. Keg v. United States*, No. 20-00008, 2021 WL 1206153, at *13 (Ct. Int'l Trade Mar. 23, 2021); citing *Peer Bearing Company Changshan v. United States,* 804 F. Supp. 2d 1337, 1353 (Ct. Int'l Trade 2011).

In short, Commerce does not depart from its regulations and its practice of valuing all inputs in a single surrogate country just because another country provides a more "specific" surrogate value. Commerce's decision in the Final Remand Results is based solely on a finding that the Malaysian data was more specific to oak logs, which is not the correct standard. While Commerce claims that data to value oak logs was "unavailable" in Brazil, there was data available in Brazil to value logs. With respect to oak logs, even though there was no data available from Brazil under HTS 4403.91, Commerce should have valued Senmao's oak logs using the Brazilian data under HTS 4403.99, regardless of whether it was less specific. Commerce's finding that data was not available in Brazil to value oak logs is, therefore, not supported by the record. In other words, there was data available in Brazil to value logs generally and Commerce cites to no record evidence that the Brazilian value for oak logs would be significantly different from the value for logs under Brazilian subheading 4403.99 or that using this Brazilian surrogate value would distort the margin more than using a surrogate value from a different surrogate country. In fact, Commerce did not provide any analysis of whether

using the Malaysian data instead of the Brazilian data outweighed the potential distortion of

valuing a primary input using data from a secondary surrogate country.  Absent such evidence

and given Commerce's normal practice to value the factors of production in a single surrogate

country, the Brazilian data provided for HTS 4403.99 remained the best information available

with which to value oak logs and avoid any distortions caused by resorting to a secondary

surrogate country.  The Court should again remand this issue to Commerce with instructions to

provide further explanation and reconsideration.

**B.      Commerce's Final Remand Results with Respect to the Surrogate Value for Plywood is Not in Accordance with the Court's Remand Order and is Not in Accordance with Law**

**1.      Commerce Again Fails to Follow it Standard Practice of Considering Whether the Average Unit Value is Aberrational in the Aggregate**

In the Final Results of the underlying administrative review, Commerce adjusted the

Brazilian surrogate value for plywood to remove Spanish import data for January 2020 from the

average unit value because a single line of data was "incorrect". IDM at Comment 2.  Commerce

noted that the quantity of plywood expressed in cubic meters was the same as the quantity

expressed in kilograms for this line item.

On appeal, the Court also concluded that "that Commerce has a standard practice of

considering whether the average unit value ("AUV") is aberrational in the aggregate for the

economically comparable surrogate countries or as compared to historical AUVs of the surrogate

country at issue." *Id.* at 1360.   The Court also held that it could not conclude that the

Department's final results were supported by substantial evidence and otherwise in accordance

with law given that the Department cited to an exhibit that was not on the record of the appeal.

*Jiangsu Senmao,* 651 F. Supp. 3d at 1361.

In the Final Remand Results, Commerce continued to adjust the Brazilian surrogate value for plywood to remove Spanish import date for January 2020 from the average unit value.  Final Remand Results at 7-8.  Commerce simply attached Exhibit 9 to American Manufacturers of Multilayered Wood Flooring's Surrogate Value Comments, which is the document the Court cited as being missing from the record of this appeal.  *Id.* This exhibit contains information on the density of wood species expressed in kilograms per cubic meter.  *Id.*   According to the Department, it was able to use this information to determine that the Spanish data for plywood in the Brazilian plywood SV were in error, as cubic meters and kilograms could not be the same and supported its removal of the line item at issue. *Id.* at 15.   Commerce claims that by making this adjustment, "the data set is more accurate…".  *Id.* at 16.

Senmao does not agree that simply putting Exhibit 9 on the record of the appeal resolves the issue for the Court.  While the Court stated that it could not conclude that the Commerce's final results were supported by substantial evidence, and otherwise in accordance with law given that Commerce cited to an exhibit that was not on the record of the appeal, that does not mean that Commerce can comply with the Court's remand order simply by placing this exhibit on the record.  This is because the Court also concluded that "that Commerce has a standard practice of considering whether the average unit value ("AUV") is aberrational in the aggregate for the economically comparable surrogate countries or as compared to historical AUVs of the surrogate country at issue." *Jiangsu Senmao*, 651 F. Supp. 3d at 1360.  "If Commerce has a routine practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation regarding why Commerce has deviated from that practice." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when

the agency offers insufficient reasons for treating similar situations differently." (internal citation omitted)).

