Slip Op. 24-47

## UNITED STATES COURT OF INTERNATIONAL TRADE

JIANGSU SENMAO BAMBOO
AND WOOD CO., LTD.,

        Plaintiff,

and

LUMBER LIQUIDATORS
SERVICES, LLC,

        Plaintiff-Intervenor,

v.

UNITED STATES,

        Defendant,

and

AMERICAN MANUFACTURERS
OF MULTILAYERED WOOD
FLOORING,

        Defendant-Intervenor.

Before:  Jennifer Choe-Groves, Judge

Court No. 22-00190

## OPINION

[Remanding the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Remand Order in the antidumping duty review of multilayered wood flooring from the People's Republic of China.]

        Dated:  April 19, 2024

Jeffrey S. Neely and Stephen W. Brophy, Husch Blackwell, LLP, of Washington,

D.C., for Plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.

Matt R. Ludwikowski and Kelsey Christensen, Clark Hill, PLC, of Washington, D.C., for Plaintiff-Intervenor Lumber Liquidators Services, LLC.  With them on the brief was Sally Alghazali.

Kelly M. Geddes, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C.   Of Counsel was Christopher Kimura, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Timothy C. Brightbill and Stephanie M. Bell, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring.  Maureen E. Thorson and Theodore P. Brackemyre also appeared.

Choe-Groves, Judge:  Before the Court is the U.S. Department of

Commerce's ("Commerce") remand redetermination in the administrative review

of the antidumping duty order on multilayered wood flooring from the People's

Republic of China ("China") for the period of December 1, 2019 through

November 30, 2020, filed pursuant to the Court's Opinion and Order in Jiangsu

Senmao Bamboo & Wood Industry Co., Ltd. v. United States ("Senmao I"), 47 CIT

__, 651 F. Supp. 3d 1348 (2023).  See Final Results of Redetermination Pursuant to

Remand Order ("Remand Redetermination"), ECF No. 55-1; see also Multilayered

Wood Flooring from the People's Republic of China ("Final Results"), 87 Fed.

Reg. 39,464 (Dep't of Commerce July 1, 2022) (final results of antidumping duty

administrative review; 2019–2020) and accompanying Issues and Decision

Memorandum for the Final Results of Antidumping Duty Administrative Review:

Multilayered Wood Flooring from the People's Republic of China; 2019–2020

(Dep't of Commerce June 24, 2022) ("IDM"), PR 245.[1]  For the reasons discussed

below, the Court remands Commerce's <u>Remand Redetermination</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1.    Whether Commerce's determination to select Brazil as the primary

     surrogate country, while using Brazilian and Malaysian data for

     valuing log inputs, is supported by substantial evidence; and

2.    Whether Commerce's determination to adjust the Brazilian surrogate

     value data for plywood is supported by substantial evidence.

## BACKGROUND

The Court presumes familiarity with the underlying facts and procedural

history of this case as set forth in <u>Jiangsu Senmao Bamboo & Wood Industry Co.,</u>

<u>Ltd. v. United States</u> ("<u>Senmao I</u>"), 47 CIT __, __, 651 F. Supp. 3d 1348, 1354

(2023).

Commerce initiated an administrative review of the antidumping duty order

on multilayered wood flooring from China for the period of December 1, 2019 to

---

[1]  Citations to the administrative record reflect the public record ("PR") and public remand record ("PRR") numbers filed in this case, ECF Nos. 48, 64.

November 30, 2020 and selected Plaintiff Jiangsu Senmao Bamboo and Wood

Industry Co., Ltd. ("Plaintiff" or "Senmao") as the mandatory respondent in the

investigation.  Initiation of Antidumping and Countervailing Duty Admin.

Review Multilayered Wood Flooring from the People's Republic of China, 86 Fed.

Reg. 8166, 8169–71 (Dep't of Commerce Feb. 4, 2021); Commerce's Resp.

Selection Mem. (Mar. 9, 2021), PR 112.

