**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | Court No. 22-00190 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

<u>**ORDER**</u>

Upon consideration of the Department of Commerce's final results of redetermination pursuant to remand, plaintiff and plaintiff intervenor's comments on the remand, defendant's response, and all other pertinent papers, it is hereby

ORDERED that the remand results are sustained; and further

ORDERED that final judgment is entered in favor of the United States.

Dated:_____, 2024          _____
       New York, NY                    JENNIFER CHOE-GROVES, JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | ) |
| Plaintiff, | ) |
| and | ) |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) |
| Plaintiff-Intervenor, | ) |
| v. | )    Court No. 22-00190 |
| UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) |
| Defendant-Intervenor. | ) |

<u>**DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS**</u>

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

OF COUNSEL:                                KELLY M. GEDDES
CHRISTOPHER KIMURA                         Trial Attorney
Attorney                                   Commercial Litigation Branch
Office of the Chief Counsel                Civil Division
  for Trade Enforcement and Compliance    Department of Justice
U.S. Department of Commerce                P.O. Box 480
Washington, D.C.                           Ben Franklin Station
Telephone:  (202) 482-0131                 Washington, D.C.  20044
                                           Telephone: (202) 307-2867
                                           Email: kelly.geddes2@usdoj.gov

Dated September 20, 2024                    *Attorneys for Defendant*

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................... 2

ARGUMENT ......................................................................................................... 7

    I.    Standard Of Review ................................................................................. 7

    II.   Commerce's Selection Of Brazil As The Primary Surrogate Country Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence And In Accordance With Law ................................................................. 7

    III.  Commerce's Minor Adjustment Of The Surrogate Value For Plywood Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence And In Accordance With Law ............................................................. 17

CONCLUSION ..................................................................................................... 21

# **TABLE OF AUTHORITIES**

## **Cases**

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) .............................................. 15

*Amanda Foods (Vietnam) Ltd. v. United States*, 774 F. Supp. 2d 1286 (Ct. Int'l Trade 2011)...... 7

*Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ................. 7

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) .............................................. 21

*Guangdong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006)....................................................................................................................................... 20

*Hebei Metals & Minerals Imp & Exp. Corp. v. United States*, 28 CIT 1 185, 2004 WL 1615597 (2004) ........................................................................................................................................ 20

*Heze Huayi Chemical Co. v. United States*, No. 17-00032, Slip Op. 18-57 (Ct. Int'l Trade 2018) .................................................................................................................................................... 18

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014).................... 16

*Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United* States, 28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ............................................................................................................................... 18

*Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023) ............................................................................................................................ 5, 14

*Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 698 F. Supp. 3d 1277 (Ct. Int'l Trade Apr. 2024)..................................................................................................................... 1, 6, 17

*Jiaxing Brother Fastener Co, v. United States*, 11 F. Supp. 3d at 1326 (Ct. Int'l Trade 2014) ... 13

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016)............................. 18, 19

*National Ford Chem Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ............................... 18

*Viraj Group v. United States*, 476 F. 3d 1349 (Fed. Cir. 2007)................................................... 15

## **Statutes**

19 U.S.C. § 1677b............................................................................................................... 2, 8

**Other Authorities**

Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection
Process (Mar. 1, 2004) ............................................................................................... 8

**Administrative Determinations**

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping
Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 62,000 (Dep't of Commerce Sept. 8,
2016) ........................................................................................................................ 20

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of
Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 Fed.
Reg. 17,350 (Dep't of Commerce Mar. 21, 2013) ...................................................... 8, 10

*Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35,595 (Dep't of Commerce
July 24, 2019) ........................................................................................................... 13

*Certain Steel Threaded Rod from the People's Republic of China: Final Results of Third
Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 66,330 (Dep't of
Commerce Nov. 5, 2013) ........................................................................................... 8

*Certain Uncoated Paper From the People's Republic of China: Final Determination of Sales at
Less Than Fair Value*, 81 Fed. Reg. 3,112 (Dep't of Commerce Jan. 20, 2016) ...................... 20

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the
People's Republic of China: Final Determination of Sales at Less Than Fair Value, and
Affirmative Final Determination of Critical Circumstances, in Part*, 77 Fed. Reg. 63,791
(Dep't of Commerce Oct. 17, 2012) ........................................................................... 8, 20

*Multilayered Wood Flooring From the People's Republic of China: Final Results of
Antidumping Duty Administrative Review and Final Results of New Shipper Review; 2012-
2013*, 80 Fed. Reg. 41,476 (Dep't of Commerce July 15, 2015) ............................................ 21

*Wood Mouldings and Millwork Products from the People's Republic of China: Final Affirmative
Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 63 (Dep't of Commerce Jan. 4,
2021) ........................................................................................................................ 12

*Wood Mouldings and Millwork Products from the People's Republic of China: Preliminary
Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final
Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 48,669 (Dep't of
Commerce Aug. 12, 2020) ......................................................................................... 12

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | | |
|---|---|---|
| JIANGSU SENMAO BAMBOO AND WOOD INDUSTRY CO., LTD., | ) | |
| Plaintiff, | ) | |
| and | ) | |
| LUMBER LIQUIDATORS SERVICES, LLC, | ) | |
| Plaintiff-Intervenor, | ) | Court No. 22-00190 |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant, | ) | |
| and | ) | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | ) | |
| Defendant-Intervenor. | ) | |

<u>**DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS**</u>

Defendant, the United States, respectfully submits this response to the comments submitted by plaintiff Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Senmao) and plaintiff-intervenor Lumber Liquidators Services, LLC concerning the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Remand Order (June 18, 2024), ECF No. 66 (Second Remand Results), issued pursuant to this Court's opinion and remand order, *Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 698 F. Supp. 3d 1277 (Ct. Int'l Trade Apr. 2024) (Second Remand Order).  As discussed below, Commerce's Second Remand Results fully comply with the Court's second remand order, and are supported by substantial

evidence and in accordance with law.  The Court should therefore sustain the Second Remand Results.