The Court ultimately remanded the issue of the plywood surrogate value data adjustment for further explanation or reconsideration.  Commerce's submission of Exhibit 9 does not address the problem of its failure to comply with its standard practice, nor does it constitute further explanation or reconsideration.  Even to the extent that it demonstrates that the kg quantity and the cubic meter quantity cannot be the same, that fact has never been in dispute. That fact, however, does not establish which of the cubic meter and the kg quantities is incorrect and whether the error impacted the accuracy of the margin calculation.  In fact, Commerce concluded in the Final Results of the underlying review that the Brazilian plywood data was not aberrational, even including the alleged error in one line item, stating that "[w]ith respect to the petitioner's conclusion that historical and POR evidence demonstrates that the Spanish import data are also aberrational, we disagree" and "[w] therefore cannot conclude that the overall AUV for Brazil is aberrational."  IDM at Comment 1.  Commerce essentially deviated from its practice to adjust a surrogate value that was not aberrational in order to remove a single line item that Commerce claims was incorrect.   It is simply not reasonable to adjust a non-aberrational surrogate value.

Commerce's decision to adjust the data is contrary to its practice, which is to determine whether the AUV, in the aggregate, is aberrational, not whether specific line items are aberrational or incorrect. *Crystalline Silicon Photovoltaic Cells from China*, 82 Fed. Reg. 29033 (June 27, 2017) and accompanying Issues and Decision Memorandum at Comment 12; *Certain Uncoated Paper from China*, 81 Fed. Reg. 3112 (Jan. 20,2016) and accompanying Issues and Decision Memorandum at Comment 2; *Multilayered Wood Flooring from China,* 80 Fed.

41476 (July 15, 2015) and accompanying Issues and Decision Memorandum at Comment l1.D.  Under such practice, Commerce does not compare individual values of imports in the selected surrogate country entered under the HTS category and evaluate and remove specific line items.  Commerce has explained: "[o]therwise, parties would advocate the manipulation of data by removing one or more line items they find objectionable, with the result that we would not be using the average prices for that category, but some subset thereof." *Id.*  The Court has also held that Commerce's policy of not disaggregating data in order to preserve representativeness is reasonable. *Canadian Solar Int'l Ltd. v. United States*, 415 F. Supp. 3d 1326, 1332 (Ct. Int'l Trade 2019).  If Commerce is going to parse the data for any line items that might be considered "clearly incorrect", then that constitutes a change in practice from which it departed without notice or reasonable explanation.  When an agency changes its practice, "it is obligated to provide an adequate explanation for the change", which the Department has not done. *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1231 (Ct. Int'l Trade 2022) *citing SKF USA Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011).

Commerce has provided no new explanation for deviating from its practice but apparently continues to assert that the Spanish data should be removed because it was incorrect. As noted above, however, Commerce's practice is not to remove specific line items from the aggregate average unit value.  Moreover, Commerce cites to no precedent creating an exception for incorrect line items.  Nor does it explain how it can determine that the surrogate value is not aberrational or incorrect in the aggregate but still needs to be adjusted by removing certain line items.

Moreover, as noted in Senmao's previous submissions, this is the first time that the government has made a distinction between "aberrational data" and "incorrect data".  The

Department has previously explicitly treated the term "incorrect" as included in the definition of "aberrational":

> Commerce endeavors to use data that is non-aberrational and reliable. *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997); Remand Results 18–19. Commerce considers data to be aberrational when it is an "extreme outlier," Remand Results 11; *Id.* at 23–24, 31–32 (citing prior agency practice), is distorted or misrepresentative, or is **"somehow incorrect"**.

*Tri Union Frozen Prod., Inc. v. United States*, 227 F. Supp. 3d 1387, 1394–95 (Ct. Int'l Trade), *determination sustained*, 254 F. Supp. 3d 1290 (Ct. Int'l Trade 2017), aff'd, 741 F. App'x 801 (Fed. Cir. 2018) (emphasis added).

> Commerce further defines "aberrational" to mean an extreme outlier, distorted or misrepresentative, or **somehow incorrect**.

*Solarworld Americas, Inc. v. United States*, 532 F. Supp. 3d 1266, 1270 (Ct. Int'l Trade 2021) citing *Tri Union Frozen Prods. v. United States*, 41 CIT ——, ——, 227 F. Supp. 3d 1387, 1394-95 (2017) (emphasis added).

> Commerce considers data to be aberrational when it is an "extreme outlier," is distorted or misrepresentative, or is **"somehow incorrect."**

*Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying Issues and Decision Memorandum at Comment 3. (emphasis added).