In its Final Results, Commerce selected Brazil as the primary surrogate

country and valued Senmao's oak and non-oak logs with Malaysian surrogate

values.  IDM at 9; see also Multilayered Wood Flooring from the People's

Republic of China ("Preliminary Results"), 86 Fed. Reg. 73,252 (Dep't of

Commerce Dec. 27, 2021) (preliminary results of the antidumping duty

administrative review, preliminary determination of no shipments, and rescission

of review, in part; 2019–2020) and accompanying Decision Memorandum for the

Preliminary Results of Antidumping Administrative Review (Dec. 17, 2022)

("PDM") at 17, PR 213.  Commerce determined that Brazilian surrogate values

were not usable for oak and non-oak log inputs.  Senmao I, 47 CIT at __, 651

F. Supp. 3d at 1357 (citing PDM at 17).  Commerce did not cite any record

evidence to support its determination that Brazilian surrogate values regarding oak

log inputs were highly questionable, inadequate, or unavailable such that a

departure from a single surrogate country was warranted.  Id.

Commerce also adjusted the Brazilian surrogate values for plywood by excluding data that it determined to be incorrect regarding the quantity of plywood. IDM at 9.  Commerce determined that the Spanish import data for 2020 were incorrect because the data reported the same quantity of plywood in cubic meters ("m³") as it did in kilograms ("kg").  Id.  Because the m³ unit measures volume and the kg unit measures weight, Commerce concluded that it was "illogical for the Spanish import data to report the same quantity in these two different units of measure."  Id.  As a result, Commerce removed the Spanish import data.  In making this determination, Commerce relied on Exhibit 9 of Multilayered Wood Flooring from the People's Republic of China: Surrogate Value Comments ("AMMWF Surrogate Value Comments" or "AMMWF Surrogate Value Cmts."), but never placed the document on the record.  Senmao I, 47 CIT at __, 651 F. Supp. 3d at 1361; AMMWF Surrogate Value Cmts. (July 29, 2021), PR 180, 182.  Commerce calculated Senmao's antidumping duty margin at 39.27%.  Final Results, 87 Fed. Reg. at 39,465.

Because Commerce failed to cite necessary record evidence, provide adequate explanations, and include cited evidence on the record, the Court remanded for Commerce to reconsider its determinations.  Senmao I, 47 CIT at __, 651 F. Supp. 3d at 1358, 1361.  The Court remanded for Commerce to reconsider its determination to apply Malaysian surrogate values for both oak and non-oak log

inputs without providing a reasonable explanation for departing from Commerce's

established practice of using one surrogate country or supporting its determination

with substantial evidence.  Id. at __, 651 F. Supp. 3d at 1357.  The Court also

directed Commerce to reconsider or further explain its adjustment of plywood

surrogate values because Commerce cited evidence that was not on the record.  Id.

at __, 651 F. Supp. 3d at 1361.

On remand, Commerce continued to select Brazil as the primary surrogate

country.  Remand Redetermination at 5–6.  Commerce also determined that it was

appropriate to value Senmao's non-oak log inputs using Brazilian data and its oak

log inputs using Malaysian data.  Id. at 15.  Commerce revised the antidumping

duty rate and assigned a 34.68% dumping margin to Senmao.  Id. at 17.

Senmao filed Plaintiff's Comments in Opposition to Remand

Redetermination.  Pl.'s Cmts. Opp'n Remand Redetermination ("Senmao's

Cmts."), ECF No. 57.  Plaintiff-Intervenor Lumber Liquidators Services, Inc.

("Plaintiff-Intervenor" or "Lumber Liquidators") filed Lumber Liquidators'

Comments in Opposition to the Remand Redetermination.  Pl.-Interv.'s Cmts.

Opp'n Remand Redetermination ("Pl.-Interv.'s Cmts."), ECF No. 58.  Defendant

United States ("Defendant" or "the Government") filed Defendant's Response to

Comments on Remand Results.  Def.'s Resp. Cmts. Remand Results ("Def.'s

Resp."), ECF No. 60.  Defendant-Intervenor American Manufacturers of

Multilayered Wood Flooring ("Defendant-Intervenor" or "AMMWF") filed

Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring's

Comments in Support of Remand Determination.  Def.-Interv.'s Cmts. Supp.

Remand Determination ("AMMWF's Cmts."), ECF No. 59.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to

review actions contesting the final results of an administrative review of an

antidumping duty order.  The Court shall hold unlawful any determination found to

be unsupported by substantial evidence on the record or otherwise not in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews

determinations made on remand for compliance with the Court's remand order.  Ad

Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp.