## BACKGROUND

On February 4, 2021, Commerce initiated the ninth administrative review of the antidumping duty order on multilayered wood flooring from China, covering the period of review from December 1, 2019, through November 30, 2020.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 86 Fed. Reg. 8,166, 8,169 (Dep't of Commerce Feb. 4, 2021) (P.R. 12).[1]  Commerce found that it was not practicable to individually examine each of the 95 companies for which Commerce initiated the administrative review, and Commerce selected Senmao as one of two mandatory respondents accounting for the largest volume of exports during the period of review.  *See* Respondent Selection Memorandum (Mar. 9, 2021) (P.R. 112, C.R. 21).  On May 3, 2021, petitioner American Manufacturers of Multilayered Wood Flooring (AMMWF) and the other mandatory respondent submitted timely withdrawals of their requests for review of the other mandatory respondent, leaving Senmao as the sole mandatory respondent subject to the review.  *See* Withdrawal of Review Requests (May 3, 2021) (P.R. 146-147).

Because Commerce considers China to be a non-market economy, as part of its non-market economy practice pursuant to 19 U.S.C. § 1677b(c), Commerce turned to the selection of a market economy country for use as a surrogate in valuing Senmao's factors of production. Commerce identified six countries—Brazil, Malaysia, Mexico, Romania, Russia and Turkey— that it determined to be economically comparable to China, and provided interested parties an

---

[1]  "P.R." and "C.R." refer to the public and confidential records of Commerce's original determination.  "P.R.R." and "C.R.R." refer to the public and confidential records of Commerce's redetermination on remand.

opportunity to submit comments and information concerning its selection of a surrogate market economy country from among those options. *See* Request for Surrogate Country and Value Comments (Jul. 1, 2021) (P.R. 153). No party has challenged Commerce's selection of these six economically comparable countries. AMMWF urged Commerce to select Malaysia. *See* AMMWF Comments on Surrogate Country Selection at 3 (Jul. 15, 2021) (P.R. 165).

AMMWF provided Malaysian import data and suggested a method of calculating surrogate financial ratios that was based on the 2018-2019 financial statement of a Malaysian company, Focus Lumber Berhad (Focus Lumber). *See* AMMWF Surrogate Value Comments (Jul. 29, 2021) (P.R. 179-182). Senmao argued that Brazil should be the surrogate country. *See* Senmao Surrogate Value Rebuttal Comments at 2 (Aug. 3, 2021) (P.R. 184). Senmao provided import data from Brazil along with a proposed surrogate financial statement, the 2019-2020 statement for a Brazilian company, Eucatex S/A Industry. *See* Senmao's Surrogate Value Comments (Jul. 29, 2020) (P.R. 176-177). AMMWF provided additional Brazilian import data, *see* AMMWF Surrogate Value Rebuttal Comments (Aug. 3, 2021) (P.R. 186), as well as another financial statement from a different Brazilian company, Duratex S.A. *See* AMMWF Additional Surrogate Value Comments (Nov. 8, 2021) (P.R. 200).

On December 27, 2021, Commerce published its preliminary results of review, in which it preliminarily determined that multilayered wood flooring from China had not been sold in the United States at less-than-fair value during the period of review. *See Multilayered Wood Flooring From the People's Republic of China*, 86 Fed. Reg. 73,252 (Dep't of Commerce Dec. 27, 2021) (P.R. 219), and the accompanying Preliminary Decision Memorandum (Dec. 20, 2021) (P.R. 213). In the preliminary results, Commerce found that Brazil and Malaysia were both viable surrogate countries because they had generally available and public data that were

contemporaneous with the period of review, representative of broad market averages, tax- and duty-inclusive, and specific to the inputs being valued.  *Id*. at 17.  Between the two options, Commerce selected Brazil because the only Malaysian financial statement on the record was from a time period outside the period of review, while the financial statement from one of the Brazilian companies, Duratex, was contemporaneous with the period of review.  *Id.*  In addition, Commerce concluded that the product produced by Duratex, laminate flooring, was more comparable to the subject merchandise, multilayered wood flooring.  *Id.*  The Malaysian company, by contrast, did not produce wood flooring, but rather produced plywood, veneer, and laminated veneer lumber.  *See* AMMWF SV Comments at Ex. 10B (P.R. 180).

Further, Commerce determined in the preliminary results to value Senmao's log inputs using Malaysian rather than Brazilian data.  *Id.*; Preliminary Surrogate Value Memorandum (Dec. 17, 2021) (P.R. 210) at 2.  Commerce explained that the Malaysian data included a category specific to oak logs, as well as a basket category for non-oak logs, and was therefore more specific to Senmao's inputs than the Brazilian data, which included only a basket category. Preliminary Surrogate Value Memo at 2.