In this case, Commerce has somehow concluded that the aggregate surrogate value is non-aberrational, and therefore correct, but still needs to be adjusted to remove one line item, which is allegedly incorrect, and therefore aberrational, in order to create an aggregate surrogate value that is "more accurate". This is contradictory and makes no sense. In this case, the surrogate value and margin calculation would have been more accurate if Commerce had simply followed its standard practice and only considered whether the aggregate surrogate value was

aberrational, rather than adjusting a non-aberrational surrogate value.  Since the aggregate

surrogate value was found to be non-aberrational, it should have been used without adjustment,

in accordance with Commerce's standard practice.

### 2.  Commerce Fails to Demonstrate that the Adjusted Plywood Value is the Best Information Available

Contrary to its claim, the removal of the line item did not make the data set more accurate

and Commerce cites to no record evidence to support this claim.  Final Remand Results at 16.

Commerce has not cited to any evidence that the aggregate AUV data was in any way distorted

or made aberrational by the error in the one line item and its decision to adjust the data without

such a determination is contrary to its practice and results in a less accurate surrogate value that

is not the best information available to value Senmao's plywood input.  In fact, by removing the

line item, without any finding that the aggregate AUV data was aberrational, Commerce has

created an aggregate AUV that is itself distorted.  As noted above, Commerce has explained that

its standard practice is necessary because removing one or more line items from the aggregate

data would not result in a more accurate surrogate value but would only result in Commerce only

using a subset of the aggregate data.   In other words, removing individual line items from a non-

aberrational surrogate value would not result in a more accurate surrogate value, but would likely

result in a less accurate surrogate value.  But that is exactly what Commerce did here.

First, Exhibit 9 does not settle the issue of whether the kg quantity or the cubic meter

quantity is correct or whether the error made the data aberrational in the aggregate.   Commerce

has made no attempt to demonstrate that the unadjusted data is aberrational by comparing it to

any historical AUVs or any other relevant data. In fact, as noted above, Commerce has

concluded that the aggregate data is not aberrational even if the Spanish data is not removed.

IDM at Comment 1.   Given that fact, there is no reason to adjust the plywood surrogate value

by removing any line items nor does removing the line item at issue make the resulting plywood surrogate value more accurate or the best information available.

In fact, removing the Spanish line items simply distorted the Brazilian data in a way grossly adverse to Senmao. The adjustment did not result in Commerce using an accurate surrogate value for plywood, let alone the best information available. In fact, by adjusting the data without evidence that the aggregate data is aberrational, Commerce has, in effect, made the aggregate data reported by Brazilian authorities less accurate, given that it is now relying only on a subset of the total Brazilian data. This can be seen from the fact that the Brazilian plywood surrogate value increased from $1.33 per cubic meter before the adjustment to $7.36 per cubic meter after the adjustment, a 453% increase. Surrogate Values for the Preliminary Results, dated December 20, 2021 at Attachment 1, Tab "Master" (P.R. 211) and Final Results Surrogate Value and Margin Calculation for Jiangsu Senmao Bamboo and Wood Industry Co., Ltd., dated October 2, 2023 at Attachment III, Tab "Master" (R.P.R 13) Commerce made this change without any record evidence that the $7.36 per cubic meter surrogate value was more accurate or more consistent with any record data than the $1.33 per cubic meter surrogate value. As a result, Commerce has not established that it used the best information available to value Senmao's plywood input.

Commerce should rely on the aggregate Brazilian data for plywood without any adjustments, which would be consistent with its practice, supported by substantial evidence on the record and otherwise in accordance with law. Senmao respectfully requests that the Court remand this issue to Commerce again with instructions to provide further explanation and reconsideration.

**CONCLUSION**

For these reasons, we respectfully request that the Court remand the case to Commerce a

second time for further explanation and reconsideration of these issues.

Respectfully submitted,

/s/Jeffrey S. Neeley
Jeffrey S. Neeley
Stephen W. Brophy
**Husch Blackwell LLP**
1801 Pennsylvania Ave. N.W., Suite 1000
Washington, DC 20006
(202) 378-2409
Jeffrey.Neeley@huschblackwell.com
*Counsel for Plaintiff Jiangsu Senmao Bamboo and*
*Wood Industry Co., Ltd.*

Dated:  December 8, 2023

17

**CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(2), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiff's Comments in Opposition to Remand Redetermination as computed by Husch Blackwell's word processing system, Microsoft Word, is 4,931 words.

/s/Jeffrey S. Neeley
Jeffrey S. Neeley
**Husch Blackwell LLP**