2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Legal Framework

Antidumping duties are calculated as the difference between the normal

value of subject merchandise and the export price or the constructed export price of

the subject merchandise.  19 U.S.C. § 1673.  To determine the normal value of the

subject merchandise in a non-market economy, Commerce must calculate surrogate

values using "the best available information regarding the values of such factors in a [comparable] market economy." Id. § 1677b(c).  In doing so, Commerce relies on one or more market economy countries that are (1) "at a level of economic development comparable to that of the non[-]market economy country," and (2) "significant producers of comparable merchandise."  Id. § 1677b(c)(4). Commerce's task is to "attempt to construct a hypothetical market value" of the subject merchandise in the non-market economy.  Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999).  When Commerce determines that there is more than one country at the same level of economic development as the non-market economy country and is a significant producer of comparable merchandise, Commerce will consider the quality and availability of the surrogate value data.  See Fujian Lianfu Forestry Co. v. United States, 33 CIT 1056, 1075, 638 F. Supp. 2d 1325, 1347 (2009).

Commerce's regulatory preference is to value all factors of production with surrogate values from a single surrogate country.  19 C.F.R. § 351.408(c)(2); see Jiaxing Brother Fastener Co., Ltd. v. United States, 822 F.3d 1289, 1302 (Fed. Cir. 2016).  Commerce may use a second surrogate country, however, if data from the primary surrogate country are unavailable or unreliable.  See Import Admin. Policy Bull. No. 04.1: Non-Market Economy Surrogate Country Selection Process ("Policy Bulletin No. 04.1") (Dep't of Commerce Mar. 1, 2004).  When

the data from a single surrogate country are "demonstrably aberrational as

compared to certain benchmark prices, and alternative data sources could be better

corroborated," Commerce's preference for using data from a single country may be

deemed unreasonable.  Peer Bearing Co.-Changshan v. United States, 35 CIT 103,

119, 752 F. Supp. 2d 1353, 1369–72 (2011).

## II.    Selection of Surrogate Country and Surrogate Values for Log Inputs

Senmao argues that Commerce failed to provide sufficient evidence or

explanations that would justify a departure from Commerce's preference for a

single surrogate country or would support Commerce's use of a secondary

surrogate country to value Senmao's inputs.  Senmao's Cmts. at 7.

If Commerce has a routine practice for addressing similar situations, it must

either apply that practice or provide a reasonable explanation regarding why

Commerce has deviated from that practice.  See SKF USA, Inc. v. United States,

263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the

agency offers insufficient reasons for treating similar situations differently."

(internal citation omitted)); see also M.M. & P. Mar. Advancement, Training, Educ.

& Safety Program v. Dep't of Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984) ("An

agency is obligated to follow precedent, and if it chooses to change, it must explain

why."); see also Cinsa, S.A. de C.V. v. United States, 21 CIT 341, 349, 966

F. Supp. 1230, 1238 (1997) ("Commerce can reach different determinations in

separate administrative reviews but it must employ the same methodology or give

reasons for changing its practice.").

19 C.F.R. § 351.408(c) provides that, "[f]or purposes of valuing the factors

of production, . . . [Commerce] normally will value all factors in a single surrogate

country." 19 C.F.R. § 351.408(c)(2). Commerce explained that when

promulgating its regulations, the preference for a single country is meant to prevent

parties from "margin shopping," and Commerce may depart from its regulatory

preference for a single surrogate country when Commerce determines that the

"accuracy of available information regarding prices for particular factors in the

surrogate country is 'highly questionable,'" in which case Commerce may reject

the questionable values and use data from a second country. Antidumping Duties;

Countervailing Duties, 61 Fed. Reg. 7308, 7345 (Dep't of Commerce Feb. 27,

1996). Commerce may use a secondary surrogate country if financial data are

"inadequate or unavailable." See Policy Bulletin 04.1 ("After all, a country that

perfectly meets the requirements of economic comparability and significant

producer is not of much use as a primary surrogate if crucial factor price data from

that country are inadequate or unavailable.").

In evaluating surrogate value data, Commerce considers several factors,

including whether the surrogate values are publicly available, contemporaneous

with the period of review, representative of a broad market average, tax and duty-

exclusive, and specific to the inputs being valued.  See Policy Bulletin No. 04.1;

see also Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386

(Fed. Cir. 2014) (citing the same factors).  Commerce explained that comparable

merchandise is determined on a case-by-case basis, the meaning of a significant

producer can differ from case to case, and fixed standards have not been adopted in

Commerce's surrogate country selection process.  See Policy Bulletin No. 04.1.  In

assessing whether a country is a significant producer of comparable merchandise,

Commerce considers whether all of the potential surrogate countries have

significant exports of comparable merchandise but does not consider levels of

significance in comparison with other countries.  See id.