Commerce published the final results on July 1, 2022.  In the final results, Commerce revised its selected plywood surrogate value by removing a facially inaccurate line item of data (the datapoint for imports from Spain during January 2020) from the Brazilian dataset of plywood import values.  *See Multilayered Wood Flooring from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019-2020*, 87 Fed. Reg. 39,464 (Dep't of Commerce Jul. 1, 2022) (Final Results), and accompanying Issues and Decision Memorandum (IDM) (P.R. 245); IDM at 9-10.

Commerce explained that the datapoint was clearly inaccurate, and therefore unreliable, because it listed identical values for the mass and volume of the imported plywood. *Id.*

Commerce continued using Malaysian surrogate values for Senmao's oak log and non-oak log inputs, even though Brazil was the surrogate country. *Id.* at 22-23. Commerce concluded that Brazilian data for non-oak and oak log import values were unavailable, because Brazil reported all of its log imports under a single catchall Harmonized Tariff Schedule (HTS) heading that does not include oak logs, and reported no oak log inputs. *Id.* at 18, 22-23. There was therefore no data for Brazilian oak log values on the record, and the non-oak data was unreliable because it was unclear whether those data erroneously included Brazil's oak log inputs, skewing the value. *Id.* Concluding that data from Brazil was unavailable, Commerce relied on data from Malaysia. *Id.*

The Court remanded to Commerce, directing Commerce to reconsider or provide further explanation for its decisions to (1) select Brazil as the primary surrogate country while using Malaysian surrogate values to value Senmao's log inputs, and (2) adjust the Brazilian surrogate value for plywood by removing the apparently erroneous datapoint from the Brazilian import value dataset. *Jiangsu Senmao Bamboo & Wood Industry Co. v. United States*, 651 F. Supp. 3d 1348 (Ct. Int'l Trade 2023). With respect to Commerce's determination to use Malaysian log values, the Court concluded that Commerce had failed to adequately identify the record evidence it relied on to conclude that Brazilian log input data were unavailable. *Id.* at 1358. As to Commerce's determination to remove the datapoint from the Brazilian dataset of plywood import values, the Court concluded that Commerce similarly failed to support its decision with record evidence, because the document Commerce relied on to conclude that plywood could not have

identical mass and volume, Exhibit 9 to AMMWF's Surrogate Value Comments, was not included in the appendix submitted to the Court.  *Id.* at 1361.

Commerce issued its remand redetermination on October 25, 2023.  Final Results of Redetermination Pursuant to Remand Order (Jun. 18, 2024), on October 25, 2023 (First Final Remand Results) (P.R.R. 11).  Commerce determined to use the Malaysian oak log data to value Senmao's oak logs because the only Brazilian log import data was for HTS subheading 4403.99, which does not include oak logs.  *Id.* at 13-15.  However, consistent with its primary surrogate country preference, Commerce determined to use the Brazilian data to value Senmao's non-oak logs.  *Id.*  Commerce also continued to adjust the Brazilian plywood surrogate value by removing the Spanish import for January 2020.  *Id.* at 8.  To support that decision, Commerce attached Exhibit 9 of AMMWF's Surrogate Value Comments, a document showing the density of various types of wood and demonstrating that it is not possible for the volume in cubic meters to be identical to the mass in kilograms, such that the datapoint for Spanish imports to Brazil in January 2020 must be incorrect.  *See* Attachment to First Final Remand Results.

The Court again remanded both issues to Commerce.  The Court held that Commerce had not cited the specific record evidence it relied on to support its selection of Brazil as the primary surrogate country.  Second Remand Order at 1283-84.  The Court therefore did not reach the question of whether Commerce had adequately supported its decision to rely on a secondary surrogate country to value Senmao's oak logs.  Further, with respect to Commerce's decision to remove the erroneous datapoint from the Brazilian plywood data, the Court found that "Commerce failed to explain how Exhibit 9 demonstrates that a quantity of plywood expressed in $m^3$ cannot be the same as the quantity expressed in kg{,}" and that "Commerce did not provide a reasonable explanation for how its removal of the Spanish import data led to a more

accurate dataset, and Commerce did not establish how removing the Spanish import data would result in the best available information{.}"  Second Remand Order at 1286.

To comply with the Court's second remand order, Commerce's second remand results provide citations to the record evidence relied upon in selecting Brazil as the primary surrogate country.  Second Remand Results at 5-8, 12-19.  The remand results also explain how Exhibit 9 to AMMWF's Surrogate Value Comments demonstrates that the line item for imports of Spanish plywood to Brazil in January 2020 is erroneous and how the removal of that datapoint results in a more reliable and accurate dataset.  *Id.* at 8-10, 23-24.

## ARGUMENT

### I.    Standard Of Review

"The same standard of review applies to the review of a remand determination as to the review of the original determination."  *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002).  Accordingly, the "court will sustain {Commerce's} determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law."  *Amanda Foods (Vietnam) Ltd. v. United States*, 774 F. Supp. 2d 1286, 1290 (Ct. Int'l Trade 2011).

### II.    Commerce's Selection Of Brazil As The Primary Surrogate Country Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence And In Accordance With Law

In its second remand redetermination, Commerce provided further explanation as to why it selected Brazil as the primary surrogate country.  This determination is supported by record evidence, complies with the second remand order, and should be sustained.