### A.    Commerce's Selection of Brazil as a Surrogate Country

The remand states that, "Commerce found that the [surrogate value] data on

the record for both Brazil and Malaysia are publicly available, contemporaneous

with the [period of review], representative of broad market averages, tax- and duty-

exclusive, and specific to the inputs being valued."  Remand Redetermination at 5

(citing PDM at 17).

Commerce determined that it was appropriate to continue with its selection

of Brazil as the primary surrogate country because:

> (1) the record contains usable Brazilian data for valuing the majority of Senmao's [factors of production]; and (2) the financial statements of Brazilian company Duratex S.A. [("Duratex")] on the record are contemporaneous with the [period of review] and superior to the financial statements of Malaysian company Focus Lumber Berhad [("Focus Lumber")]."

Id. at 5–6 (citing PDM at 17; Commerce's Surrogate Values for the Preliminary Results (Dec. 17, 2021) ("Prelim. Surrogate Value Mem."), PR 210–211).

Commerce failed to cite any specific documents on the record in support of its determination. Commerce only cited to the Preliminary Determination Memorandum to support its conclusory statement in the Remand Redetermination that Brazilian and Malaysian surrogate values were publicly available, contemporaneous with the period of review, representative of a broad market average, tax and duty-exclusive, and specific to the inputs being valued. There is no further discussion of any documents in evidence, nor any further explanation in the Remand Redetermination of how any record evidence supports Commerce's determinations.

19 U.S.C. § 1516a(b)(1)(B)(i) requires that Commerce must support its determinations with substantial record evidence. By merely citing "PDM at 17" as support for its remand determination that the surrogate value data for both Brazil and Malaysia are publicly available, contemporaneous with the period of review, representative of broad market averages, tax- and duty-exclusive, and specific to

the inputs being valued, Commerce failed to cite substantial evidence.  See

Remand Redetermination at 5.

First, Commerce's Preliminary Determination Memorandum itself is not

record evidence because it expresses the agency's views.  Moreover, a review of

page 17 of the Preliminary Determination Memorandum states that, "[w]e

considered the [surrogate value] data on the record and determine that both the

Brazilian and Malaysian data generally are publicly available, contemporaneous

with the [period of review], representative of broad market averages, tax- and duty-

exclusive, and specific to the inputs being valued."  PDM at 17.  No citation to

record evidence appears in support of this conclusory statement on page 17 of the

Preliminary Determination Memorandum.

Second, Commerce only cited to the Preliminary Determination

Memorandum and Preliminary Surrogate Value Memorandum to support its

determination that Brazil was the appropriate primary surrogate country.  Neither

the Preliminary Determination Memorandum nor the Preliminary Surrogate Value

Memorandum are record evidence; both documents merely express the agency's

views.  Commerce's references to the Preliminary Determination Memorandum

and Preliminary Surrogate Value Memorandum did not include any citations to

particular documents in evidence that show how Commerce reached the

determination that Brazil was the appropriate primary surrogate country.

The Remand Redetermination states that, "[t]o comply with the Court's Remand Order, we reconsidered the [surrogate value] for Senmao's log inputs and determined that the substantial evidence did not lead us to conclude that the Brazilian log [surrogate value] is either highly questionable, inadequate, or unavailable to use to value Senmao's log inputs." Remand Redetermination at 6. Commerce only cites to the Draft Remand Redetermination, the IDM, and Final Surrogate Value Memorandum. None of these are documents in evidence.

It is insufficient under 19 U.S.C. § 1516a(b)(1)(B)(i) for Commerce to simply declare that its determination is supported by substantial evidence, citing to its own determinations, without actually discussing any documents on the record that support its determinations. See 19 U.S.C. § 1516a(b)(1)(B)(i) ("The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."). The Court already remanded once for Commerce's failure to cite evidence, and must now remand again for the same failure.

The Court holds that Commerce's determinations are not supported by substantial evidence because Commerce failed to identify any record evidence on which it relied on for the determinations that Brazilian and Malaysian surrogate value data were publicly available, contemporaneous with the period of review, representative of a broad market average, tax and duty-exclusive, and specific to

the inputs being valued, nor any evidence to support its determination that Brazil was the appropriate primary surrogate country. The Court remands these issues for further reconsideration consistent with this Opinion.

### B.    Surrogate Values for Log Inputs

With respect to log inputs, Commerce used Brazilian surrogate values for the valuation of Senmao's non-oak log inputs and used Malaysian surrogate values for the valuation of Senmao's oak log inputs. Remand Redetermination at 14–15.