When using a surrogate country to determine the normal value of subject merchandise, Congress has instructed Commerce to value the factors of production using "the best available information regarding the values of such factors in a market economy country or countries

considered to be appropriate by {Commerce}." 19 U.S.C. § 1677b(c)(1). When multiple

economically comparable countries are significant producers of comparable merchandise, as was

the case here, Commerce examines the availability and reliability of the competing surrogate

value data in each country. *See* Import Administration Policy Bulletin 04.1: Non-Market

Economy Surrogate Country Selection Process (Mar. 1, 2004). Commerce considers various

factors including whether the data are publicly available, contemporaneous with the period of

review, representative of a broad-market range, tax- and duty-exclusive, and specific to the

inputs used to produce the subject merchandise. Second Remand Results at 5 (citing, as an

example, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of*

*Antidumping Duty Administrative Review and New Shipper Reviews; 2010-2011*, 78 Fed. Reg.

17,350 (Dep't of Commerce Mar. 21, 2013), and accompanying IDM at Comment I(C)).

Commerce prefers to satisfy all of these criteria, but the criteria do not constitute a rigid test.

Rather, in each case Commerce carefully considers the entirety of the evidence in light of the

particular facts of each industry before making its determination. Second Remand Results at 5

(citing *Certain Steel Threaded Rod from the People's Republic of China: Final Results of Third*

*Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 66,330 (Dep't of Commerce

Nov. 5, 2013), and accompanying IDM at 7; *Crystalline Silicon Photovoltaic Cells, Whether or*

*Not Assembled into Modules, from the People's Republic of China: Final Determination of Sales*

*at Less Than Fair Value, and Affirmative Final Determination of Critical Circumstances, in*

*Part*, 77 Fed. Reg. 63,791 (Dep't of Commerce Oct. 17, 2012), and accompanying IDM at

Comment 9).

      Here, Commerce concluded that the data placed on the record for Malaysia and Brazil

both satisfied the criteria listed above. The data are publicly available and, other than a few

minor exceptions (namely, the Brazilian marine insurance pricing information data submitted by

Senmao and the Malaysian water pricing information submitted by AMMWF, which are not

dated) contemporaneous with the period of review.  *See* Second Remand Results at 6.

Specifically, Senmao submitted Brazilian data that included 2019-2020 import data from the

Global Trade Atlas, an established source of publicly available data, *see* P.R. 176 at PDF pages

10-30, P.R. 177[2]; 2019-2020 ocean freight pricing data from the public website of shipping

company Maersk, *see* P.R. 176 at PDF pages 31-56, P.R. 177 at tab "Ex 3 Ocean Freight";

marine insurance pricing data from the public website of P.A.F. Insurance Services, LLC, *see*

P.R. 176 at PDF pages 57-66, P.R. 177 at tab "Ex 4 Marine Insurance"; 2018-2020 consumer

price index data from the public website of the Brazilian Institute of Geography and Statistics,

*see* P.R. 176 at PDF pages 68, P.R. 177 at tab "Ex 5 CPI"; 2019 electricity pricing data from the

public website of Brazil's Agência Nacional de Energia Elétrica, *see* P.R. 176 at PDF pages 70,

P.R. 177 at tab "Ex 6 Electricity"; 2019-2020 labor pricing data from Trading Economics that

was sourced from public data collected by the Instituto Brasileiro de Geografia e Estatistica, *see*

P.R. 176 at 72, P.R. 177 at tab "Ex 7 Labor"; 2020 water pricing data from the public website of

a government-owned water company (Sabesp), *see* P.R. 176 at PDF page 74, P.R. 177 at tab "Ex

8 Water"; and 2020 transportation pricing data from *Doing Business 2020*, a publication by the

World Bank based on publicly available information, *see* P.R. 176 at PDF pages 75-78, P.R. 177

at tabs "Ex 9 Truck Freight," "Ex 10 Brokerage & Handling."

  Similarly, AMMWF submitted publicly available and contemporaneous information for

Malaysia.  *See* P.R. 179 at 1-3 (summarizing AMMWF's submissions).  Specifically, AMMWF

---

 [2]  The specific tabs from P.R. 177 with data from the Global Trade Atlas are the 20 tabs
beginning with "Ex. 2 SV_44039900" and ending with "SV_44012200."

provided 2019-2020 import data from the Global Trade Atlas, *see* P.R. 182; 2019-2020 exchange rate data from a database on Commerce's public website, *see* P.R. 180 at PDF pages 6-14; 2017-2020 electricity pricing data and water pricing data from the public website of the Malaysian Investment Development Authority, *see* P.R. 180 at PDF pages 15-43; 2019-2020 labor pricing data from Trading Economics that was sourced from the public website of Malaysia's Department of Statistics, *see* P.R. 180 at PDF pages 45-54; information about paid days off in Malaysia from the public website of the Malaysian Investment Development Authority, *see* P.R. 180 at PDF pages 55-60; and 2020 transportation cost information from *Doing Business 2020*, *see* P.R. 180 at PDF pages 62-74. AMMWF later provided supplemental 2019-2020 Malaysian import data from the Global Trade Atlas, *see* P.R. 200 at PDF page 8. AMMWF also provided additional Brazilian information that was contemporaneous and publicly available: 2015-2020 data sourced from the Global Trade Atlas, information on employment law from the public website of Globalization Partners, and 2019-2020 currency exchange rate information from Commerce's publicly available database. *See* P.R. 186 at PDF pages 1-2 (summarizing submissions); 7-12 (Global Trade Atlas data), 13-35 (Globalization Partners information); P.R. 200 at PDF pages 106-112 (exchange rate information).