Senmao argues that Commerce's selection of Malaysia as a secondary surrogate country is inconsistent with Commerce's policy preference to use a single surrogate country to value inputs. Senmao's Cmts. at 7–10. Senmao contends that Commerce's decision to use Malaysian data to value oak logs was based solely on a finding that Malaysian data were more specific than Brazilian data. Id. at 9. Senmao also argues that Commerce did not cite to any record evidence that shows that Brazilian data under Harmonized Tariff Schedule ("HTS") subheading 4403.99 would distort the margin if the data were used to value oak logs that are classified under HTS subheading 4403.91. Id. at 10.

Defendant counters that Commerce's decision to use Malaysian data was based on the fact that there were no Brazilian data available on the record to value oak logs, not because Malaysian data were more specific. Def.'s Resp. at 7. Defendant argues that there was no evidence of Brazilian imports classified under

HTS subheading 4403.91 for the period of review and that the unavailability of

such information warranted the use of a secondary primary country, consistent with

Commerce's practice.  Id. at 9 (citing Policy Bulletin No. 04.1).

The Court is remanding Commerce's determination to select Brazil as the

primary surrogate country due to Commerce's failure to cite substantial evidence,

and therefore does not reach the issue of whether Commerce's determination to use

Malaysia as a secondary surrogate country to value oak log inputs is supported by

substantial evidence.

## III.    Adjustment of Surrogate Values for Plywood

Senmao argues that Commerce's determination to adjust surrogate values for

plywood is inconsistent with Commerce's practice of adjusting a surrogate value

after considering whether it is aberrational in the aggregate.  Senmao's Cmts. at 12.

As noted previously, if Commerce has a routine practice for addressing

similar situations, it must either apply that practice or provide a reasonable

explanation regarding why Commerce deviated from that practice.  See SKF USA,

Inc., 263 F.3d at 1382.  Commerce has a standard practice of considering whether

the average unit value ("AUV") is aberrational in the aggregate for the

economically comparable surrogate countries or as compared to historical AUVs of

the surrogate country at issue.  See SolarWorld Americas, Inc. v. United States, 42

CIT __, __, 320 F. Supp. 3d 1341, 1351–52 (2018) ("Commerce explains that its

practice is to assess aberrationality by examining HTS data both across potential

surrogate countries and within the surrogate country over multiple years . . . [and]

considers import data to be aberrationally high if that data [are] 'many times higher

than import values from other countries.'").  Interested parties need to demonstrate

that the import data are aberrational in the aggregate.  Id.

On remand, Commerce maintained that its initial determination to adjust the

plywood surrogate values by removing erroneous data was reasonable.  Remand

Redetermination at 15.  Commerce stated that it complied with the Court's Order

in Senmao I by attaching Exhibit 9 of AMMWF's Surrogate Value Comments

("Exhibit 9"), which demonstrates "the density of various wood species and

standard conversion factors of wooden products."  Id. (citing AMMWF's Surrogate

Value Comments, at Ex. 9).  Commerce explained that Exhibit 9 supports

Commerce's decision to remove an erroneous line of Spanish import data from the

plywood AUVs because Exhibit 9 "demonstrates that a quantity of plywood

expressed in [m$^3$] cannot be the same as the quantity expressed in [kg]."  Id. at 15–

16.  Commerce determined that instead of disqualifying an entire dataset for

containing erroneous data, it was unnecessary to do so in this instance because the

problem caused by the erroneous data was "easily remedied" by removing the

distinct subset of Spanish import data, thus making the remaining dataset "more

accurate" and enabling Commerce to use the surrogate values of plywood from the primary surrogate country of Brazil.  Id. at 16.

Senmao argues that Commerce's determination is inconsistent with Commerce's practice of removing data only if the data are "aberrational in the aggregate."  Senmao's Cmts. at 10–15.  Senmao asserts that when Commerce removed the data subset containing Spanish values for Brazilian plywood imports, it distorted the data in a manner that was grossly adverse to Senmao.  Id. at 16.

The Government counters that Commerce only applies the "aberrational in the aggregate" test when a party argues that a data point is unusually high or low and is therefore likely to distort the average value.  Def.'s Resp. at 12.  The Government argues that in this case, Commerce's determination to remove the Spanish data was not based on the reasoning that the data were aberrational, but because the quantities expressed in $m^3$ and kg units made the data incorrect and Commerce could not rely on such data when calculating Senmao's dumping margin.  Id. at 13.  The Government also asserts that removing the data subset with the Spanish values did not distort the data on the record because Commerce removed incorrect data in order to use "the best available information" to determine an accurate antidumping margin.  Id. at 14.