Further, the import data for both countries was predominantly sourced from the Global Trade Atlas, which represents broad market averages because the data consist of average prices for inputs imported into the entire country during the review period. *See* Second Remand Results at 6; P.R. 176 at PDF pages 10-30; P.R. 177; P.R. 182; P.R. 200 at PDF page 8; P.R. 186 at PDF pages 7-12. Such data has also been previously found to be tax- and duty- exclusive, which parties have not contested. *See* Second Remand Results at 6 (citing *Frozen Fish Fillets from Vietnam*, 78 Fed. Reg. 17,350, and accompanying IDM at Comment 5; Senmao's Surrogate

Value Comments at Exhibit 13 (P.R. 176 at PDF page 372) (incorporating a chart called

"Reconciliation of income tax expenses and social contributions"); AMMWF's Surrogate Value

Comments at Exhibit 10A (P.R. 180 at PDF page 90) (showing the annual report of Focus

Lumber, including profit before and after tax); Senmao's Case Br. (P.R. 228); Senmao's Rebuttal

Br. (P.R. 233); Petitioner's Case Br. (P.R. 231, C.R. 98); and Petitioner's Rebuttal Br. (P.R. 235,

C.R. 99)).

Lastly, Commerce explained that the Malaysian and Brazilian data are specific to the

inputs as both data sets include raw Global Trade Atlas data for HTS codes covering the vast

majority of inputs used in the production of subject merchandise.  *See* Second Remand Results at

6-7; P.R. 176 at PDF pages 10-30; P.R. 177; P.R. 182; P.R. 200 at PDF page 8; P.R. 186 at PDF

pages 7-12.

Accordingly, Commerce fully supported with record evidence its determination that both

Brazil and Malaysia satisfied the criteria Commerce generally relies on to determine if data from

a potential surrogate country are sufficiently available and reliable.

Commerce also provided further explanation of its decision to select Brazil, rather than

Malaysia, as the primary surrogate country.  *See* Second Remand Results at 7-8.  As explained

above, two financial statements from Brazilian companies, Eucatex and Duratex, had been

placed on the record, as well as a financial statement from a Malaysian company, Focus Lumber.

*See id.*; P.R. 176 at Exhibit 13 (PDF pages 201-383) (Eucatex); P.R. 180-81 at Exhibit 10B (PDF

pages 91-113 of P.R. 180, all of P.R. 181) (Focus Lumber); P.R. 200 at Exhibit 3B (PDF pages

17-105) (Duratex).  Commerce noted that the financial statement from Eucatex had a qualified

opinion by its auditors and was therefore less reliable than the other financial statements.  *See*

Second Remand Results at 7 (citing *Wood Mouldings and Millwork Products from the People's*

11

*Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value,*

*Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg.

48,669 (Dep't of Commerce Aug. 12, 2020), and accompanying Preliminary Decision

Memorandum (determining that Eucatex's 2019 financial statements were unreliable because of

a qualified opinion by its auditors), unchanged in *Wood Mouldings and Millwork Products from*

*the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair*

*Value*, 86 Fed. Reg. 63 (Dep't of Commerce Jan. 4, 2021), and accompanying IDM)).

Commerce also considered that the only Malaysian financial statement on the record, for Focus

Lumber, was not contemporaneous with the December 2019 – November 2020 period of review,

but rather was from 2018.  *See* Second Remand Results at 7; P.R. 180 at Exhibit 10B (PDF page

92).  Further, Focus Lumber is not a producer of wood flooring, but of other wood products

including plywood, veneer, and laminate veneer lumber.  *See* P..R. 180 at Exhibit 10B, page 9

(PDF page 102).  By contrast, the financial statement for Duratex was contemporaneous with the

period of review, *see* P.R. 200 at Exhibit 3B (PDF page 18), and Duratex is a producer of

laminate flooring, *see* P.R. at Exhibit 3B page 19 (PDF page 48).  Commerce therefore

concluded that Duratex is a "producer of identical or comparable merchandise" to the subject

merchandise (multilayered wood flooring).  Second Remand Results at 7.  Accordingly,

Commerce selected Brazil as the primary surrogate country, because the Duratex financial

statement was the best available option on the record.  *Id.* at 7-8.

Commerce continued to use Malaysian data for oak log inputs, despite selecting Brazil as

the primary surrogate country.  As noted above, while Commerce prefers to use data from a

single surrogate country, it may use data from a secondary surrogate country if data from the

primary surrogate country are unavailable.  *See* IDM at 23 (citing *Jiaxing Brother Fastener Co,*

*v. United States*, 11 F. Supp. 3d at 1326, 1332 (Ct. Int'l Trade 2014)).  Here, Senmao used both

oak and non-oak logs as inputs during the period of review, and there are separate HTS

subheadings—and different prices—for oak and non-oak logs.  *See* P.R. 182 at tab "Include

Summary" (showing average unit price of $2,872.57 for subheading 4403.91, oak logs, and

$1,565.61 for subheading 4403.99, non-oak logs).  The Malaysian data on the record include

imports for logs under two HTS subheadings: 4403.91.1000 covering "Oak Wood In The Rough,