Commerce explained that its decision to remove the data subset with the Spanish values for the Brazilian imports was not based on a determination that the

data were many times higher than import values from other countries, but based on the fact that the quantities expressed in association with the units of measurement made the data incorrect for the purposes of measuring the quantity of plywood. Remand Redetermination at 16. By removing the incorrect data subset, Commerce stated that it was able to calculate Senmao's dumping margin using the best available information on the record and as accurately as possible. Id. (citing Shakeproof Assembly Components, Div. of Illinois Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001)).

Commerce simply cited to Exhibit 9 as support for Commerce's decision to remove Spanish import data that Commerce deemed erroneous, but Commerce failed to explain how Exhibit 9 demonstrates that a quantity of plywood expressed in $m^3$ cannot be the same as the quantity expressed in kg. Commerce attached Exhibits 9, 9A, and 9B to the Remand Redetermination and AMMWF's Surrogate Value Comments, yet Commerce did not identify which of these exhibits it actually relied on to show how the density of various wood species and standard conversion factors demonstrate that the Spanish import data were erroneous. At no point did Commerce cite to specific information in Exhibits 9, 9A, or 9B to illustrate that it was illogical for the Spanish $m^3$ and kg values to be expressed in the same quantity.

Furthermore, Commerce made a conclusory statement that removing the Spanish import data would enable Commerce to calculate the dumping margins as

accurately as possible.  Commerce failed to explain, however, how the removal of

the Spanish import data would be more accurate, or how such removal made the

rest of the dataset the "best available information" pursuant to 19 U.S.C.

§ 1677b(c)(1).  See 19 U.S.C. § 1677b(c)(1) ("[T]he valuation of the factors of

production shall be based on the best available information regarding the values of

such factors in a market economy country or countries considered to be appropriate

by the administering authority.").

The fact that the kg and m$^3$ quantities cannot be the same does not support

the automatic conclusion, without any explanation, that removal of erroneous data

led to a more accurate dataset.  Senmao points out that Commerce's adjustment of

the dataset led to an increase of the Brazilian plywood surrogate value from $1.33

per m$^3$ to $7.36 per m$^3$, yet Commerce concluded that it was using the best

information available without showing how the $7.36 per m$^3$ was more accurate

than the $1.33 per m$^3$.  Senmao's Cmts. at 16.  The Court agrees with Senmao that

Commerce did not provide a reasonable explanation for how its removal of the

Spanish import data led to a more accurate dataset, and Commerce did not

establish how removing the Spanish import data would result in the best available

information for calculating Senmao's dumping margin rate.  The Court notes that

Commerce removed the purportedly erroneous data without providing the parties

with a chance to correct the information and without explaining why it was more

accurate to remove the incorrect data than to allow the parties to provide corrected

data.  On remand, the Court suggests that Commerce should consider providing the

parties with the opportunity to submit corrected information that will lead to a

more accurate dumping margin calculation, rather than simply removing data from

a larger dataset without explaining how removal is more accurate than allowing for

the submission of corrected information.  It seems to the Court that allowing the

Parties to submit corrected information would lead to a more accurate result than

merely deleting subsets of information that Commerce deems to be erroneous.

The Court concludes that Commerce's determination to adjust the Brazilian

plywood dataset by removing the Spanish import data is not supported by

substantial evidence on the record.  The Court remands the issue for further

consideration consistent with this Opinion.

## CONCLUSION

For the foregoing reasons, the Court concludes that Commerce's <u>Remand

Redetermination</u> is not supported by substantial evidence.  Accordingly it is hereby

**ORDERED** that Commerce's Final Results of Redetermination Pursuant to

Remand Order, ECF No. 55-1, are remanded to Commerce for reconsideration

consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the remand determination on or before June 20,

2024;

(2) Commerce shall file the administrative record on or before July 3, 2024;

(3) Comments in opposition to the remand determination shall be filed on or before August 20, 2024;

(4) Comments in support of the remand determination shall be filed on or before September 20, 2024; and

(5) The joint appendix shall be filed on or before September 30, 2024.

  /s/ Jennifer Choe-Groves   
Jennifer Choe-Groves, Judge

Dated:      April 19, 2024     
        New York, New York