Whether Or Not Stripped Of Bark Or Sapwood Or Roughly Squared, Not Treated: Of Oak

(Quercus Spp.): Baulks, Sawlogs And Veneer Logs," and subheading 4403.99, "Nonconiferous

Wood In The Rough, Nesoi,[3] Whether Or Not Stripped Of Bark Or Sapwood Or Roughly

Squared, Not Treated."  *See* P.R. 182.  The Brazilian data on the record included imports under

HTS subheading 4403.99, but not under 4403.91.1000, despite the fact that oak logs have

historically been imported to Brazil under 4403.91.1000.  *See* P.R. 176 at PDF page 11 (period

of review imports under subheading 4403.99); P.R. 186 at Exhibit 1 (PDF pages 8-10) (showing

oak log imports to Brazil in 2015 and 2017, but not 2019-2020).  Accordingly, since HTS

subheading 4403.99 does not include oak logs, Commerce concluded that there was information

available on the record for non-oak log imports to Brazil, but not for oak log imports to Brazil.

*See* Second Remand Results at 14-15.  However, since there was no import data available for oak

---

[3]  The word "Nesoi" is used in tariff schedules to describe products "not elsewhere specified or indicated."  *See, e.g., Certain Steel Racks and Parts Thereof From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 35,595 (Dep't of Commerce July 24, 2019), and accompanying IDM at Comment 3 ("HTS number 7306.69 covers pipes, tubes, and hollow profiles of a non-circular cross section not elsewhere specified or indicated ('nesoi').  Since HTS number 7306.61 covers pipes, tubes, and hollow profiles of a square or rectangular cross section, HTS number 7306.69 is a "catch all" category for all non-circular, non-square, non-rectangular pipes and tubes.").

logs, Commerce valued oak logs using the available Malaysian data under subheading

4402.91.1000. *Id*.

Senmao asserts that Commerce should not have selected Brazil while using Malaysian

data to value oak logs. Senmao Br. at 4. However, the fact that a particular value may be

missing or unusable in the primary surrogate country does not preclude that country's selection

as the primary surrogate country. As the Court found in its first remand order, Commerce may

use surrogate values outside of the primary surrogate country when its data is either unavailable

or inadequate. *Jiangsu Senmao*, 651 F. Supp. 3d at 1355. Commerce made that showing here.

In particular, in Commerce's First Final Remand Results, Commerce explained why it was

appropriate to use an oak log surrogate value because there was no oak log value in the primary

surrogate country (Brazil). *See* Final Results of Redetermination Pursuant to Court Remand

(October 25, 2023), ECF. No 55 (First Final Remand Results), at 5-7.

Further, Commerce reasonably chose Brazil over Malaysia because the financial

statement from Duratex was contemporaneous with the period of review and from a producer of

a more similar product, as explained above. Senmao effectively asks this Court to substitute its

judgment for that of Commerce, and hold that it is more important to value oak logs from the

primary surrogate country than to use a contemporaneous financial statement from a producer of

comparable merchandise. This is precisely the sort of technical judgment call that Commerce is

best positioned to make. *See, e.g.*, *Daewoo Electronics Co., Ltd. v. United States,* 6 F.3d 1511,

1516 (Fed. Cir. 1993) (Commerce is "the 'master' of antidumping law . . . [and its

determinations are] worthy of considerable deference.") (citations omitted); *see also Fujitsu*

*Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) ("Antidumping and

countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

In particular, Senmao argues that logs are a major input and that using data from outside the primary surrogate country could have distortive effects due to its potential outsized impact. Senmao claims that the major input's impact thus outweighs the superior Brazilian financial statement when deciding whether to maintain or switch the primary surrogate country. In its remand results, Commerce noted that the Malaysian oak logs are specific to only two of the seven log inputs used in Senmao's production process, with the Brazilian logs left to value the remaining five. Second Remand Results at 15. In other words, Commerce is not replacing the major input in its entirety, as Senmao implies, but is using Malaysian log data to account for a fraction of the logs. Senmao Br. at 6-7. In addition, the only "distortion" Senmao relies on is the change in its dumping margin from previous reviews. *Id.* Senmao's comments contradict its own claim, as Senmao later says in the plywood argument that "Senmao's margin was still zero after the preliminary determination, even with Commerce's use of the Malaysian data to value log inputs." *Id.* at 11. In other words, Senmao's brief acknowledges that using the Malaysian oak log data does not have the claimed "outsized" impact. Additionally, dumping margins can and do change across reviews. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1356 (Fed. Cir. 2016) ("There is no basis to simply assume that the underlying facts or calculated dumping margins remain the same from period to period."). And Commerce cannot alter its methodologies in order to achieve a particular result. The Federal Circuit has rejected "inappropriately results-oriented" methodologies in the past. *Viraj Group v. United States*, 476 F. 3d 1349, 1358 (Fed. Cir. 2007).

Senmao also argues that Commerce should not have used Brazil as the primary surrogate country after determining to exclude the datapoint for plywood imports from Spain in January 2020. *See* Senmao Br. at 4. Senmao fails to explain how removing a single inaccurate datapoint from the dataset renders the entire dataset unusable or inaccurate. Again, this is a technical determination that is best left to Commerce, and Commerce has thoroughly explained its reasons for selecting Brazil, rather than Malaysia, in order to base its calculations on a contemporaneous surrogate financial statement from a company that makes a comparable product.

Senmao's citation to *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1376 (Ct. Int'l Trade 2014) also does not detract from Commerce's decision to select Brazil as the primary surrogate country. The very language quoted by Senmao states the use of a single surrogate country is preferable when "all other factors are 'fairly equal.'" Senmao Br. at 6 (quoting *Jacobi*, 992 F. Supp. 2d at 1376). Here, Commerce reasonably found the surrogate values available for oak logs were not fairly equal, because no Brazilian oak log data is available for the review period.

Lastly, we agree with Senmao that petitioner placed information on the record to value high density fiberboard under Malaysian HTS code 4411.92. *See* Senmao Br. at 4-5. While Commerce cited the valuation of high density fiberboard as additional support in the Second Remand Results, Commerce's selection of Brazil as a primary surrogate country did not hinge on this finding – as is evidenced by the fact that Commerce selected Brazil as a primary surrogate country in the final results and first remand results without addressing fiberboard. Rather, Commerce reasonably selected Brazil as the primary surrogate country based on its preference for relying on a contemporaneous financial statement from a producer of comparable merchandise. This determination is supported by substantial evidence and should be sustained.

III.    **Commerce's Minor Adjustment Of The Surrogate Value For Plywood Is In Accordance With The Court's Remand Order And Is Supported By Substantial Evidence And In Accordance With Law**

Commerce's decision to remove a single datapoint from the Brazilian plywood import data was also supported by substantial evidence. In its second remand order, the Court found that "Commerce failed to explain how Exhibit 9 demonstrates that a quantity of plywood expressed in $m^3$ cannot be the same quantity as expressed in kg{,}" and that "Commerce did not provide a reasonable explanation for how its removal of the Spanish import data led to a more accurate dataset, and Commerce did not establish how removing the Spanish import data would result in the best available information." *See* Second Remand Order at 1286. Commerce has addressed these issues in its Second Remand Results, and its determination should be sustained.

The data for imports of plywood from Spain in January 2020 showed the entries as having the exact same total mass in kilograms as volume in cubic meters. Preliminary Surrogate Value Memo at Attachment 1 (Sheet "Brazil – Calculated_SV_Data" at row 1886) (P.R. 211). Commerce determined that this could not be accurate based on Exhibit 9 of AMMWF's surrogate value comments. *See* IDM at 9-10; P.R. 180 at PDF pages 77-79. Exhibit 9A shows the density of various wood species, including birch, elm, and oak, from the website Engineering ToolBox, as well as standard conversion factors of wooden products from the Food and Agriculture Organization of the United Nations that is located immediately below the density table. P.R. 180 at PDF pages 77-79. The density for each type of log, as indicated in the right-side column of Exhibit 9A, is its mass in kilograms divided by its volume in cubic meters. If those values were equal, it would result in a density of one. However, Exhibit 9A shows that *all* species of logs have a density in the hundreds. In other words, the mass of wood in kilograms is always hundreds of times its density in cubic meters. Additionally, Exhibit 9B to AMMWF's surrogate value comments includes a chart that lists the density of plywood as 650 kilograms per

17

meters cubed.  *See* P.R. 180 at PDF page 87.  Given these numbers, it is evident that the

datapoint for imports of plywood from Spain to Brazil in 2020 must be an error if the value for

mass in kilograms is equal to the value for volume in cubic meters.

Further, removing the erroneous datapoint, which only represents a single month of

imports from a single country, results is a more reliable and accurate dataset.  The U.S. Court of

Appeals for the Federal Circuit has defined "accuracy" in the context of Commerce's

determinations as "correct as a mathematical and factual matter, thus supported by substantial

evidence."  *See Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016)

(*Nan Ya*).  In addition, what constitutes the "best" available information is a product-specific and

case-specific decision, and "the statute affords administrative discretion to examine various data

sources for determining the best available information."  *See Heze Huayi Chemical Co. v. United*

*States*, No. 17-00032, Slip Op. 18-57 (Ct. Int'l Trade 2018), at 3-4 (citing *Jiangsu Jiasheng*

*Photovoltaic Tech. Co., Ltd. v. United* States, 28 F. Supp. 3d 1317, 1336 (Ct. Int'l Trade 2014),

*and National Ford Chem Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)).  Relying

on data that is known to be incorrect cannot possibly produce a result that is more "correct as a

mathematical and factual matter."  *Nan Ya*, 810 F.3d at 1344.  Nonetheless, Commerce

reasonably found that the Brazilian import data for plywood remains the best available

information because of Commerce's preference for using data from the primary surrogate

country, and because the flaw in the data is limited to a very small and isolated subset of data

that can be easily removed.

Senmao asserts that Commerce's analysis ignores its practice and does not achieve a

more accurate result.  Senmao Br. at 7-12.  These arguments lack merit.  Commerce's statement

that the new dataset is more accurate and reliable is not conclusory, as this Court and the Federal

Circuit have found that accuracy and reliability are conditioned on mathematic and factual correctness. *See Nan Ya*, 810 F.3d at 1344 (Fed. Cir. 2016). By removing the erroneous Spanish plywood data, the dataset no longer includes mathematically and factually incorrect data and is thus more accurate and reliable, a logic sanctioned by this Court and the Federal Circuit. Nor has Commerce "ignored" the Court's finding that Commerce has a standard practice of considering whether the average unit value is aberrational in the aggregate. *Id*. at 8. As Commerce has previously explained, the aberrational in the aggregate practice does not apply here. *See* IDM at 9-10; Defendant's Response In Opposition To Plaintiff's And Plaintiff-Intervenor's Motions For Judgment Upon the Administrative Record, ECF No. 41, at 20-23. The aberrational in the aggregate test is aimed at identifying data that is aberrational—that is, unusually high or low values that are not necessarily inaccurate, but would not be appropriately representative surrogate values. Commerce only excludes data that is aberrational in the aggregate, rather than individual aberrational datapoints, because otherwise parties would cherry-pick unusually high or low values from within large datasets in order to skew the results in their favor. The aberrational in the aggregate test is therefore a matter of administrative convenience to "avoid the 'impossible task' of identifying and defining 'what is and what is not aberrational among…thousands of data points'…and to discourage cherry-picking and manipulation of data." *See Certain Corrosion Inhibitors from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 86 Fed. Reg. 7,532 (Dep't of Commerce Jan. 29, 2021), and accompanying IDM at Comment 2.

In this case, the issue is not whether a datapoint is "aberrational." Rather, the datapoint at issue its factually incorrect on its face, and cannot possibly contribute to an accurate result. Commerce did not need to identify and define what was aberrational among thousands of data

points; the clearly erroneous line item was easily discovered and removed.  Moreover,
Commerce has removed inaccurate subsets of data in the past.  *See Certain Activated Carbon
from the People's Republic of China: Final Results of Antidumping Duty Administrative Review;
2014-2015*, 81 Fed. Reg. 62,000 (Dep't of Commerce Sept. 8, 2016), and accompanying IDM at
Comment 5 (where Commerce removed French imports from the Thai import data).  And this
Court has found that even when considering aberrational data, Commerce may reasonably
remove aberrational values rather than only considering the data in the aggregate.  *See
Guangdong Chemicals Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365, 1370 (Ct. Int'l
Trade 2006) (stating that Commerce's "elimination of aberrational values has been held to be a
reasonable means for compensating for flaws in a data set") (citing *Hebei Metals & Minerals
Imp & Exp. Corp. v. United States*, 28 CIT 1 185, 2004 WL 1615597, at *12 (2004)).

  None of the examples cited by Senmao concern clearly erroneous line items.  Rather,
they concern instances where Commerce was determining whether particular values were too
high or low compared to others on the record and were therefore distortive, which is when the
aberrational in the aggregate test applies.  *See Crystalline Silicon Photovoltaic Cells, Whether or
Not Assembled Into Modules, From the People's Republic of China: Final Results of
Antidumping Duty Administrative Review and Final Determination of No Shipments; 2014-2015*,
82 Fed. Reg. 29,003 (Dep't of Commerce June 27, 2017), and accompanying IDM at 47-49;
*Certain Uncoated Paper From the People's Republic of China: Final Determination of Sales at
Less Than Fair Value*, 81 Fed. Reg. 3,112 (Dep't of Commerce Jan. 20, 2016), and
accompanying IDM at 17-19; *and Multilayered Wood Flooring From the People's Republic of
China: Final Results of Antidumping Duty Administrative Review and Final Results of New*

*Shipper Review; 2012-2013*, 80 Fed. Reg. 41,476 (Dep't of Commerce July 15, 2015), and accompanying IDM at 41-43.

Senmao argues that removing the datapoint significantly changed the plywood value, and therefore changed Senmao's dumping margin. But this does not suggest that removing the datapoint made Commerce's results less accurate. Rather, it is a circular argument that assumes, without justification, that the results were more accurate when they included a facially incorrect value. And this is another results-oriented argument that should be rejected.

Lastly, Senmao claims that Commerce ignored the Court's suggestion to reopen the record for parties to submit corrected plywood surrogate value data. Senmao Br. at 12. But this decision was left to Commerce's discretion, and it is not Commerce's general practice to reopen the record upon remand. *See* Second Remand Results at 24 (citing *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277-8 (Fed. Cir. 2012) (holding that the decision to reopen the record is left with Commerce)). Where parties have failed to correct a mistake in the submitted data during the course of the administrative proceeding, they should not be permitted to circumvent the administrative process and force Commerce to redo its calculations after the fact—once they receive an unfavorable rate—by bringing suit in this Court and seeking a remand. Further, the inaccurate datapoint originated from Global Trade Atlas, an independent source, not the parties themselves. *Id*.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand results and enter judgment in favor of the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

|                                            | PATRICA M. McCARTHY<br>Director                     |
|--------------------------------------------|-----------------------------------------------------|
|                                            | TARA K. HOGAN<br>Assistant Director                 |
| OF COUNSEL:<br>CHRISTOPHER KIMURA<br>Attorney<br>Office of the Chief Counsel<br>  for Trade Enforcement and Compliance<br>U.S. Department of Commerce<br>Washington, D.C.<br>Telephone:  (202) 482-0131 | KELLY M. GEDDES<br>Trial Attorney<br>Commercial Litigation Branch<br>Civil Division<br>Department of Justice<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C.  20044<br>Telephone: (202) 307-2867<br>Email: kelly.geddes2@usdoj.gov |
| Dated September 20, 2024                    | *Attorneys for Defendant*                           |

## **CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,363 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s Kelly Geddes
Kelly Geddes